**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

<table>
<tr><td>

**NUANCE COMMUNICATIONS, INC.,**

                **Plaintiff,**

     **v.**

**INTERNATIONAL BUSINESS**
**MACHINES CORPORATION**,

            **Defendant.**

</td><td>

**Case No: 16-cv-5173**
**ECF Case**

</td></tr>
</table>

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR**
**SUMMARY JUDGMENT**

QUINN EMANUEL URQUHART
& SULLIVAN, LLP
Richard I. Werder, Jr.
Kevin S. Reed
Elinor Sutton
Hope Skibitsky, *pro hac vice*
Florentina Dragulescu, *pro hac vice*
51 Madison Avenue, 22nd Floor
New York, New York 10010
Tel. (212) 849-7000
Fax (212) 849-7100

*Attorneys for Defendant*
*International Business Machines*
*Corporation*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ........................................................................................................3

I.      THE CREATION OF DEEPQA BY IBM RESEARCH.....................................3

II.     IBM LICENSES DEEPQA TO NUANCE........................................................4

III.    NUANCE'S EFFORTS TO COMMERCIALIZE DEEPQA.............................5

IV.   IBM'S COMMERCIALIZATION OF DEEPQA ............................................7

STANDARD OF REVIEW .........................................................................................9

ARGUMENT .............................................................................................................9

I.      SUMMARY JUDGMENT SHOULD BE GRANTED IN IBM'S FAVOR ON
       COUNTS I AND II BECAUSE THERE IS NO TRIABLE ISSUE
       CONCERNING NUANCE'S ENTITLEMENT TO MODIFICATIONS TO
       DEEPQA CREATED OUTSIDE OF IBM RESEARCH...................................10

      A.     The SLA Unambiguously Limits Nuance's License To Code "Owned By,
            Or That Has Been Developed Or Licensed By IBM Research"............................10

      B.     Even If The SLA Was Ambiguous, The Extrinsic Evidence Conclusively
            Shows That The Parties Did Not Intend For Nuance To Receive SWG
            Work Product .................................................................................................14

            1.     IBM, With Nuance's Knowledge, Maintained A Firewall Between
                  IBM Research And SWG Regarding DeepQA.........................................14

            2.     Nuance's Internal Documents Evidence Its Understanding That Its
                  License Was Limited To IBM Research Code .........................................16

            3.     Nuance Understood That IBM Research Did Not Have The
                  Authority To License SWG Code.............................................................17

II.     SUMMARY JUDGMENT SHOULD BE GRANTED IN IBM'S FAVOR ON
       COUNT III BECAUSE THERE IS NO TRIABLE ISSUE AS TO A BREACH
       OF THE IMPLIED COVENANT OF GOOD FAITH .....................................19

      A.     Nuance's Breach Of Implied Covenant Claim Must Be Dismissed As
            Duplicative.....................................................................................................19

      B.     There Is No Triable Issue As To The Breach Of An Implied Promise.................20

III.    NUANCE'S CLAIMS ARE TIME-BARRED UNDER THE CONTRACT...................22

IV.   IN THE ALTERNATIVE, THIS COURT SHOULD GRANT PARTIAL
       SUMMARY JUDGMENT AGAINST NUANCE ON ALL CLAIMS TO CODE
       NOT DERIVED FROM DEEPQA.................................................................24

CONCLUSION.........................................................................................................26

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Ariz. State Bd. for Charter Schs. v. U.S. Dep't of Educ.*,
464 F.3d 1003 (9th Cir. 2006) ................................................. 12

*Berry v. Marchinkowski*,
137 F. Supp. 3d 495 (S.D.N.Y. 2015) ....................................... 9

*Blue Jeans U.S.A. Inc. v. Basciano*,
729 N.Y.S.2d 703 (N.Y. App. Div. 2001) ................................ 14

*Caring Habits, Inc. v. Fund for the Public Interest, Inc.*,
No. 11-5768, 2014 WL 7146041 (S.D.N.Y. Dec. 13, 2014) ............................ 12, 13

*Dalton v. Educ. Testing Serv.*,
663 N.E.2d 289 (N.Y. 1995)............................................. 20, 22

*Freidman v. General Motors Corp.*,
721 F. Supp. 2d 218 (2d Cir. 2010) .................................... 11, 14

*Global Reins. Co. of Am. v. Century Indem. Co.*,
91 N.E.3d 1186 (N.Y. 2017)................................................ 20

*Long v. Marubeni Am. Corp.*,
No. 05-0639, 2006 WL 1716878 (S.D.N.Y. June 20, 2006) ................. 20

*Manley v. AmBase Corp.*,
337 F.3d 237 (2d Cir. 2003) ............................................. 14

*Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*,
906 F.2d 884 (2d Cir. 1990) ........................................... 10, 11

*Murphy v. Am. Home Prods. Corp.*,
448 N.E. 2d 86 (N.Y. 1983)............................................... 21

*Paraco Gas Corp. v. Travelers Cas. and Sur. Co. of Am.*,
51 F. Supp. 3d 379 (S.D.N.Y. 2014) ..................................... 20

Defendant International Business Machine Corporation ("IBM") respectfully submits this memorandum of law in support of its motion for summary judgment in its favor on all claims asserted by Plaintiff Nuance Communications, Inc. ("Nuance").

## PRELIMINARY STATEMENT

In February 2011, the world was amazed when an IBM computer system appeared as a contestant on the television game show *Jeopardy!* and trounced two of its most famous champions. The computer system, which was created by the IBM Research Group ("IBM Research"), competed under the name "Watson."  Just as IBM's Deep Blue had been a stunning advance in artificial intelligence when it beat the reigning world chess champion, Gary Kasparov, in 1997, Watson was likewise hailed as a remarkable advance in cognitive computing, the science of making computers mimic human thought processes.

In September 2010, as Watson was nearing readiness for its historic television appearance, IBM agreed to license the source code that ran the system – known as DeepQA – to Nuance.  The express purpose of the license was to allow Nuance to further develop the DeepQA code, which then represented the leading edge in computerized question-and-answer technology, and incorporate it into commercial products Nuance would sell.  Nuance paid IBM ███████ for those rights.  The license left IBM free to make its own efforts to commercialize DeepQA and gave Nuance no right to share in the benefits of those efforts, unless otherwise agreed.

When it took the license, Nuance had what it believed to be a world-class team of computer scientists with the ability to extract value from DeepQA.  What Nuance did not have, however, was a clear plan for *how* it would do that.  It did not have a specific product or industry in mind, only a raft of avenues to explore.  Some within Nuance were skeptical as to whether Nuance could do *anything* useful with the code.  Without a clear plan, Nuance's efforts to commercialize DeepQA floundered and, by 2014, they had been largely abandoned.

This lawsuit is the manifestation of Nuance's buyer's remorse.  Stung by its inability to generate a return on its investment in DeepQA, Nuance asks the Court to create one for it by ordering IBM to provide Nuance with other valuable source code comprising the work product of IBM's business units that commercialize products in the cognitive computing space.  Nuance advances two conflicting theories to secure that result, both of which are spurious.

*First,* Nuance asserts claims for declaratory judgment and breach of contract in which it maintains that its license extends to any and all code developed anywhere within IBM's global organization that is derived from the licensed DeepQA code.  This claim cannot be squared with the plain and unambiguous language of the license agreement, which expressly restricts the license to code "that is owned by, or that has been developed or licensed *by IBM Research Group*" (emphasis added).  Moreover, even if the license was not clear on that point, the parties' conduct – detailed below – would resolve any ambiguity by making clear that both parties understood it that way and that Nuance's claim to the contrary is self-serving revisionist history.

*Second,* notwithstanding its claim that its license entitles it to the work product of all of IBM's business units, Nuance claims that IBM impliedly promised in the license agreement that its business units responsible for commercializing code would not work to improve DeepQA and that all such work would be done within IBM Research (and thus accrue to Nuance).  This implied covenant claim is both legally and factually unsustainable.  It is legally unsustainable because it is a duplicative reframing of Nuance's breach of contract claim, and it is factually unsustainable because Nuance – which has the burden – has adduced no evidence whatsoever that it actually understood the license agreement to include such a promise or that a reasonable person in its position would have done so.

All of these claims, moreover, are time barred under the parties' agreement, which provides that any claims arising therefrom must be brought no more than two years from the time they have accrued and been discovered.  Nuance filed this complaint in June 2016, alleging that IBM had failed to deliver all of the code to which Nuance was entitled under its license.  As detailed below, documentary evidence establishes beyond dispute that Nuance knew it was not receiving the code to which it now claims an entitlement no later than 2012, *i.e.*, at least *four* years before filing this action.  Its claims here fail for that independent reason, as well.

Buyer's remorse is not a viable cause of action, and neither are the claims Nuance has pled in an effort to circumvent that fact.  The Court should grant summary judgment in IBM's favor.

## BACKGROUND

### I.    THE CREATION OF DEEPQA BY IBM RESEARCH

IBM Research is one of the world's foremost computer science research labs.  It is a stand-alone unit within IBM with a dual mission to advance the field of computer science and develop technologies that IBM's commercial divisions can incorporate into products and services for sale.[1]

IBM periodically tasks IBM Research with solving a Grand Challenge, a multi-year goal to solve a problem thought to be near unsolvable.  In the 1990s, the Grand Challenge was to build a computer that could beat the world chess champion, and the result was Deep Blue.  Around 2007, the Grand Challenge was to build a computer system that used natural language and mimicked how humans think.  Extending the game theme of Deep Blue, the goal was refined to building a computer capable of playing and winning *Jeopardy!*, and this time the result was DeepQA.

---

[1]    Defendant's Statement of Undisputed Material Facts ("SOF") ¶ 1; Ex. 1 (King Tr.) at 96:2-7; Ex. 2 (Reardon Tr.) at 26:13-24, 27:11-20, 33:19-34:7.  Unless otherwise indicated, all Exhibit numbers cited herein refer to exhibits to the Declaration of Kevin S. Reed ("Reed Decl.").

DeepQA is a question-answering system, designed (broadly speaking) to accept an input in the form of a natural language question, access and search a body of information, rank possible answers, and return the correct one.[2]  DeepQA appeared on *Jeopardy!* under the moniker "Watson"—an homage to IBM's long-time chairman and CEO, Thomas J. Watson.  Two famous *Jeopardy!* champions, Ken Jennings and Brad Rutter, played against Watson in matches broadcast on February 14 through 16, 2011.  DeepQA won both matches, more than tripling the next-closest contestant's score each time.[3]

## II.   IBM LICENSES DEEPQA TO NUANCE

IBM Research does not sell or develop commercial products, but it does seek to generate revenue in order to fund itself.  Among the ways it does this is by licensing technologies it develops.[4]  In the fall of 2010, as DeepQA was being readied for its *Jeopardy!* appearance, IBM Research decided to license DeepQA.  IBM Research executives approached Nuance, with which IBM Research had previously entered into licensing agreements, and the parties began negotiating.

On September 30, 2010, Nuance and IBM signed a software license agreement in respect of DeepQA (the "SLA").[5]  The SLA states in its first paragraph that the parties to the agreement were Nuance and IBM "through its IBM Research Group."[6]  The SLA states in its third paragraph that its purpose was to grant Nuance a perpetual license to "an Automatic Open-Domain Question

---

[2]   SOF ¶ 3; Ex. 3 (Brown Tr.) at 16:22-17:6, 21:5-22:12.

[3]   SOF ¶¶ 22-24; John Markoff, *Computer Wins on 'Jeopardy!': Trivial, It's Not*, THE NEW YORK TIMES (Feb. 16, 2011), https://www.nytimes.com/2011/02/17/science/17jeopardy-watson.html.

[4]   SOF ¶ 2; Ex. 2 (Reardon Tr.) at 71:5-13; Ex. 4 (Cox Tr.) at 111:2-20.

[5]   SOF ¶ 11; Ex. 5.

[6]   SOF ¶ 12; Ex. 5 at 10734.

Answering software system [i.e., DeepQA] . . ., which Nuance may use to develop and commercialize its own products."[7]  The negotiated price for the license was ▆▆▆▆▆▆.[8]

## III.   NUANCE'S EFFORTS TO COMMERCIALIZE DEEPQA

When the SLA was executed, DeepQA was an extremely valuable, cutting-edge computerized question-answering technology that represented years of work by some of the country's best computer scientists.[9]  Nuance understood, however, that DeepQA was research code, meaning it required significant further development before it *might* be ready for commercial use.[10]  Nuance had what it believed to be a first-class team of computer scientists capable of further developing the code.[11]  The parties also contemplated the possibility of doing further development work together, as reflected in Articles 2.8 and 2.9 of the SLA, which provide that the parties would "begin [] negotiating in good faith" a separate joint research agreement to further develop DeepQA and a separate joint research and development agreement to "develop IBM and/or Nuance branded products or services using" DeepQA.[12]  Nonetheless, Nuance understood from the outset that its

---

[7]  SOF ¶ 13; Ex. 5 at 10734-35.

[8]  SOF ¶ 14; Ex. 5 at 10739.

[9]  SOF ¶ 4; Ex. 3 (Brown Tr.) at 154:25-155:18 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆; Ex. 6 (Sejnoha Tr.) at 61:2-4 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆.

[10]  SOF ¶ 6; Ex. 6 (Sejnoha Tr.) at 60:13-62:13.

[11]  SOF ¶ 53; Ex. 7 (McCann Tr.) at 91:24-93:2; Ex. 8 (Stubley Tr.) at 28:12-17.

[12]  SOF ¶ 17; Ex. 5 at 10737-38.  Ultimately, no agreement to develop commercial products was concluded.  Ex. 9 at 35609.

investment in DeepQA was a risky one.[13]  Nuance's internal documents show that its executives

knew that there were ███████████████████████████[14]███████████████████████

███████████████████[15]███████████████████████████████████████████

███████████████████████[16]

    Nuance exacerbated these risks by failing to have a plan to exploit DeepQA in place when

it signed the SLA.  ███████████████████████████████████

████████████████████████████████████████████

██████████████████████████████[17]  Joseph Petro, a

Senior Vice President of Engineering at Nuance, opined in that same period that the ████████

████████████████████████████████████████████

██████████████[18]

    As late as a full year after the SLA was executed, Nuance employees were *still*

brainstorming appropriate use cases for the development of DeepQA.[19]  And, as early as January

---

[13]  SOF ¶ 49; Ex. 6 (Sejnoha Tr.) at 61:21-62:4 (testifying ██████████████████████
████████████████████████).

[14]  SOF ¶ 48; Ex. 10.

[15]   SOF ¶¶ 46, 52; Ex. 11 at 9157 (████████████████████████████████
████████████████████); Ex. 12 at 29905 ███████████████████████
████████████████████).

[16]  SOF ¶ 48; Ex. 10.

[17]  SOF ¶ 44; Ex. 13 at 27530-31.

[18]  SOF ¶¶ 45, 47; Ex. 13 at 27529-30; *see also* Ex. 14 (Sept. 29, 2010 e-mail from Ms.
McCann to Mr. Ricci ████████████████████████).

[19]  SOF ¶ 51; Ex. 15; *see also* Ex. 16 (Gallpoyn Tr.) at 107:16-20 (████████████████
████████████████████████████████).

2011, Nuance engineers ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████[20] Ultimately, in April 2013,

less than three years after the SLA was signed, Nuance ████████████████[21]

## IV.   IBM'S COMMERCIALIZATION OF DEEPQA

Nothing in the SLA precluded IBM from undertaking its own efforts to commercialize DeepQA, and it quickly moved to do so.[22]  In 2011, following the sensation created by Watson's appearance on *Jeopardy!*, IBM assigned responsibility for commercializing DeepQA to the IBM Software Group ("SWG"), which was the business unit responsible for developing and marketing IBM's software products.[23]

As a first step toward commercialization, SWG "bluewashed" the DeepQA code.[24] Code developed for research purposes is fundamentally different than code developed for a product.[25] Researchers, unconcerned with creating something for sale, may employ open-source code or other code that IBM does not have the right to sell.  Moreover, researchers primarily concerned with creating code that functions as intended may not take the time to create something that functions in the most efficient or stable manner; the result may be what is evocatively described as spaghetti code.  The bluewashing process is designed to remedy these issues and "harden" the code.  Code

---

[20]   SOF ¶ 50; Ex. 17 at 1962; Ex. 18 at 1954.

[21]   SOF ¶ 54; Ex. 19.

[22]   SOF ¶ 18; Ex. 20 at 5561.

[23]   SOF ¶¶ 25-26; Ex. 21 (Rhodin Tr.) at 52:22-53:5; Ex. 3 (Brown Tr.) at 30:8-17.

[24]   SOF ¶ 32; Ex. 22 (Boloker Tr.) at 55:12-57:8.

[25]   Ex. 4 (Cox Tr.) at 111:8-20.

that IBM does not have the right to sell and control is removed, and spaghetti code is cleaned up and rewritten to optimize performance and stability.  In the case of DeepQA, █████████



[26]

.[27]

.[28]  Very quickly, however, the effort to commercialize DeepQA expanded into an effort to build a much broader cognitive computing business under the brand name "Watson."[29]  In August 2011, IBM created its Watson division within SWG, and during the ensuing years, developers in the Watson division, and later in the independent Watson Group business unit, developed and acquired an array of new cognitive computing technologies and products that share no common lineage and/or common functionality with DeepQA.[30]

---

[26]  Ex. 22 (Boloker Tr.) at 84:22-85:11.

[27]   SOF ¶ 33; Ex. 23 (High Tr.) at 40:9-15 ████████████████████████████████ ████████████████████████████████████████████████ .

[28]   Ex. 23 (High Tr.) at 41:22-42:4, 62:10-13 (Watson Engagement Advisor), 72:23-73:16 (Watson Discovery Advisor), 88:7-9 (Watson for Oncology).

[29]   Ex. 23 (High Tr.) at 44:4-10.

[30]   Ex. 24 (Kelly Tr.) at 64:20-70:4.  These include, among others, Document Conversion, Discovery, Natural Language Understanding, Natural Language Classifier, Retrieve and Rank, Tone Analyzer, Watson Explorer, and Watson Knowledge Studio.

**STANDARD OF REVIEW**

"Summary judgment is appropriate where the movant shows that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' . . . 'However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015).

**ARGUMENT**

The SLA provides that Nuance's license extends to the source code comprising DeepQA, as well as "modifications, updates, upgrades, error corrections, [and] bug fixes [collectively, "Modifications"]," to that source code that IBM Research may create for a ███████ period. Nuance asserts in Counts I and II of its Complaint that the SLA further and expressly extends its license to Modifications to DeepQA created by SWG and any other business unit responsible for developing commercial products within IBM.  Count I thus seeks a declaratory judgment that IBM is required to deliver to Nuance all Modifications to DeepQA "regardless of where they are developed," and Count II seeks an order of specific performance to that effect.  Count III contradictorily alleges that IBM impliedly promised that business units outside of IBM Research would *not* create Modifications to DeepQA and breached the covenant of good faith and fair dealing by allowing them to do so and refusing to give their work product to Nuance.

IBM is entitled to summary judgment on all these claims.  With respect to Counts I and II, the SLA expressly restricts Nuance's license to source code "that is owned by, or that has been developed or licensed by IBM Research Group" and thereby excludes code developed by any other divisions of IBM.  Were there any ambiguity on that point (and there is not), the extrinsic evidence makes clear that both parties intended that result in the SLA.  As to Count III, Nuance's implied

9

covenant claim is invalid as a matter of law because it is a duplicative reframing of its breach of contract claim.  Summary judgment for IBM on Count III is also required because Nuance has failed to adduce evidence that a reasonable person would have understood the SLA to include an implied promise that IBM would not develop Modifications to DeepQA outside of IBM Research.  Indeed, the evidence is unequivocal that Nuance did *not* understand the SLA to include any such promise.  Finally, and independently, summary judgment should be granted to IBM on all of Nuance's claims because Nuance missed a contractually-mandated deadline to bring its claims by at least two years.

I.   **SUMMARY JUDGMENT SHOULD BE GRANTED IN IBM'S FAVOR ON COUNTS I AND II BECAUSE THERE IS NO TRIABLE ISSUE CONCERNING NUANCE'S ENTITLEMENT TO MODIFICATIONS TO DEEPQA CREATED OUTSIDE OF IBM RESEARCH**

   A.   **The SLA Unambiguously Limits Nuance's License To Code "Owned By, Or That Has Been Developed Or Licensed By IBM Research"**

The foundational premise of Counts I and II – that the SLA entitles Nuance to Modifications to DeepQA created outside of IBM Research – is contrary to the unambiguous language of the SLA.

Under New York law, "[c]ontract language is unambiguous if it has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'"  *Metro. Life Ins. Co. v. RJR Nabisco, Inc*., 906 F.2d 884, 889 (2d Cir. 1990).  "Language whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation."  *Id.*  Courts should reject parties' interpretations of contractual language where such interpretations "would 'strain[ ] the contract language beyond its reasonable and ordinary meaning.'"  *Id.* (alteration in original).  Where "a contract is unambiguous, its interpretation is a question of law

and summary judgment is appropriate."  *Freidman v. Gen. Motors Corp.*, 721 F. Supp. 2d 218, 225 (2d Cir. 2010).

Applying these non-controversial principles here, summary judgment in IBM's favor on Counts I and II is required because the SLA unambiguously excludes code developed outside of IBM Research from Nuance's license.  There is no dispute that the SLA grants Nuance a license to – and only to – a set of source code defined as "the Licensed IBM Background Software."[31] The "Licensed IBM Background Software," in turn, is defined in Schedule A, in pertinent part, as

> all Software that exists as of the Effective Date in all available formats (including Source Code and Object Code) that is owned by, or that has been developed or licensed by IBM Research Group . . . and that is listed on Exhibit A [i.e., the DeepQA source code], **including** any modifications, updates, upgrades, error corrections, bug fixes, diagnostic and/or testing tools . . . and other changes, if available ("Modifications"), and if such Modifications are not contractually prohibited under a Third Party agreement, and such Modifications are available, will be timely provided to Nuance; and where the Modifications continue to meet the scope contemplated in Article 2.1 regarding the licensing of DeepQA under this Agreement, as of the Effective Date and thereafter ▮▮▮▮▮▮▮▮▮ and additional Software as agreed by the parties, provided to Nuance by IBM under the Agreement (collectively "Updates").[32]

The latter part of this definition apparently became a bit garbled as the parties rushed to complete the agreement before the quarter ended on September 30, 2010, but it is clear and unambiguous in limiting the SLA to (i) a defined set of code "that is owned by, or that has been developed or licensed by IBM Research Group," and (ii) any additional software the parties agreed IBM would provide to Nuance under the terms of the agreement (yellow highlighting).[33]  The code licensed to Nuance that is owned, developed, or licensed by IBM Research is limited to (i) a set of files comprising the DeepQA system, listed on Exhibit A to the SLA (purple); (ii) any

---

[31]   SOF ¶ 13; Ex. 5  at 10735.

[32]   SOF ¶ 15; Ex. 5 at 10986 (emphasis added).

[33]   Nuance makes no claim that IBM agreed to include any such "additional software."

Modifications to any files listed on Exhibit A existing as of the execution of the SLA (blue); and (iii) any Modifications to any files listed on Exhibit A created during the ███ period following the effective date of the SLA (green).

Contrary to Nuance's claim, the definition of Licensed IBM Background Software makes clear that the Modifications to which Nuance is entitled are only those comprising software owned, developed, or licensed by IBM Research and not Modifications created elsewhere within IBM. This is evident from the use of the word "including" (**bold blue**) which establishes that the Modifications described by the words that follow are *a subset of the IBM Research code being licensed*, not an expansion of the license to code developed outside of IBM Research. Courts have recognized that "[i]n both legal and common usage, the word 'including' is ordinarily defined as a term of illustration, signifying that what follows is an example of the preceding principle." *Ariz. State Bd. for Charter Schs. v. U.S. Dep't of Educ.*, 464 F.3d 1003, 1007 (9th Cir. 2006). This Court, in particular, has rejected interpretations of "including" in contractual language that would allow for the reading of the preceding principle and the example as separate and additional components. Thus, in *Caring Habits, Inc. v. Fund for the Public Interest, Inc.*, No. 11-5768, 2014 WL 7146041, at *5 (S.D.N.Y. Dec. 13, 2014), the court rejected a claim that a contract allowing for early termination if there was a "repeated and marked deterioration" in a party's level of service, "including untimely reporting or recurring errors," required the terminating party to show "a 'deterioration' in addition to 'recurring errors.'" As the court explained, "[c]ourts interpreting contract language have noted that the word 'including' is definitional, and is 'designed *to broaden the concept being defined*.'" *Id* (emphasis added).

In arguing that it is entitled to Modifications created anywhere within IBM, Nuance ignores the import of the word "including" in the definition of "Licensed IBM Background Software." It

also ignores the fact that the very first sentence of the SLA recites that IBM entered into the agreement "through its IBM Research Group," which further shows that the parties intended for Nuance to license only code developed by IBM Research.  To support its contrary interpretation, Nuance relies upon a phrase at the very the end of the definition of Licensed IBM Background Software: "provided to Nuance by IBM under the Agreement."[34]  Nuance argues that this phrase creates an obligation for IBM to provide Nuance Modifications created anywhere within the global IBM organization, but the phrase does not and was not intended to carry that much weight.

A plain reading of the definition of Licensed IBM Background Software makes clear that the words "provided to Nuance by IBM under the Agreement" do not purport to define *what* code is licensed to Nuance; they merely specify *who* will deliver *a specified set of code* to Nuance.  The "who" is IBM, because IBM owns all of the code developed by its divisions and is thus the only entity with authority to deliver such code.[35]  The specified set of code is "additional software as agreed by the parties."  That is the phrase the words "provided to Nuance by IBM under the Agreement" immediately follow and modify.  Those words do not broaden or otherwise modify the earlier term "Modifications," as Nuance urges.  It would be nonsensical to specify that Modifications are provided to Nuance "under the Agreement," because Modifications are expressly stated to be licensed to Nuance in the previous sentence and, because of that, must be provided to Nuance under the Agreement.  To specify that again at the end of the definition would be superfluous, and such a reading is therefore disfavored under New York law.  *See Manley v. AmBase Corp.*, 337 F.3d 237, 250 (2d Cir. 2003) (rejecting contractual interpretation "as contrary to New York law, which disfavors interpretations that render contract provisions . . . superfluous").

---

[34]  Ex. 7 (McCann Tr.) at 125:21-126:14.

[35]  SOF ¶ 20; Ex. 5 at § 1.2, 10734 (noting that the code "is owned by IBM"); Ex. 4 (Cox Tr.) at 102:24-25 ("IBM is a corporation, owns the IP, and therefore it has a delivery obligation.").

Thus, read properly, the language upon which Nuance relies merely provides that the parties can agree that IBM will provide Nuance with additional software – *i.e.*, software that it is not already obligated to provide – under the terms of the SLA.[36]

Because the "four corners" of the SLA reflect the parties' unambiguous intent to license specific code "owned[,] . . . developed[,] or licensed by IBM Research Group," including such Modifications to that code that IBM Research owns, develops, or licenses, the interpretation of the SLA "is a question of law and summary judgment [in IBM's favor] is appropriate." *Freidman*, 721 F. Supp. 2d at 225.

**B.     Even If The SLA Was Ambiguous, The Extrinsic Evidence Conclusively Shows That The Parties Did Not Intend For Nuance To Receive SWG Work Product**

Even if the terms of the SLA were ambiguous, the extrinsic evidence would confirm that IBM's reading of the SLA is correct. *See Blue Jeans U.S.A. Inc. v. Basciano*, 729 N.Y.S.2d 703, 705 (N.Y. App. Div. 2001) (holding that when a term is ambiguous, extrinsic evidence "may be considered 'to elucidate the disputed portions of the parties' agreement'").

**1.     IBM, With Nuance's Knowledge, Maintained A Firewall Between IBM Research And SWG Regarding DeepQA**

Virtually from the inception of IBM's efforts to commercialize DeepQA, IBM maintained a firewall between IBM Research and SWG in regards to DeepQA.  The firewall prohibited SWG personnel from collaborating with IBM Research personnel on matters relating to DeepQA or the Watson Core.[37]  IBM erected the firewall because of a concern that, if SWG consulted with IBM

---

[36]     Section 2.4 of the SLA, which references the possibility that "IBM" may provide Modifications likewise merely reflects that IBM will be the legal entity providing that code and does not purport to address what code must be provided.

[37]     SOF ¶¶ 34-36; Ex. 25 at 23986-89; Ex. 26 at 27749.

14

Research on work relating to the Watson Core, Nuance might claim that the SWG work in question had been developed by IBM Research and was thus within the scope of Nuance's license.[38]

██████████████████████████████████████████████████████

████████████████████████████████████████[39]  As a result, in August 2011, IBM sent Nuance a proposed amendment to the SLA to make the firewall unnecessary by clarifying that the mere fact that IBM Research employees consulted with SWG employees would not bring the work of the latter within the scope of the SLA.[40]  The proposed amendment, which Nuance rejected, provided that software "written by IBM employees that are not IBM Research Group employees shall not be considered 'Licensed IBM Background Software' even if such non-IBM Research Group employees consult with IBM Research Group employees in the course of their work on such Software."[41]

Nuance was aware of the firewall and the problems it was creating for IBM and understood that the proposed amendment of the SLA was designed to alleviate them.  In a January 2013 memorandum to her CEO, Nuance's Jeanne McCann wrote, "████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████

---

[38]   SOF ¶ 36; Ex. 25 at 23986; Ex. 26 at 27749; Ex. 1 (King Tr.) at 117:3-18.

[39]   SOF ¶ 37; Ex. 27 (McQueeney Tr.) at 94:14-95:5 (testifying that ████████████ ████████████████████████████████████████████████████ Ex. 3 (Brown Tr.) at 186:11-16 (testifying that he ████████████████████████ ████████████████████

[40]   SOF ¶¶ 38-39; Ex. 28 at 1695.

[41]   SOF ¶ 38; Ex. 28 at 1696.

████████████████████████████████████."[42]  Tellingly, Nuance never said anything to IBM to the effect of, "Why are you bothering with a firewall?  The SLA gives Nuance the right to SWG's work whether they consult with IBM Research or not."[43]  Instead, Ms. McCann suggested to Mr. Ricci that the ambiguity IBM perceived in the SLA concerning the impact of consultations between IBM Research and SWG was ███████████████████████████."[44]

The critical point, of course, is that there would have been no reason for any of this – not the firewall, not the proposed amendment to the SLA, not Nuance's strategizing about how to leverage the problems the firewall created for IBM – *unless the parties were operating on the understanding that the SLA did not entitle Nuance to SWG's work product*.  The only reason for IBM to protect against bringing SWG work product within the scope of Nuance's license, in other words, is that the license did not already include SWG's work product.  Likewise, had Nuance believed that it was entitled to source code created by SWG, it unquestionably would have demanded that IBM take down the firewall (to improve the quality of the work product) instead of trying to leverage the problems it created for IBM.  Thus, the firewall and events related to it are powerful evidence against Nuance's claims.

## 2. Nuance's Internal Documents Evidence Its Understanding That Its License Was Limited To IBM Research Code

Though Nuance now claims that the SLA gives Nuance rights to Modifications created anywhere within IBM, on at least three occasions before filing this lawsuit, Nuance executives involved in negotiating the SLA ████████████████████████████████████

---

[42]  SOF ¶ 41; Ex. 29 at 18482; *see also* Ex. 1 (King Tr.) at 115:9-21.

[43]  SOF ¶ 42.

[44]  SOF ¶ 43; Ex. 30 at 35656.

██████████████████████████████. On September 30, 2010, the day the SLA was signed, Nuance's CEO, Paul Ricci, presented the deal to the board of directors, describing the ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[45]  In preparing to update the board five months later, in February 2011, Nuance executives prepared a presentation again stating that █████████████████████████████████[46]  Even in 2013, ████████████████████████████████, *see infra* pp. 22-24, Nuance executives continued to characterize the SLA as entitling Nuance only to ████████████ ██████████████████████[47]  Similarly, in materials created to prepare their CEO to discuss DeepQA with IBM, Nuance executives described the SLA as ███████████████████ ██████████████████████████████[48]  Not surprisingly, Nuance's witnesses testified that they took pains to communicate accurately with the company's board of directors and CEO.[49]  Accordingly, these pre-litigation, internal communications making clear that Nuance understood it had licensed only IBM Research's work strongly rebut Nuance's claims.

### 3.  Nuance Understood That IBM Research Did Not Have The Authority To License SWG Code

As noted previously, *see* p. 4, *supra*, the first sentence of the SLA states that IBM is entering into the agreement "through its IBM Research Group," and as detailed immediately above, Nuance executives █████████████████████████████████████████████████

---

[45]  SOF ¶ 57; Ex. 31 at 18328 (emphasis added).

[46]  SOF ¶ 58; Ex. 32 at 36259 (emphasis added).

[47]  SOF ¶ 59; Ex. 33 at 18214 (emphasis added).

[48]  SOF ¶ 60; Ex. 30 at 35656 (emphasis added).

[49]  SOF ¶ 62; Ex. 7 (McCann Tr.) at 106:21-24, 203:1-5; Ex. 34 (Ricci Tr.) at 61:8-13.

███████████████████████████████. That is significant for the additional reason that Nuance understood that IBM Research did not have the authority to license code developed by SWG and so could not have expected the SLA to give them rights to work created by SWG.

In an email that pre-dates the signing of the SLA, Ellen Cox, the IBM attorney responsible for negotiating the SLA, unequivocally advised Nuance's attorney with whom Ms. Cox negotiated the SLA that IBM Research "simply do[es] not have the 'power' to commit code that is owned by another division."[50]  Ms. Cox further testified that Nuance was very much aware of that after having negotiated numerous licensing deals with IBM Research.[51]  More importantly for summary judgment purposes, Nuance's documents confirm its understanding on this point.  Specifically, in an email chain bridging the day before and day of the signing of the SLA, ████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████,"[52]

There is no evidence in the record to suggest that SWG agreed to give Nuance rights in its future work on DeepQA through the SLA or that Nuance had any basis to believe it had done so. The evidence, in fact, is all to the contrary, as in addition to the internal Nuance emails indicating

---

[50]   SOF ¶ 9; Ex. 35.

[51]   SOF ¶ 5; Ex. 4 (Cox Tr.) at 100:4-15.  This was reinforced during negotiations.  Ex. 2 (Reardon Tr.) at 137:15-17 ("We told [Nuance], as I recall, that they would get the updates that IBM Research was doing[.]"); Ex. 4 (Cox Tr.) at 46:7-21 ("[A]nother consistent theme throughout all of this is that this was a [R]esearch agreement and this wasn't an agreement with any other division in the company.").

[52]   SOF ¶ 10; Ex. 36 at 30610 (capitalization changed).

████████████████████████████████, every IBM witness who was asked testified that the SLA was intended to license only code created by IBM Research.[53]  Moreover, it was not until months *after* the SLA was executed that IBM decided that SWG would work on DeepQA.[54]  Nuance's claim thus boils down to the illogical notion that, through the SLA, SWG agreed to license future work of an unknown nature that it did not even know it would be developing.

## II.   SUMMARY JUDGMENT SHOULD BE GRANTED IN IBM'S FAVOR ON COUNT III BECAUSE THERE IS NO TRIABLE ISSUE AS TO A BREACH OF THE IMPLIED COVENANT OF GOOD FAITH

### A.   Nuance's Breach Of Implied Covenant Claim Must Be Dismissed As Duplicative

In Count III, Nuance asserts that IBM breached the covenant of good faith by developing Modifications in SWG.  ECF No. 6, ¶ 49.  However, though labeled differently, this claim is just a differently-clad version of the breach of contract claim Nuance pleads in Count II.  Whereas Count II alleges that IBM breached an express contractual obligation "to deliver *all [Modifications] of [DeepQA]*," *see id.* ¶ 44, Count III asserts that IBM "split[] the ongoing development of DeepQA into two code bases, with valuable code improving the functionality of the DeepQA software developed outside of IBM Research Group, in an attempt to deprive Nuance of the benefit of its bargain," *i.e.*, the right to receive *all Modifications of DeepQA*, *see id.* ¶ 44.

Both claims thus arise from the same contract (the SLA), allege the same harm (IBM's refusal to deliver DeepQA Modifications developed by SWG), and seek the same remedy (delivery of these withheld alleged Modifications).  Count III, therefore, is improperly duplicative, and summary judgment for IBM should be granted on that basis.  "New York law 'does not recognize

---

[53]   Ex. 4 (Cox Tr.) at 52:20-25; Ex. 1 (King Tr.) at 82:6-17; Ex. 2 (Reardon Tr.) at 135:14-136:10; Ex. 22 (Boloker Tr.) at 40:4-12; Ex. 3 (Brown Tr.) at 149:6-11; Ex. 27 (McQueeney Tr.) at 103:24-104:15; Ex. 21 (Rhodin Tr.) at 48:19-23.

[54]   SOF ¶ 25; Ex. 21 (Rhodin Tr.) at 52:22-53:5.

19

a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled.'" *Paraco Gas Corp. v. Travelers Cas. and Sur. Co. of Am.*, 51 F. Supp. 3d 379, 403 (S.D.N.Y. 2014); *see also Long v. Marubeni Am. Corp.*, No. 05-0639, 2006 WL 1716878, at *1 (S.D.N.Y. June 20, 2006) ("[D]espite plaintiffs' effort to assert that the two claims arise from different facts, the claims clearly arise from the same contract and the same breach, and seek essentially the same relief.").

**B.      There Is No Triable Issue As To The Breach Of An Implied Promise**

"Particularly where an agreement is 'negotiated between sophisticated, counseled business people negotiating at arms length, . . . courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include.'" *Global Reins. Co. of Am. v. Century Indem. Co.*, 91 N.E.3d 1186, 1193 (N.Y. 2017). With that principle as background, the *sina qua non* of an implied covenant claim is the breach of a promise that a reasonable person would have understood to be implied into the parties' agreement. *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995). Nuance does not clearly specify the implied promise that IBM allegedly breached by forking the DeepQA code and refusing to provide Nuance with code created by SWG. Logically, though, the two possibilities are that IBM impliedly promised (i) it would give Nuance code created outside of IBM Research, or (ii) it would not fork the code but would develop all Modifications within IBM Research.

The first of these is a non-starter, because the covenant of good faith cannot be used to imply terms into an agreement that conflict with the agreement's express terms. *See Murphy v. Am. Home Prods. Corp.*, 448 N.E. 2d 86, 91 (N.Y. 1983) ("No obligation can be implied . . . which would be inconsistent with other terms of the contractual relationship."). Since the SLA expressly limits Nuance's license to code developed by IBM Research, Nuance may not use the covenant of good faith to expand its license to code developed outside of IBM Research.

As to the second possibility – an implied promise to develop Modifications only within IBM Research – Nuance has failed to adduce evidence sufficient to raise a triable issue as to whether such a promise was included in the SLA.  Quite the opposite, the evidence establishes that Nuance knew that the SLA did *not* include any such promise.  In particular, Jeanne McCann, Nuance's chief negotiator of the SLA, testified that ███████████████████████████████ ███████████████████████████████████████████████████.[55]  She further testified, (and her emails confirm) that ████████████████████████████████████████████████████ ████████████████████████████████████.[56] ███████████████████████████████████████ ███████████████████████████████████████████.[57]  Nuance's other witnesses testified similarly, claiming that ████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████████ █████████████████████████.[58]  As explained above, Nuance's revisionist claims that the SLA entitled Nuance to Modifications developed outside of IBM Research cannot be squared with the SLA's plain language and other documentary evidence from the time, but its disappointment on that

---

[55]  SOF ¶ 30; Ex. 7 (McCann Tr.) at 96:14-97:7 █████████████████████████████████████ ████████████████████████████████████.

[56]  SOF ¶ 30; Ex. 7 (McCann Tr.) at 196:4-7 █████████████████████████████████████ ████████████████████████████████████████.

[57]  Ex. 7 (McCann Tr.) at 196:12-197:3.

[58]  Ex. 37 (Bloom Tr.) at 145:10-20 ███████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ Ex. 6 (Sejnoha Tr.) at 134:24-135:8 ███████████████████████████████████████████████ ██████████████████████████████████████████████ Ex. 38 (Petro Tr.) at 128:17-21 █████ █████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

subject does not permit it to re-write the SLA by implying into it a material restriction on IBM's development of DeepQA to which IBM never agreed.

It also bears noting that Nuance failed to adduce evidence that an assumption that IBM would limit development of Modifications to IBM Research would have been objectively reasonable. *See Dalton*, 663 N.E.2d at 291. IBM's practice was for IBM Research to hand over its work product to IBM's commercial units for further commercial development.[59]   Nuance witnesses ██████████████████████████████, and Nuance's chief engineer in charge of DeepQA acknowledged that IBM's model of using a business unit to further develop code created by researchers was a common model in the industry.[60]   Accordingly, even if the evidence did not prove that Nuance had no actual expectation that IBM would restrict development of Modifications to DeepQA to IBM Research, summary judgment for IBM would still be required, because Nuance has failed to raise a triable issue as to whether such an expectation would have been objectively reasonable under the circumstances.

## III.   NUANCE'S CLAIMS ARE TIME-BARRED UNDER THE CONTRACT

The SLA provides that "[n]either party may bring an action arising out of this Agreement . . . more than two years after the cause of action has accrued and the party obtained knowledge thereof."[61] This provision bars Nuance's claims in this action, filed on June 30, 2016, because Nuance was aware by 2012 that it was not receiving the SWG code it claims it is owed.

In its Complaint, Nuance alleges that it was only in January 2015 that Nuance learned that IBM had "forked" the DeepQA code and would not provide the SWG side of the fork to Nuance.

---

[59]   SOF ¶ 27; Ex. 4 (Cox Tr.) at 111:2-20.

[60]   SOF ¶ 27; Ex. 37 (Bloom Tr.) at 23:5-8; Ex. 7 (McCann Tr.) at 79:7-21; SOF ¶¶ 28-29; Ex. 8 (Stubley Tr.) at 17:3-20:2.

[61]   SOF ¶ 21; Ex. 5 at 10751.

ECF No. 6, ¶ 26.  The record disproves that conclusively and explicitly.  In particular, the record

contains an email dated January 23, *2012* in which Jeanne McCann reports to Paul Ricci about ███



██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████[62]  Nuance thus knew some

*five years* before filing this action that IBM had "forked" the DeepQA code.

And there was no confusion at that time concerning whether IBM was providing Nuance

with SWG's work.  ██████████████████████████████████████████████████

████[63]████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████.[64]

During the same period, in September 2011, Ms. McCann wrote to Mr. Ricci that ████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

████████████████████████████████████."[65]  She also complained

to IBM in October 2011 that the parties had a "[m]aterial gap on expectations" with regard to

whether Modifications were owed by IBM or IBM Research."[66]  At no point during this period did

IBM relent on its position that Nuance was not entitled to SWG's work.  To the contrary, in January

2013, Ms. McCann reported to Mr. Ricci that ████████████████████████████████████

---

[62]    SOF ¶¶ 69-70; Ex. 39; *see also* Ex. 40 (Jan. 17, 2012 SWG presentation to Nuance detailing SWG's "specific enhancements (completed and planned) to the Deep QA engine").

[63]    SOF ¶ 68; Ex. 16 (Gallopyn Tr.) at 102:8-20.

[64]    SOF ¶ 68; Ex. 41 (Fanty Tr.) at 171:22-172:10; 108:20-109:13.

[65]    SOF ¶¶ 65-66; Ex. 42 at 40235.

[66]    SOF ¶ 67; Ex. 43 at 7536.

██████████████████████████████████████████████████████

████████████████████████████████████████[67]

Given the above evidence, there is no triable issue of fact as to whether Nuance brought its claims before the contractually-mandated deadline. It missed that deadline by years, and summary judgment in IBM's favor is warranted on that basis, too.

## IV.   IN THE ALTERNATIVE, THIS COURT SHOULD GRANT PARTIAL SUMMARY JUDGMENT AGAINST NUANCE ON ALL CLAIMS TO CODE NOT DERIVED FROM DEEPQA

Nuance has asserted that its right to receive Modifications to DeepQA entitles it to code that performs a similar function to any part of the DeepQA pipeline, regardless of whether it was developed from or as part of DeepQA. Under this theory, Nuance has asserted an entitlement to code that was developed entirely separately from DeepQA and even code that IBM purchased from third-parties. The SLA cannot reasonably support this claim.

The language of the SLA that grants Nuance a right to Modifications is not open-ended. Rather, the SLA specifies that Nuance shall receive "modifications, updates [and] upgrades" *to the "Software . . . listed on Exhibit A*,"[68] which is the source code comprising DeepQA. The plain meaning of this language requires that, before a set of code can be considered a Modification, it must bear one of the enumerated relationships to the DeepQA code; that is, it must modify, update, or upgrade it. Shared functionality is not among the relationships deemed a Modification by the SLA. Accordingly, the mere fact that a set of code shares functionality with some aspect of DeepQA cannot qualify that set of code as a Modification.

---

[67]   SOF ¶ 41 ; Ex. 29 at 18482.

[68]   SOF ¶ 15; Ex. 5 at 10986 (emphasis added).

Tellingly, even Nuance's own expert, computer scientist Ronald Schnell, ███████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████[69]   Nuance's fact witnesses would not support it

either.[70]   Nor does Nuance have any other persuasive evidence for that position.   Nuance has

previously cited an out-of-context snippet of testimony from IBM witness Eric Brown to argue

that IBM considered shared functionality sufficient to create a Modification, but Mr. Brown

actually said no such thing.   Read in its entirety, Mr. Brown's testimony was that Modifications

were limited to changes to the DeepQA code or to code that replaced a portion of the DeepQA

code or was added to it in order to improve its functionality.[71]   The notion that a set of code that

was developed independently of DeepQA can constitute a Modification is, therefore, without

support in the SLA or elsewhere in the record.   To the extent Nuance's claims rely on that

contention, summary judgment should be granted on them in favor of IBM.

---



[69]   Ex. 44 (Schnell Rep.) ¶¶ 184-223; Ex. 45 (Schnell Tr.) at 80:24-81:5 █████████
████████████████████████████████████████████████████████████████████

[70]   SOF ¶ 63; Ex. 46 at 19898 (█████████████████████████████████████Ex. 41
(Fanty Tr.) at 55:10-56:3 █████████████████████████████████████████████████
███████████████████████ Ex. 7 (McCann Tr.) at 140:24-141:11 █████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

[71]   Ex. 3 (Brown Tr.) at 262:10-19 ("Q.   So if there was a new -- when you say 'new
implementation,' so if there was a new component *that was written for DeepQA*, even if it was
not part of the original source code, providing that would be in the spirit of the agreement?   A.   If
it was written to perform a function or task that was in the original contemplation of DeepQA as
it existed at the time it was licensed.") (emphasis added).

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court enter summary judgment on all claims.

Dated:  July 27, 2018
       New York, New York

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By:  *Kevin S. Reed*
     Richard I. Werder, Jr.
     Kevin S. Reed
     Elinor Sutton
     Hope Skibitsky, *pro hac vice*
     Florentina Dragulescu, *pro hac vice*
     51 Madison Avenue, 22nd Floor
     New York, New York 10010
     Tel. (212) 849-7000
     Fax (212) 849-7100
     rickwerder@quinnemanuel.com
     kevinreed@quinnemanuel.com
     elinorsutton@quinnemanuel.com
     hopeskibitsky@quinnemanuel.com
     florentinafield@quinnemanuel.com

     *Attorneys for Defendant*

26