**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NUANCE COMMUNICATIONS, INC., | x<br>:<br>: |
| Plaintiff, | :<br>: |
| v. | :  NO. 16-CV-5173 (KMK)(JCM) |
| INTERNATIONAL BUSINESS MACHINES<br>CORPORATION | :<br>:<br>: |
| Defendant. | :<br>:<br>:<br>x |

**PLAINTIFF NUANCE COMMUNICATIONS INC.'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS .........................................................................................3

    A.    IBM Presented DeepQA As A Starting Point For Significant Work In The "Intelligent QA Systems" Space ...........................................................................3

    B.    Nuance Insisted Upon A "Robust" Updates Provision To Ensure It Would Receive IBM's Promised Development Work .......................................................4

    C.    After The Jeopardy! Competition IBM Concluded It Undervalued DeepQA And Undertook Elaborate Efforts To Keep Updates From Nuance ..........................................................................................................5

    D.    IBM Assured Nuance That It Was Delivering All Updates ...................................7

LEGAL STANDARD................................................................................................7

ARGUMENT ..........................................................................................................8

I.    THE COURT SHOULD DENY IBM'S MOTION FOR SUMMARY JUDGMENT AS TO NUANCE'S DECLARATORY JUDGMENT (COUNT I) AND BREACH OF CONTRACT (COUNT II) CLAIMS................................................8

    A.    The SLA Unambiguously Entitles Nuance To All DeepQA Updates...................8

    B.    If The Court Determines The SLA Is Ambiguous And Considers Extrinsic Evidence, Material Questions Of Fact Abound, Necessitating A Trial................12

        1)    A Wealth Of Extrinsic Evidence Supports Nuance's Interpretation .........13

            (a)    Extrinsic Evidence Related To The Negotiation Of The SLA Supports Nuance's Reading Of The Contract .....................13

            (b)    IBM's Proposed Amendment Demonstrates That IBM Knew Updates Were Not Limited To Those Developed By RG ...............................................................................13

        2)    IBM's Extrinsic "Evidence" Is Overstated And Misleading ....................14

            (a)    Nuance Did Not Have Knowledge Of The Firewall.....................14

            (b)    Nuance's Internal Documents Do Not Evidence Its Purported "Understanding" That The SLA Was Limited In Scope...............................................................................15

            (c)    IBM's Argument That Nuance "Understood"  RG Did Not Have The Authority To License SWG Code Is Irrelevant And Unsupported ...........................................................16

II.    QUESTIONS OF FACT PRECLUDE SUMMARY JUDGMENT ON NUANCE'S IMPLIED COVENANT CLAIM (COUNT III)..........................................18

III.    QUESTIONS OF FACT PRECLUDE IBM'S REQUEST FOR PARTIAL
SUMMARY JUDGMENT ...................................................................................21

IV.    IBM'S LIMITATIONS DEFENSE FAILS AS A MATTER OF LAW ..........................22

      A.    Ample Evidence Establishes that Nuance's Claims Are Timely ...........................22

      B.    IBM Waived A Limitations Defense ....................................................................24

      C.    IBM Should Be Equitably Estopped From Asserting A Limitations
Defense ...............................................................................................................25

      D.    Nuance's Claims Are Timely Under The Continuing Wrong Doctrine ...............25

CONCLUSION........................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Int'l Grp v. Bank of Am. Corp.*,
    712 F.3d 775 (2d Cir. 2013)................................................................11

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)................................................................7

*Ariz. State Bd. for Charter Schs. v. U.S. Dep't of Educ.*,
    464 F.3d 1003 (9th Cir. 2006) ................................................................10

*Bank of China v. Chan*,
    937 F.2d 780 (2d Cir. 1991)................................................................21

*Bulova Watch Co. v. Celotex Corp.*,
    46 N.Y. 2d 606 (1979)................................................................25

*Buttry v. Gen. Signal Corp.*,
    68 F.3d 1488 (2d Cir. 1995)................................................................25

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)................................................................7

*Cole v. Macklowe*,
    953 N.Y.S.2d 21 (1st Dep't 2012) ................................................................10

*Faulkner v. Nat'l Geographic Soc.*,
    452 F. Supp. 2d 369 (S.D.N.Y. 2006), *aff'd*, 284 F. App'x 822 (2d Cir. 2008)................15

*Fischoff v. Coty, Inc.*,
    634 F.3d 647 (2d Cir. 2011)................................................................18

*Galvstar Holdings, LLC v. Harvard Steel Sales, LLC*,
    No. 722 F. App'x 12 (2d Cir. 2018) ................................................................18

*Guilbert v. Gardner*,
    480 F.3d 140 (2d Cir. 2007)................................................................25

*Law Debenture Tr. Co. of New York v. Maverick Tube Corp.*,
    595 F.3d 458 (2d Cir. 2010)................................................................8, 9

*Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*,
    967 F.2d 742 (2d Cir. 1992)................................................................24

*Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)........................................................................................7

*McClellan v. Smith*,
    439 F.3d 137 (2d Cir. 2006)...........................................................................7

*Morris v. Putnam Berkeley, Inc.*,
    687 N.Y.S.2d 139 (1st Dep't 1999) ..............................................................18

*NFL Enters. LLC v. Comcast Cable Commc'ns, LLC*,
    851 N.Y.S.2d 551 (1st Dep't 2008) ..............................................................12

*RJE Corp. v. Northville Indus. Corp.*,
    329 F.3d 310 (2d Cir. 2003)........................................................................8, 9

*Topps Co., Inc. v. Cadbury Stani S.A.I.C.*,
    526 F.3d 63 (2d Cir. 2008)..............................................................8, 12, 14

**Other Authorities**

Fed.R.Civ.P. 56(a) ...............................................................................................7

Local Rule 56.1 ....................................................................................................1

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, Plaintiff Nuance Communications, Inc. ("Nuance") submits this memorandum of law in opposition to Defendant International Business Machines, Corp.'s ("IBM") motion for summary judgment.

## PRELIMINARY STATEMENT

IBM's motion should be denied because, as set forth in Nuance's motion for summary judgment, the plain and unambiguous language of the Software License Agreement ("SLA") requires IBM to provide Nuance DeepQA updates developed anywhere within IBM. Indeed, the updates clause explicitly provides for ███████ of "modifications, updates, upgrades, error corrections, bug fixes . . . and other changes" to be "provided to Nuance by IBM," which is defined in the SLA as IBM Corporation. *See* Pl.'s Opposition to Def.'s Local Rule 56.1 Statement ("56.1 Opp.") ¶¶ 15, 20, Sept. 14, 2018; Ex. 43 (SLA) § 7.11 & Sched. A.[1] IBM's attempt to limit Nuance to updates that are developed only by IBM Research Group ("RG") cannot be squared with the actual language of the SLA, would produce an absurd result, and ignores basic rules of grammar and construction.

Much of IBM's brief is focused on selected extrinsic evidence, which is inadmissible given the plain language of the SLA. However, if the Court concludes such evidence needs to be reviewed, ample extrinsic evidence supports Nuance's interpretation or at a minimum raises questions of material fact precluding summary judgment. This includes, for example: (i) the negotiation history of the updates provision, which is similar to a provision in a prior deal between the parties pursuant to which RG agreed to deliver updates developed throughout IBM, and (ii) a proposed amendment to the SLA sent by IBM attempting to limit its obligation to deliver only those updates generated in RG. The extrinsic evidence IBM points to, such as IBM's maintenance

---

[1] Unless otherwise indicated, all Exhibit numbers cited herein refer to exhibits to the Declaration of David J. Lender ("Lender Decl."), September 14, 2018.

of a firewall and Nuance's purported knowledge that RG did not have authority to license the updates promised in the contract, is overstated and, at best, a preview of IBM's trial arguments.

IBM's attempt to short circuit a trial on Nuance's implied covenant of good faith and fair dealing claim also fails. Contrary to IBM's argument that Nuance's claim is "duplicative" of its breach of contract claim, it is separate and distinct. Discovery in this case has confirmed that IBM knew Nuance was not interested in licensing software that could only play *Jeopardy!*. Accordingly, to bait Nuance's ▆▆▆▆▆ investment, IBM pitched DeepQA to Nuance as the baseline for its core question answer technology that it would continue to invest in and develop. Then, after DeepQA's success on *Jeopardy!*—and Nuance's refusal to accede to an amendment limiting IBM's obligation to deliver updates to only those developed by RG—IBM implemented a switch. Specifically, it "▆▆▆▆▆" RG's work on DeepQA "▆▆▆▆▆▆▆▆" and did all ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆." Ex. 19 at 1717. IBM did this by: (1) "forking" (or copying) the code and providing a copy to its SWG, (2) transferring DeepQA researchers out of RG and into the SWG to help SWG develop their copy of the code, (3) firewalling off the engineers who remained in RG from SWG's work on the code, and (4) failing to invest in the RG fork of the DeepQA code. The direct and deliberate result of this scheme was that RG's development work on DeepQA ground to a halt and all real updates to DeepQA were generated outside of RG. In addition, after promising all development in a single core, IBM advanced its question answer technology outside the DeepQA core pipeline, generating a suite of products that IBM admits "evolved" from DeepQA but still withheld from Nuance. Given IBM's promises that it would substantially invest in DeepQA and that Nuance would benefit from that investment, IBM denuded Nuance's bargain when it purposefully developed all real updates out of Nuance's reach. Even under IBM's interpretation that Nuance is only entitled to updates developed within RG, it is a breach of the implied covenant of good faith and fair dealing to

2

redirect development work and core engineers from RG to deprive Nuance of the benefit of its bargain.

IBM has also failed to show that Nuance's claims are untimely under the relevant limitations period, which did not begin to run until Nuance "obtained knowledge"—as required under the SLA—of IBM's breach.  Contrary to IBM's contentions, evidence shows that Nuance did not have knowledge of the breach until 2015 and indeed repeatedly sought and received assurances from IBM that it was delivering all updates to DeepQA regardless of where within IBM those updates were developed.  Moreover, IBM waived any limitations defense when it failed to assert such defense in its answer.  IBM should also be estopped from asserting a limitations defense because it deliberately misled Nuance when Nuance sought assurances that IBM was delivering all updates, knowing that Nuance had no way to independently verify whether IBM was fulfilling its contractual obligations.  Finally, under New York's continuing obligation doctrine, the limitation period restarted each time IBM failed to provide updates as they became available, rendering Nuance's claims timely.

## STATEMENT OF FACTS

### A.   IBM Presented DeepQA As A Starting Point For Significant Work In The "Intelligent QA Systems" Space

Contrary to IBM's litigation narrative, which omits several material events that illuminate IBM's wrongdoing, the evidence shows that this is actually a case of seller's remorse.  In the summer of 2010—before IBM realized DeepQA would form the underpinning of the IBM Watson franchise—IBM approached Nuance with the possibility of licensing DeepQA while it was still developing the code for use on *Jeopardy!*. Ex. 13 (Reardon Tr.) 75:8-77:4; Ex. 21 at 11678.  IBM knew that a ██████████████ tuned to play *Jeopardy!* was useless to Nuance and that Nuance was instead interested in getting in on the ground-floor of potentially valuable technology.  56.1 Opp ¶ 4; Ex. 5 (Hicks Tr.) 211:13-25; Ex. 4 (Brown Tr.) 154:4-19; Ex. 13 (Reardon Tr.) 106:5-

107:5; Ex. 9 (McCann Tr.) 85:23-86:1.  To that end, IBM described going ██████████ ███████████████████████████████████████████████████████████ Ex. 36 at 19351.  Eager for ████████ in funding to ███████████████████, IBM represented to Nuance that it would continue to develop the DeepQA core question and answer pipeline, with the goal of ███████████████████████████████████████ ██████████████████████████████. Ex. 13 (Reardon Tr.) 63:6-11, 71:5-73:6, 95:15-97:18; Ex. 1 (Bloom Tr.) 35:10-16, 46:2-12, 49:4-20; Ex. 9 (McCann Tr.) 53:8-20; Ex. 8 (King Tr.) 57:3-18; Ex. 36 at 19352.

Nuance appreciated the risk of purchasing a software that had no immediate monetizable application, but justified a ████████ investment based on IBM's promise of future development work.  As IBM points out in its brief, when asked about DeepQA's value to Nuance *before* signing the SLA in September 2010, Nuance engineers stated that they could ██████████████ █████████████████████████████████ Ex. 39 at 27530 (emphasis added).  As one engineer explained at the time, that was because ███████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ *Id.* at 27531. IBM therefore knew that the only way Nuance would invest in this nascent technology would be if IBM was truly committed to developing DeepQA beyond *Jeopardy!*.  Ex. 12 (Petro Tr.) 224:4-225:11; Ex. 13 (Reardon Tr.) 106:6-107:5. IBM executives assured Nuance that it was, and, knowing healthcare was of keen interest to Nuance, made ████████████████ ████████████████████████████████████████████████████████████ ███████ Ex. 35 at 18293; Ex. 13 (Reardon Tr.) 7:8-73:6; Ex. 8 (King Tr.) 57:3-18.

**B.     Nuance Insisted Upon A "Robust" Updates Provision To Ensure It Would Receive IBM's Promised Development Work**

In September 2010, IBM sent Nuance a first draft of the SLA, which did not include an

updates provision. Ex. 1 (Bloom Tr.) 54:23-55:14. This was a "nonstarter" for Nuance who refused to pay ▮▮▮▮▮ for software that required substantial work before it could have any commercial utility. *Id.*; Ex. _ (Petro Tr.) 224:4-225:22.  Nuance therefore insisted on adding a ▮▮▮▮▮▮ ▮▮▮▮ updates provision, so that it could benefit from IBM's promised development work on DeepQA. Ex. 40 at 27614.  Ultimately, the parties agreed to ▮▮▮▮▮ of updates, whereby "IBM"– –defined as "IBM Corporation, unless expressly limited to a division or group of IBM Corporation herein"—would provide Nuance any "modifications, updates, upgrades, error corrections, bug fixes . . . and other changes" ("Updates") to DeepQA.  Ex. 43 (SLA) § 7.11 & Sched. A.

**C.  After The *Jeopardy!* Competition IBM Concluded It Undervalued DeepQA And Undertook Elaborate Efforts To Keep Updates From Nuance**



Shortly after the Jeopardy! competition aired, a ▮▮▮▮▮▮▮▮▮▮ comprised of executives from several IBM divisions including RG and SWG, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 7 (Kelly Tr.) 215:21-218:2; Ex. 13 (Reardon Tr.) 40:7-18; Ex. 14 (Rhodin Tr.) 61:8-62:11.[2] Realizing that it had licensed Updates to technology that would form the cornerstone of their new franchise, IBM executives ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. 23 at 22642-64; Ex. 24 at 27218; Ex. 29 at 39844. They therefore ▮▮▮▮▮▮▮▮▮▮▮▮

Adopting the position that the Updates provision was limited to Updates developed by RG, IBM came up with a plan to ensure that all real Updates to DeepQA would be generated outside RG and would not get back to Nuance.  Specifically, IBM moved the DeepQA asset to SWG by "forking" (or copying) the code so that SWG could work independently on DeepQA.  Ex. 2

---

[2] "Watson" was the moniker for the supercomputer used to play *Jeopardy!*, which was powered by DeepQA.  56.1 Opp ¶ 22; Ex. 13 (Reardon Tr.) 60:5-14.

(Boloker Tr.) 61:9-16, 73:9-20, 90:2-5; Ex. 4 (Brown Tr.) 95:6-24; Ex. 14 (Rhodin Tr.) 63:13-64:17. IBM then ███████████████████████████████████████████████████

███████████████████████████████████████████████████ Ex. 7 (Kelly Tr.) 48:5-49:6; Ex. 14

(Rhodin Tr.) 20:9-21:14; Ex. 4 (Brown Tr.) 15:18-16:7, 180:9-185:8; Ex. 29 at 39845. Further,

IBM implemented a "firewall" to ensure that RG employees did not receive information about

SWG's work on DeepQA, based on the idea asserted by IBM that RG would have to transfer that

work to Nuance. 56.1 Opp. ¶ 36; Ex. 4 (Brown Tr.) 178:2-180:8; Ex. 2 (Boloker Tr.) 73:21-74:17.

Though the SWG had access to RG's DeepQA work (███████████████████████████████████

███████████████████), that access was not reciprocal. 56.1 Opp. ¶ 35, 37 and evidence cited

therein. The SWG updated and enhanced DeepQA, and IBM developed products based on SWG's

copy of the code, including ███████████████████████████████████████████████████████

███████████ Ex. 44 (IBM Resp. to Nuance 3rd Set of Interrogatories) No. 18; Ex. 4 (Brown Tr.)

106:8-107:16; 180:9-185:8; Ex. 6 (High Tr.) 62:14-64:15, 74:11-78:7; Ex. 37 (Schnell Report) ¶

218; Ex. 32 (Redbook) 41. IBM did not provide any of the Updates used in these products to

Nuance. Ex. 37 (Schnell Report) ¶ 218; Ex. 7 (Kelly Tr.) 41:5-42:5. The SWG also enhanced

DeepQA's question answer functionality outside of the DeepQA core pipeline, and withheld those

Updates as well. Ex. 37 (Schnell Report) ¶¶ 189-217; Ex. 32 (Redbook) 60.

Worried that Nuance would catch on and demand SWG Updates, IBM sought to alter the

bargain struck by the parties through a proposed "SLA Amendment" (the "Proposed

Amendment"). 56.1 Opp. ¶ 38 and evidence cited therein. IBM sent Nuance a redline to the

definition of Licensed IBM Background Software with ███████████████████████ that would

███████████████████████████████████████████████████ and sought to add language

to the Updates provision that Software ███████████████████████████████████████████

███████████████████████████████████" *Id.* ¶¶ 38-39; Ex. 18 at 1696. The

purpose of the proposed amendment was to revise the SLA to ensure Nuance would not be entitled to DeepQA work developed outside of RG.  Ex. 9 (McCann Tr.) 151:11-151:21.  Nuance rejected the Proposed Amendment.  *Id.*; 56.1 Opp. ¶ 40.

### D.   IBM Assured Nuance That It Was Delivering All Updates

Despite IBM's elaborate efforts to keep DeepQA Updates from Nuance, IBM repeatedly assured Nuance that it was receiving all of IBM's work on DeepQA.  56.1 Opp. ¶¶ 64, 68 and evidence cited therein; Ex. 16 (Sejnoha Tr.) 97:19-101:9 ██████████████████████████

████████████████████████████████████████████████████

███████████████████████████████).  This misdirection was effective.  It was only in 2015 that IBM executive Bill LaFontaine informed Nuance executive Jeanne McCann that the IBM Watson Group was working off DeepQA code it was not providing to Nuance, a fact which Ms. McCann was "surprise[d]" to learn.  *See* Ex. 46 (Compl.) ¶¶ 26-28; Ex. 45 (Nuance Resp. to IBM 2nd Set of Interrogatories) at Nos. 10-13; 56.1 Opp. ¶ 64.  Nuance timely filed suit.

## LEGAL STANDARD

Summary judgment is not appropriate if a genuine issue of material fact exists and the moving party is not entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A fact is material if it "might affect the outcome of the suit under governing law," and issues are "genuine" if they require resolution by a trier of fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding a motion for summary judgment, the Court should not weigh the evidence or determine the truth of any matter, but rather must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party.  *Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006).

In a contract dispute, this "generally means that a motion for summary judgment may be

granted . . . only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning." *Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008) (citations omitted).  A contract is unambiguous when it can be interpreted "according to the plain meaning of its terms" and the "intent of the parties [can] be gleaned from within the four corners of the instrument, and not from extrinsic evidence." *Law Debenture Tr. Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010); *RJE Corp. v. Northville Indus. Corp.*, 329 F.3d 310, 314 (2d Cir. 2003).  If the moving party's case hinges on ambiguous contract language, "summary judgment may be granted only if the ambiguities may be resolved through extrinsic evidence that is itself capable of only one interpretation," or where there is "no extrinsic evidence that would support a resolution of [the] ambiguities in favor of the nonmoving party's case." *Topps*, 526 F.3d at 68.

## ARGUMENT

I.   **THE COURT SHOULD DENY IBM'S MOTION FOR SUMMARY JUDGMENT AS TO NUANCE'S DECLARATORY JUDGMENT (COUNT I) AND BREACH OF CONTRACT (COUNT II) CLAIMS**

A.   **The SLA Unambiguously Entitles Nuance To All DeepQA Updates**

As discussed in Nuance's motion for summary judgment, the plain language of the SLA clearly states that "IBM"—which the contract defines as "IBM Corporation unless otherwise expressly limited to a division or group of IBM Corporation herein"—will provide "modifications, updates, upgrades, error corrections, bug fixes . . . other changes" and additional agreed-upon Software (collectively defined in the SLA as "Updates") to Nuance for a ten-year period.  Ex. 43 (SLA) § 7.11 & Sched. A.  This plain language reading is supported by other provisions of the SLA, including Section 2.4, which states that "[i]f IBM provides . . . any modifications, updates, upgrades, error corrections, bug fixes . . . and other changes to the Licensed IBM Background Software, IBM will update Exhibit B [to the SLA]." *Id.* § 2.4.  The language in Section 2.4

demonstrates that Nuance was to receive Updates from all of IBM, as the use of "IBM" rather than "IBM Research Group"—again in the context of the same Update language—would have been unnecessary if RG were the only group that could provide "modifications, updates, upgrades," etc. to Nuance, thus necessitating an update to Exhibit B.  Moreover, the parties plainly contemplated what limitations should apply to Nuance's broad Updates entitlement, as the SLA licenses Nuance "*any*" Modifications except those that (i) are not "available"; (ii) are "contractually prohibited"; or (iii) do not "continue to meet the scope of Article 2.1."  *Id*. Sched. A.  These carve-outs in no way relate to RG, and if the parties had wanted to limit the Updates to those developed by RG, they would have expressly done so.  It is therefore clear from the plain language of the SLA that Nuance is entitled to Updates developed by all of IBM.

Unlike Nuance's reading of the Updates Provision, which can readily be "gleaned from within the four corners" of the SLA, *RJE Corp.*, 329 F.3d at 314, IBM asks the court to rearrange the definition of Licensed IBM Background Software to fit its desired interpretation.  *See Law Debenture Tr. Co.*, 595 F.3d at 468 (the court cannot "add or excise terms . . . and thereby make a new contract for the parties under the guise of interpreting the writing") (citations omitted).[3]  IBM asserts several arguments to support its position, but based on basic rules of construction and grammar, each of IBM's arguments fail.

First, IBM argues that under the SLA, Nuance is only entitled to Updates that are "owned, developed, or licensed" by RG because "the use of the word 'including' [in the definition of

---

[3] Notably, as discussed *infra*, IBM already tried to "rewrite" into the SLA "conditions the parties did not insert" when it proposed an amendment in 2011. Even if IBM's asserted reasoning for the Proposed Amendment were correct—that it was sent to clarify, rather than change, IBM's obligations—the amendment demonstrates that IBM's interpretation is not readily apparent by the plain language of the contract.

Licensed IBM Background Software]"[4] establishes that Updates "are a subset of the [RG] code being licensed."   IBM Br. at 12.   According to IBM, this is because the words that follow "including" are "example[s] of the preceding principle," and here, the preceding principle is "all Software that exists as of the Effective Date in all available formats . . . that is owned by, or that has been developed or licensed by [RG] . . . ."   *Id.* at 11-12.   By IBM's reasoning, however, everything after "including" would also have to be a subset of Software *that exists as of the Effective Date*, which makes no sense because future Updates obviously did not, and by definition, could not, exist as of the Effective Date.   *See Ariz. State Bd. for Charter Schs. v. U.S. Dep't of Educ.*, 464 F.3d 1003, 1008 (9th Cir. 2006) ("including" can mean "in addition to" where "the exclusivity of two or more terms requires a broader interpretation to avoid an irrational result").   Because IBM's interpretation would produce an absurd result, it fails as a matter of law.   *See Cole v. Macklowe*, 953 N.Y.S.2d 21, 23 (1st Dep't 2012) (holding that it is a well settled principle "that a contract should not be interpreted to produce an absurd result").[5]

   Second, ignoring the actual commas in the definition of Licensed IBM Background Software (*see supra* n. 4), IBM insists that the phrase "provided to Nuance by IBM" can only

---

[4] "'Licensed IBM Background Software' means (a) all Software that exists as of the Effective Date in all available formats (including Source Code and Object Code) that is owned by, or that has been developed or licensed IBM Research Group, including Tools, and that is listed on Exhibit A, *including* any modifications, updates, upgrades, error corrections, bug fixes, diagnostic and/or testing tools, that are JDBC compliant, and other changes, if available ("Modifications"), and if such Modifications are not contractually prohibited under a Third Party agreement, and such Modifications are available, will be timely provided to Nuance; and where the Modifications continue to meet the scope contemplated in Article 2.1 regarding the licensing of Deep QA under this Agreement, as of the Effective Date and thereafter ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and additional Software as agreed by the parties, provided to Nuance by IBM under the Agreement (collectively "Updates") . . . ." Ex. 43 (SLA) Sched. A (emphasis added).

[5] IBM apparently recognized that "including" also did not clearly convey the idea that future Updates had to be owned, developed, or licensed by RG.   When IBM sought the Proposed Amendment, its redline of the Licensed IBM Background Software definition crossed out "including" and changed it to "as well as."   Ex. 18 at 1696.

modify the preceding phrase "and additional Software as agreed by the Parties."  IBM Br. at 13.

IBM cites no authority to support this contention, which is likely because binding precedent

dictates precisely the opposite.  *See Am. Int'l Grp v. Bank of Am. Corp.*, 712 F.3d 775, 780-81 (2d

Cir. 2013) (rule of the last antecedent only applies "where no contrary intention appears," and a

contrary intention appears when a comma is used to separate a list from the subsequent modifier).

As the court in *American International Group* explained:

> One of the methods by which a writer indicates whether a modifier that follows a
> list of nouns or phrases is intended to modify the entire list, or only the immediate
> antecedent, is by punctuation--specifically by whether the list is separated from the
> subsequent modifier by a comma. When there is no comma . . . the subsequent
> modifier is . . . understood to apply only to its last antecedent. When a comma is
> included . . . the modifier is . . . understood to apply to the entire series. For example,
> the statement, "This basketball team has a seven-foot center, a huge power forward,
> and two large guards, who do spectacular dunks," differs from the statement, "This
> basketball team has a seven-foot center, a huge power forward, and two large
> guards who do spectacular dunks." The first statement conveys that all four players
> do spectacular dunks. The latter statement conveys that only the guards do so.

*Id.* at 781-82 (citations omitted).   Applying these straightforward rules of grammar and

construction here, it is evident that the phrase "provided to Nuance by IBM under the Agreement"

applies to the entire clause after the semicolon; *i.e.*, both to future Modifications for a period of 10

years and to "additional Software as agreed by the parties."  Ex. 43 (SLA) Sched. A.

Third, IBM contends that "provided to Nuance by IBM" merely "specif[ied] *who* will

deliver *a specified set of code* to Nuance," *i.e.*, that IBM will deliver the Updates to Nuance.  IBM

Br. at 13.  But IBM ignores the fact that the SLA uses the term "deliver" when discussing *who* will

deliver *a specified set of code* under the agreement.  For example, Section 1.1 states that

> IBM will *deliver* to Nuance . . . one (1) copy of the Licensed IBM Background
> Software . . . and related . . . Software Materials, listed in Exhibit A. The *delivery*
> obligations in this Article 1.1 and in Article 7.17 constitute the sole *delivery*
> obligations of IBM regarding the Licensed IBM Background Software under this
> Agreement.

Ex. 43 (SLA) § 1.1 (emphasis added). Similarly, SLA Section 7.17 states, "[t]he parties agree that,

after the Effective Date each party shall execute and *deliver* such other Licensed IBM Background Software documents . . . ." *Id.* § 7.17 (emphasis added).  Thus, if the parties had intended to specify who would deliver a set of code to Nuance in the definition of Licensed IBM Background Software, they would have used the word "deliver" to do so.  *NFL Enters. LLC v. Comcast Cable Commc'ns, LLC*, 851 N.Y.S.2d 551, 557 (1st Dep't 2008) ("The use of different terms in the same agreement strongly implies that the terms are to be accorded different meanings.").

In sum, the Court need not cut and paste the relevant provision to reach the correct result.  The SLA clearly and unambiguously requires "IBM" to provide all Updates to Nuance for a period of ten years and no amount of color-coding by IBM can change this plain language.  Nevertheless, in a last ditch effort, IBM argues that "the latter part of this definition"—*i.e.*, the critical part of the definition for the instant dispute—"apparently became a bit garbled as the parties rushed to complete the agreement . . . ."  IBM Br. at 11.  Even standing alone, this is a concession that IBM's proposed interpretation is not clear from the face of the SLA.  The Court should deny IBM's motion for summary judgment for all of these reasons.

### B. If The Court Determines The SLA Is Ambiguous And Considers Extrinsic Evidence, Material Questions Of Fact Abound, Necessitating A Trial

Recognizing that its strained interpretation of the SLA is anything but clear and unambiguous, IBM resorts to extrinsic evidence.  But the extrinsic evidence IBM points to, such as Nuance's purported knowledge of IBM's firewall, and purported "understanding" of the scope of the SLA and IBM's authority to license the Updates promised in the contract, is overstated, disputed, and not "capable of only one interpretation." *Topps*, 526 F.3d at 68.  Moreover, IBM fails to establish that there is "no extrinsic evidence that would support a resolution of the[] ambiguities in [Nuance's] favor." *Id.*  To the contrary, as discussed below, ample extrinsic evidence supports Nuance's interpretation of the SLA.

1)      **A Wealth Of Extrinsic Evidence Supports Nuance's Interpretation**

(a)      <u>Extrinsic Evidence Related To The Negotiation Of The SLA Supports Nuance's Reading Of The Contract</u>

The initial draft of the SLA sent by IBM to Nuance did not include a provision requiring IBM to provide Updates. Ex. 1 (Bloom Tr.) 54:23-55:14. This was a "nonstarter" for Nuance, thus, Nuance immediately asked for the same "updates/upgrades" obligations "as in the RTTS agreement [the Real Time Translation Services Agreement between the parties] as part of the license agreement." *Id.*, Ex. 22 at 12284. In response to Nuance's demands, IBM revised the SLA to include language that was ███████████████ to the RTTS update language. Ex. 9 (McCann Tr.) 236:4-12. Under the RTTS agreement, ███████████████

███████████████████████████████

███████████████ *Id.* at 78:19-79:2, 236:21-237:4. In requesting and obtaining the same updates/upgrades as in the RTTS agreement, the parties clearly understood and intended that the Update obligation would extend to all of IBM.

(b)      <u>IBM's Proposed Amendment Demonstrates That IBM Knew Updates Were Not Limited To Those Developed By RG</u>

Less than a year after the parties executed the SLA, with Watson's victory on *Jeopardy!* being the primary intervening event, IBM sent Nuance a proposed "SLA Amendment" which sought to "adjust[]" the definition of "Licensed IBM Background Software." Ex. 18 at 1695-96. Specifically, the Proposed Amendment attempted to change the definition of "Licensed IBM Background Software" to mean:



*Id.* The Proposed Amendment also purported to ████ that ████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████ *Id.* Viewed in the light most favorable to Nuance, the Proposed Amendment shows that IBM understood the SLA granted Nuance a license to all Updates regardless of where they were developed; otherwise, the Proposed Amendment limiting Updates to those written by RG employees would have been unnecessary. While IBM can offer its own spin on the Proposed Amendment, the credibility of IBM's alternative story if considered is a question of fact, which necessitates a trial. *See Topps*, 526 F.3d at 68 (credibility assessments, choices between conflicting versions of events, and weighing of evidence are matters for the fact finder); *see also* 56.1 Opp. ¶ 41 and evidence cited therein.

### 2) IBM's Extrinsic "Evidence" Is Overstated And Misleading

#### (a) Nuance Did Not Have Knowledge Of The Firewall

IBM's argument about its firewall is disputed. 56.1 Opp. ¶ 41 and evidence cited therein. Contrary to IBM's assertions, Nuance had no knowledge of a "firewall" or the effect any such firewall had on Nuance's receipt of Updates.[6] *Id.*; Ex. 9 (McCann Tr.) at 200:6-201:17; Ex. 2 (Boloker Tr.) at 185:2-6; Ex. 4 (Brown Tr.) at 178:18-24; Ex. 1 (Bloom Tr.) at 166:4-167:3; Ex. 16 (Sejnoha Tr.) at 96:1-11. As IBM witnesses testified, ████████████████████

████████████████████ Ex. 8 (King Tr.) 134:8-12. In any event,

---

[6] IBM points only to emails from 2013 (two years after IBM says the firewall went into effect) in which ██████████████████████████████████ Ex. 9 (McCann Tr.) 76:20-77:1, 200:6-205:5, 218:11-223:18. As Ms. McCann ██████████████████████████████████████████████████ ████████████████████ *Id.* These documents do not demonstrate that Nuance knew of any "firewall" IBM put into place or the parameters or effects of that firewall.

evidence of IBM's unilateral decision to enact a firewall after the parties executed the SLA is not "extrinsic evidence" demonstrating the intent of the parties in agreeing upon the terms of the SLA. *See Faulkner v. Nat'l Geographic Soc.*, 452 F. Supp. 2d 369, 379 (S.D.N.Y. 2006) ("[U]nilateral expression[s] of one party's postcontractual subjective understanding of the terms of the agreement . . . [are] not probative as an aid to the interpretation of the contract.") (citations omitted), *aff'd*, 284 F. App'x 822 (2d Cir. 2008). Indeed, the firewall is not evidence of anything but IBM's bad faith.

(b)   <u>Nuance's Internal Documents Do Not Evidence Its Purported "Understanding" That The SLA Was Limited In Scope</u>

IBM contends that Nuance "understood" the SLA did not entitle it to Updates developed outside of RG, but provides no real evidence to support its conclusion. IBM Br. at 16. Nuance has never disputed the fact that at the time the SLA was signed, Nuance was acquiring code from RG. Ex. 9 (McCann Tr.) 96:14-97:7. Nor could it—in September 2010, DeepQA was managed exclusively within that group. *Id.* 107:5-10. Nuance has also consistently maintained that its expectation was that RG would serve as a "conduit" for the Updates developed throughout IBM. Ex. 16 (Sejnoha Tr.) 110:19-111:1; *see also* 56.1 Opp ¶ 56. Thus, even if code was generated in SWG, if it fell under the scope of the SLA, it would flow to Nuance through the RG code drops. 56.1 Opp. ¶ 64; Ex. 9 (McCann Tr.) 95:8-103:1, 110:2-112:12, 171:3-173:4; Ex. 16 (Sejnoha Tr.) 40:8-41:13. The documents cited by IBM merely reflect this understanding.

For example, IBM cites Nuance documents ███████████████████████████ but omits testimony by the Nuance employee responsible for drafting these documents (Jeanne McCann) explaining that ████████████████████████████████████ ███████████████████████████████████████ 56.1 Opp. ¶ 56; Ex. 9 (McCann Tr.) 107:1-23, 171:18-172:10. IBM also omits Ms. McCann's subsequent testimony stating that her understanding was ████████████████████████████████

15

███████████████████████████████████████████████████████

████████████████  *Id.* at 108:10-112:12.   Further, IBM leaves out testimony by Nuance

employees explaining ████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████  and that RG ████████████████████

██████"[7]  56.1 Opp. ¶ 56; Ex. 16 (Sejnoha Tr.) 110:19-111:1; Ex. 9 (McCann Tr.) 225:14-226:2.

Viewed in the light most favorable to Nuance, when put into context, the evidence IBM points to

at best creates a question of fact as to Nuance's "understanding" of the scope of the license.

> (c)   IBM's Argument That Nuance "Understood"  RG Did Not Have
>         The  Authority  To  License  SWG  Code  Is  Irrelevant  And
>         Unsupported

IBM, as the undisputed owner of the Licensed IBM Background Software and counterparty

to the SLA, licensed the DeepQA code and any Updates thereto to Nuance.  *See* 56.1 Opp. ¶ 20.

Thus, whether Nuance understood that RG (which, by IBM's own admission, is merely a division

within IBM Corporation) had the authority to license SWG code is a red herring.  *See* 56.1 Opp. ¶

1; Ex. 7 (Kelly Tr.) 61:4-17.  Regardless, an overwhelming amount of evidence controverts IBM's

assertion that Nuance "understood" that RG did not have such authority.

First, as discussed *supra*, Nuance and IBM "through its Research Group" previously

---

[7] IBM also misstates Nuance witnesses' testimony about their efforts to "communicate accurately
with the company's board of directors and CEO" in the context of the cited documents.  IBM Br.
at 17.  For example, when ████████████████████

█████████████████████  Ex. 16 (Sejnoha Tr.) 112:6-115:12.  He further stated that ███

████████████████████████████████████████████████████████

████████████████████████  *Id*. at 114:19-115:5. Similarly, when ████

████████████████████████████████████████████████████████

█████████████████████  56.1 Opp. ¶ 62; Ex. 9 (McCann Tr.) 226:6-

15.

entered into a license agreement for RTTS source code under which the parties agreed to an

Updates provision with language that was ███████████████████████ to that of DeepQA.

Ex. 9 (McCann Tr.) 236:4-12; Ex. 10 (McCann Dep. Ex. 10) ¶ 1.  Under that agreement, Nuance

"understood" that it would receive Updates to the licensed code from all of IBM.  Ex. 9 (McCann

Tr.) 236:21-237:4. Moreover, under that agreement, RG also served as the "custodian of [the] core

[code] base."  *Id*. at 237:5-13.  Because IBM "through its RG" had previously licensed Updates

that Nuance understood would come from all of IBM, Nuance could not possibly have understood

that RG did not have authority to license the SWG code.  Ex. 10 (McCann Dep. Ex. 10).

IBM also ignores testimony by Nuance executives that they did *not* think that RG lacked

authority.  *See* 56.1 Opp. ¶ 7.  For example, in discussing the email cited by IBM related to a

*separate agreement*, when asked point blank by IBM's attorney whether "█████████████████

███████████████████████████████████████████████████████

███████████████████████████ IBM Br. at 18; Ex. 9 (McCann Tr.) 116:12-

117:8.  She explained that ████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████  *Id*.  Later, when discussing the document cited by IBM, which refers to three

specific SWG components in DeepQA (Juru, JFrost and ESG) and her statement that Nuance

would ████████████████████████████████████████████████████

███████████████████████████████," IBM's attorney again asked whether

she "████████████████████████████████████████████████████

████████████████  *Id*. 118:22-119:18; IBM Br. at 18. Ms. McCann responded: ████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████. 119:20-120:13.  Thus, viewing this evidence

in the light most favorable to Nuance, the extrinsic evidence does not resolve this issue in IBM's favor.

*************

As demonstrated above, the plain language of the SLA supports Nuance's interpretation and summary judgment should be granted in Nuance's favor.  If, however, the court finds an ambiguity and looks to the extrinsic evidence, it too supports Nuance's view of the contract or at least is highly contested.  In that instance, this case should proceed to trial so that the Court, as the finder of fact, can hear the conflicting evidence, make credibility determinations, and resolve factual disputes.  IBM's motion for summary judgment as to Counts I and II should be denied.

## II.   QUESTIONS OF FACT PRECLUDE SUMMARY JUDGMENT ON NUANCE'S IMPLIED COVENANT CLAIM (COUNT III)

In New York, all contracts imply a covenant of good faith and fair dealing, which "embraces a pledge that neither party [to the contract] shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Fischoff v. Coty, Inc.*, 634 F.3d 647, 653 (2d Cir. 2011) (quotation marks and citations omitted). Courts will enforce this pledge where, as here, "an implied promise was so interwoven in the whole writing of a contract as to be necessary for effectuation of the purposes of the contract," or where "a party's acts subsequent to performance on the contract so directly destroy the value of the contract for another party that the acts may be presumed to be contrary to the intention of the parties." *Galvstar Holdings, LLC v. Harvard Steel Sales, LLC*, No. 722 F. App'x 12, 16 (2d Cir. 2018) (citations omitted); *see also Morris v. Putnam Berkeley, Inc.*, 687 N.Y.S.2d 139, 140 (1st Dep't 1999) (questions of fact remained as to plaintiff's implied covenant claim where contract called for plaintiff to be compensated by royalties from sales of subject software and defendant decided not to market or distribute software).  IBM's conduct satisfies both scenarios.

The record is clear that IBM's promises regarding a common core and the significant

investments it would make in DeepQA's question answer technology were integral to Nuance's willingness to enter into the SLA and pay ██████ for software that had no immediate monetizable value to Nuance.  Ex. 9 (McCann Tr.) 108:10-113:3; Ex. _ (Hicks Tr.) 211:16-25. The evidence also shows that after the parties executed the SLA, IBM determined its future work on DeepQA would be too valuable to provide to Nuance and took elaborate efforts to prevent Nuance from obtaining that work.  Ex. 7 (Kelly Tr.) 48:5-49:6, 102:14-103:9; Ex. 4 (Brown Tr.) 178:2-180:8; Ex. 30 at 41800-01; Ex. 24 at 27219; Ex. 2 (Boloker Tr.) 61:9-16, 73:9-20, 90:2-5. IBM unilaterally decided that Nuance was limited to Updates from RG and sought to secure its revisionist interpretation of the SLA in writing.  Ex. 18 at 1695-96.  When Nuance rejected the Proposed Amendment, IBM ████████████████████████ and performed ████ ████████████████████████████████ Ex. 19 at 1717; Ex. 2 (Boloker Tr.) 53:2-6; Ex. 7 (Kelly Tr.) 60:5-14.  By "forking" the DeepQA code, implementing a firewall between RG and the rest of IBM, and transferring DeepQA researchers out of RG, IBM left RG with a "lackluster" team that did not advance the question answer technology.  Ex. 16 (Sejnoha Tr.) 104:7-13.  IBM admits that the ████████████████████ while engineers in SWG "productized" the DeepQA code to make it suitable for use in what later became several Watson products.  Ex. 2 (Boloker Tr.) 53:2-63:20, 83:16-84:21; Ex. 44 (IBM Resp. to Nuance's Third Set of Interrogatories) at No. 18; Ex. 4 (Brown Tr.) 106:8-107:16. Instead of investing in what was ultimately provided to Nuance (the original plan), IBM spent ██████████████ ████████ engineers in developing enhancements to DeepQA that it kept out of Nuance's reach. Ex. 28 at 39837-38; Ex. 7 (Kelly Tr.) 60:5-14; Ex. 2 (Boloker Tr.) 33:9-34:8; Ex. 14 (Rhodin Tr.) 77:11-79:20.  These actions by IBM are undisputed.  Moreover, IBM admits that it took these steps to prevent DeepQA Updates from flowing to Nuance.  IBM's conduct is a far cry from good faith or the substantial investment promised to Nuance in the SLA negotiations.

Further, IBM also promised Nuance that it would reap the benefits of any improvements made to the question answer technology behind DeepQA. 56.1 Opp. ¶ 63. Both Nuance and IBM witnesses testified that the ███████████████████████ ████████████████████████████████████████ and that the SLA required IBM to provide changes "███████████████████████████████████████████ ██████████████████" Ex. 16 (Sejnoha Tr.) 31:4-22, 35:8-41:21; Ex. 4 (Brown Tr.) 261:5-262:24. IBM developed numerous products that represented improvements to DeepQA's functionality, including improvements to the core components of DeepQA. Ex. 32 (Redbook) 31-32, 41. For example, ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████ Ex. 37 (Schnell Report) ¶¶ 189-217. As IBM admits, "[a]lthough the original DeepQA architecture and technologies have evolved and modernized, the 'fingerprints' can be found" throughout these products. Ex. 32 (Redbook) 60. By withholding these products, and firewalling off RG, IBM deprived Nuance the benefit of its bargain.

IBM asserts two baseless arguments in an attempt to dispose of Nuance's claim for breach of the implied covenant of good faith and fair dealing without addressing the evidence of its bait-and-switch. First, in a classic straw man argument, IBM submits that there is "no triable issue" because IBM never promised (i) to provide all Updates developed outside RG or (ii) to develop all Updates in RG. IBM Br. at 20. The problem with IBM's argument is that, as discussed in detail above, Nuance's implied covenant claim is not premised on either of those promises and thus IBM's contention that Nuance "failed to adduce evidence sufficient to raise a triable issue" is a red herring.

Second, IBM submits that Nuance's claim for breach of the implied covenant of good faith

and fair dealing is duplicative of its breach of contract claim in part because, according to IBM, both claims "allege the same harm (IBM's refusal to deliver DeepQA Modifications developed by SWG)." IBM Br. at 19. But IBM ignores ample undisputed evidence of IBM's active efforts to prevent Nuance from getting any of IBM's work on DeepQA, including by specifically developing Updates "██████████████████." Ex. 19 at 1717. This conduct goes well beyond IBM's failure to deliver Updates in breach of its express contractual obligations and directly "impair[ed] the value of the contract" for Nuance. *See Bank of China v. Chan*, 937 F.2d 780, 789 (2d Cir. 1991). It is possible for a fact finder to find no breach of any express term of the SLA, but that IBM did breach the covenant of good faith and fair dealing by, for example, moving knowledgeable researchers out of the RG and firewalling off those that remained. Nuance's claim for breach of the implied covenant of good faith and fair dealing is therefore not duplicative of its breach of contract claim. IBM's motion as to Count III should be denied.

## III.   QUESTIONS OF FACT PRECLUDE IBM'S REQUEST FOR PARTIAL SUMMARY JUDGMENT

During discovery in this matter, IBM refused to produce source code metadata for six products Nuance alleged are derived from DeepQA. This hindered Nuance's expert Ron Schnell's ability to opine on the connection between those products and DeepQA. Ex. 37 (Schnell Report) ¶ 187-89. Nevertheless, based on his review of the final version of the products' source code and IBM's statements about the evolution of the products, Mr. Schnell was able to conclude that

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████           *Id.* ¶ 189. As discussed *supra* Section II, IBM represented to Nuance that all work generated to improve the functionality underlying the DeepQA pipeline, such as question analysis, hypothesis generation and scoring, and final merger and ranking, would be incorporated into DeepQA and flow to Nuance as Updates. Ex. 9 (McCann

Tr.) 95:8-103:1, 110:2-112:12; Ex. 16 (Sejnoha Tr.) 40:8-41:13; Ex. 4 (Brown Tr.) 261:10-262:24. IBM's request for partial summary judgment should be denied because, viewing the evidence in the light most favorable to Nuance, there is a question of fact as to whether these products, which IBM itself has said "evolved" from DeepQA, should have been delivered to Nuance under the SLA. Ex. 32 (Redbook) 60.

Moreover, IBM argues that its motion for partial summary judgment should be granted because, according to IBM, the SLA only entitles Nuance to Updates to the code listed in Exhibit A. IBM manufactured this argument during this litigation after Nuance's expert discovered ███████████████████████████████████████████████████████████. Ex. 37 (Schnell Report) ¶¶ 218-23. But IBM's assertion cannot be reconciled with the language of the contract or even its course of performance—the initial DeepQA source code delivery and subsequent Update deliveries included code not listed on Exhibit A. Ex. 5 (Hicks Tr.) 150:12-151:13. The best IBM's expert could come up with to explain this contradiction was to state that IBM ███████████████ ████████████████ *Id*. Such an explanation surely cannot resolve this issue on summary judgment.

## IV.    IBM'S LIMITATIONS DEFENSE FAILS AS A MATTER OF LAW

### A.    Ample Evidence Establishes that Nuance's Claims Are Timely

Nuance's claims are timely because Nuance did not have "knowledge" of IBM's breach––as required under the SLA's limitation period—until the earliest January 2015. 56.1 Opp. ¶ 64 and evidence cited therein. As a preliminary matter, Nuance's expectation was that Updates would come from all of IBM and would be kept in a common code base managed by RG as "custodian" of the code. *Id.*; Ex. 9 (McCann Tr.) 95:8-103:1, 111:5-18, 171:3-173:4; Ex. 16 (Sejnoha Tr.) 40:8-41:13. Nuance's receipt of Updates from RG therefore did not indicate that it was missing IBM's work generated by other groups, and based on what Nuance received from IBM, it appeared that Updates were coming from outside RG. For example, as IBM points out, ███████████████

[REDACTED]

[REDACTED] 56.1 Opp ¶ 64; IBM Ex. 39. [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] 56.1 Opp. ¶ 64; Ex. 9 (McCann Tr.) 187:17-190:5; 193:4-196:19. Thus, while IBM tries to use these presentations against Nuance, when put into context, these documents reinforce, rather than refute, Nuance's lack of knowledge.

Moreover, Nuance had no way of verifying what IBM was doing on DeepQA outside of the code Update "drops" sent to Nuance through RG. 56.1 Opp. ¶ 64 and evidence cited therein; Ex. 16 (Sejnoha Tr.) 142:15-144:9. As Ms. McCann explained, [REDACTED] [REDACTED] *Id.* Ex. 9 (McCann Tr.) 184:7-16. Nuance thus [REDACTED] [REDACTED] *Id.* IBM's brief only points to the questions Nuance had as to whether IBM was providing all Updates to DeepQA, including those developed by SWG. But it repeatedly ignores the assurances Nuance obtained from IBM in response. 56.1 Opp. ¶¶ 64, 68 and evidence cited therein. For example, IBM points out that, in September 2011 (just after Nuance rejected the proposed SLA amendment) SWG employee Manoj Saxena "threaten[ed] that [IBM] would pull back from living up to the wording in the contract" and RG employee Murthy Devarakonda made similar representations to Nuance employee Mark Fanty. IBM Br. at 23. IBM omits the fact that Nuance "addressed" the threat by Mr. Saxena with IBM executives and complained to Mr. Devarakonda who, in October 2011, came back and [REDACTED] [REDACTED] Ex. 9 (McCann Tr.) 160:3-17, 167:6-14; Ex. 31 at 9113; Ex. 41 at 35384. And again, when Nuance inquired as to whether it was in fact receiving all Updates in February 2013, Mr. Devarakonda assured Nuance that IBM was [REDACTED]

█████████████████████████████████████████████ Ex. 34 at 18208.  Thus,

contrary to IBM's contentions, IBM absolutely represented—on several occasions—that Nuance

was getting all Updates.  56.1 Opp. ¶ 68 and evidence cited therein.  In fact, each of the Nuance

executives in charge of the DeepQA project, including Nuance's Chief Executive Officer, Chief

Technology Officer, and Chief Information Officer testified that IBM "█████████████"

Nuance that they "███████████████████████████████████████████████

████████████████████████████."  Ex. 16 (Sejnoha Tr.) 97:19-101:9, 143:8-11;

Ex. 15 (Ricci Tr.) at 20:20-23:11, 112:6-113:15; Ex. 9 (McCann Tr.) 167:6-14, 184:7-19, 235:3-

11.[8]

When put into context, IBM's "evidence" of Nuance's knowledge is no more than smoke

and mirrors.  Nuance had ten years of Updates and its executives believed that if they were

"patient," as IBM asked them to be, IBM would make good on its promise to deliver the Updates

provided by all of IBM.  Thus, viewing the evidence in the light most favorable to Nuance, IBM's

motion for summary judgment should be denied.

**B.     IBM Waived A Limitations Defense**

In addition to being unsupported by the evidence, IBM's limitations argument also fails

because IBM waived any defense based on the limitations period when it failed to assert such a

defense in its answer.  *See Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 967 F.2d 742, 751-

52 (2d Cir. 1992) (a claim that a limitations period bars a suit is an affirmative defense, and, as

such, it is waived if not raised in the answer to the complaint) (citing Fed. R. Civ. P. 8(c)); *see also*

---

[8] IBM again cites to a January 2013 document █████████████████████████

████████████████████████████ IBM Br. at 23.  And, when asked point blank whether

Nuance had ████████████████████████████████████████████████████

██████████████████████████ Ms. McCann responded that they █████████

█████████████████████ Ex. 9 (McCann Tr.) 234:12-22.

ECF No. 9.  IBM's request for relief based on the limitations period must therefore be denied.

### C.     IBM Should Be Equitably Estopped From Asserting A Limitations Defense

IBM should also be equitably estopped from asserting a defense based on the limitations period because IBM repeatedly assured Nuance that it was receiving all Updates under the SLA. Equitable estoppel is appropriate where, as here: "(1) the defendant made a definite misrepresentation of fact, and had reason to believe that the plaintiff would rely on it;" and "(2) the plaintiff reasonably relied on that misrepresentation to his detriment." *Buttry v. Gen. Signal Corp.*, 68 F.3d 1488, 1493-94 (2d Cir. 1995).  Here, as discussed *supra* Section IV (A), (1) IBM failed to disclose that it was not delivering all Updates to DeepQA while also (2) repeatedly and deliberately misleading Nuance when Nuance asked whether IBM was providing all Updates, knowing that (3) without access to the SWG's fork of the code Nuance had no way of knowing that IBM was withholding Updates, and (4) Nuance relied on IBM's misrepresentations to its detriment.  *See* Ex. 16 (Sejnoha Tr.) 97:19-101:9, 142:15-144:9; Ex. 15 (Ricci Tr.) at 20:20-23:11, 112:6-113:15.  Accordingly, IBM should be estopped from asserting a limitations defense.

### D.     Nuance's Claims Are Timely Under The Continuing Wrong Doctrine

Finally, where a contract requires "continuing performance over a period of time, each successive breach may begin the . . . limitations [period] running anew." *Guilbert v. Gardner*, 480 F.3d 140, 150 (2d Cir. 2007); *Bulova Watch Co. v. Celotex Corp.*, 46 N.Y. 2d 606, 611 (1979). Here, the SLA calls for continuing performance—delivery of Updates—for a ████████████. Ex. 43 (SLA) Sched. A.  IBM's failure to provide Updates as they become available, which is required under the SLA, constitutes repeated breaches of IBM's continuing obligation.  *Id.*

### <u>CONCLUSION</u>

For the foregoing reasons, Nuance respectfully requests that the Court deny IBM's motion for summary judgment.

Dated: September 14, 2018
       New York, New York

David J. Lender
Jessica L. Falk
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Tel: 212-310-8000
Fax: 212-310-8007
david.lender@weil.com
jessica.falk@weil.com

David R. Singh
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Tel: 650-802-3000
Fax: 650-802-3100
david.singh@weil.com

*Attorneys for Plaintiff*

26