**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **NUANCE COMMUNICATIONS, INC.,** | **Case No: 16-cv-5173** |
| **Plaintiff,** | **ECF Case** |
| **v.** | |
| **INTERNATIONAL BUSINESS MACHINES CORPORATION**, | |
| **Defendant.** | |

## DEFENDANT INTERNATIONAL BUSINESS MACHINES CORPORATION'S REPLY IN FURTHER SUPPORT OF ITS SUMMARY JUDGMENT MOTION

QUINN EMANUEL URQUHART
& SULLIVAN, LLP
Richard I. Werder, Jr.
Kevin S. Reed
Elinor Sutton
Hope Skibitsky
Florentina Dragulescu, *pro hac vice*
51 Madison Avenue, 22nd Floor
New York, New York 10010
Tel. (212) 849-7000
Fax (212) 849-7100

*Attorneys for Defendant*
*International Business Machines*
*Corporation*

International Business Machines Corporation ("IBM") respectfully submits this reply brief in further support of its motion for summary judgment ("IBM Br.") dated July 28, 2018 (ECF No. 121), and in response to Nuance Communications, Inc.'s ("Nuance") opposition brief ("Opp. Br.") (ECF No. 130).   Additionally, IBM incorporates by reference its opposition to Nuance's motion for partial summary judgment, dated September 14, 2018 (ECF No. 133).

## ARGUMENT

## I.    THERE IS NO TRIABLE ISSUE CONCERNING NUANCE'S ENTITLEMENT TO MODIFICATIONS OF DEEPQA CREATED OUTSIDE OF IBM RESEARCH

Nuance's claims for declaratory judgment and breach of contract ask the Court to find that the SLA entitles Nuance to Modifications[1] to DeepQA created anywhere within IBM.  In its opposition, however, Nuance is unable to cite to any language in the SLA that says anything remotely resembling that.  Instead, as IBM anticipated in its opening brief, Nuance's position rests entirely on the part of the definition of Licensed IBM Background Software that reads "provided to Nuance by IBM under the Agreement."  According to Nuance, it was by including those words in the SLA that the parties turned IBM's obligation to provide Nuance with DeepQA Modifications created by IBM Research into an obligation to deliver DeepQA Modifications created throughout IBM.  More particularly, Nuance imbues the single word "provided" with dispositive significance, arguing that the use of "provided" rather than "delivered" somehow changes the phrase from a simple statement about who will deliver a specified set of code into a substantive provision that defines code to be delivered.  Opp. Br. at 11.  None of it makes any sense.

*First*, the phrase "provided to Nuance by IBM under this agreement" is facially a passive descriptor, by which the parties referenced who would deliver the code that phrase describes. Nuance's argument that the parties used the word "deliver" when imposing an obligation to convey

---

[1]   All terms herein maintain the definitions set forth in IBM's opening brief.

something (Opp. Br. 11-12), such that "provide" must have some other meaning, is absurd. The SLA frequently uses the word "provide" to express that IBM (not IBM Research) is to deliver, provide, give or supply something to Nuance. *See*, *e.g.*, Ex. 5 (SLA) §§ 2.4, 2.7, 2.10, 3.5, 3.6, 5.1, 5.3, 5.7.[2] The idea that "provide" was used in the definition of Licensed IBM Background Software as anything other than a synonym for "deliver" is thus inconsistent with the contract as a whole. Moreover, Nuance cannot explain what other meaning "provide" could have that would require IBM to give Nuance any DeepQA Modifications created outside of IBM Research.

*Second*, the phrase "provided to Nuance by IBM under this agreement" does not even apply to Modifications and thus cannot enlarge IBM's obligation to deliver Modifications. IBM Br. 13-14. The phrase only modifies the preceding item listed in the definition of Licensed IBM Background Software, "additional Software as agreed by the parties." *Id.* Nuance tries to refute this with an argument about the significance of where a comma is placed (Opp. Br. 10-11), but it has no answer for, and therefore ignores, IBM's larger and dispositive point: The first part of the definition of Licensed IBM Background Software makes clear that Modifications to DeepQA are within the scope of Nuance's license and thus must be delivered to Nuance pursuant to the SLA (Nuance cannot and does not dispute this). Accordingly, there was no reason to say a second time, at the end of the definition, that Modifications must be provided to Nuance pursuant to the SLA. The only way that phrase makes sense in context, and the reason it was included, is to make clear that, after the execution of the SLA, the parties could agree to extend Nuance's license to additional software – *i.e.*, software not included in the initial license granted by the SLA – in which case, IBM would provide Nuance with such additional software *pursuant to the terms of the Agreement*.

---

[2]    Unless otherwise indicated, all exhibits cited are exhibits to the Declaration of Kevin Reed submitted in support of IBM's motion for summary judgment. (ECF No. 122). Any exhibits cited as "Reed Decl., Ex. _" reflect citations to the Declaration of Kevin Reed submitted herewith.

Since Nuance does not contend that any other language in the SLA entitles it to Modifications created outside of IBM Research, its arguments about the remainder of the definition of Licensed IBM Background Software are of no relevance.  In particular, Nuance's response to IBM's argument about the significance of the word "including" near the beginning of the definition (Opp. Br. 9-10) is mooted by Nuance's position that it is only the language at the end of the definition that extends its entitlement to Modifications to those created anywhere within IBM.  That said, Nuance's argument is wrong.  As explained in IBM's opening brief, by stating that Nuance licensed the existing DeepQA code developed by IBM Research, "including" a set of modifications, updates and upgrades defined as "Modifications," the SLA makes clear that the defined term "Modifications" comprises only code developed by IBM Research.  IBM Br. 12-13. The fact that the SLA goes on to provide that IBM shall continue delivering such Modifications for ten years does not change this fundamental aspect of the defined term.

## II.   THE EXTRINSIC EVIDENCE CONCLUSIVELY SHOWS THAT THE PARTIES DID NOT INTEND FOR NUANCE TO RECEIVE SWG WORK PRODUCT

In light of the above, there continues to be no need for the Court to examine extrinsic evidence here.  Were there any need, however, the extrinsic evidence would, not surprisingly, lead to the same result as the unambiguous contract language.  Nuance's opposition makes clear that the Court need only look at one key piece of extrinsic evidence to see that this is so.

IBM's opening brief highlighted that, after executing the SLA, IBM, with Nuance's knowledge, erected a firewall between IBM Research and SWG for fear that collaboration between them would lead Nuance to claim that SWG's work product belonged to IBM Research and thus fell within Nuance's license.  IBM explained that the only reason it made sense for IBM to protect against bringing SWG's work product within Nuance's license is that the license did not already extend to SWG's work product.  Finally, IBM explained that had Nuance believed itself entitled

to SWG's work product, it would have demanded that IBM take down the firewall, so as to improve the quality of the Modifications it was owed.  IBM Br. 14-16.

Nuance does not dispute the existence of the firewall or that Nuance did not object to it. Equally important, Nuance also concedes the logic of IBM's arguments.  Nuance thus does not deny that there would have been no reason for IBM to maintain the firewall if it understood the SLA to entitle Nuance to SWG's work, nor does Nuance deny that it would not have tolerated the firewall if it had believed itself entitled to SWG's work.  Instead, Nuance tries to duck the impact of this compelling course of dealing evidence, *see Faulkner v. National Geographic Soc*., 452 F. Supp. 2d 369, 381 (S.D.N.Y. 2006) ("[T]he parties' course of dealing throughout the life of a contract is highly relevant to determining the meaning of the terms of the agreement."), by claiming that it did not know about the firewall and thus had no opportunity to object.  Nuance fails, however, to raise a triable issue on this point because the evidence shows conclusively that Nuance knew.

In emails that Jeanne McCann, the senior Nuance executive who negotiated the SLA, sent to Paul Ricci, Nuance's CEO, Ms. McCann unambiguously stated that ███████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████████. IBM Br. 15-16. ████████████████████████████████ █████████████████████████████████████████████████████. ███████████████████ ████████████████████████████████████████████████████████████ █████████████████████.[3]  Opp. Br. 14 n.6.  This is at best wishful thinking and, less charitably, a

---

[3] Nuance also notes that the emails were written two years after the firewall was erected, but this is irrelevant.  To begin with, the emails speak of ████████████████████████████████ ███████████████████████████.  Additionally, even if Nuance had only learned of the firewall in 2013, Nuance does not argue it would not have been motivated to strenuously object to it at that point if it had believed that the SLA entitled it to SWG's work.

questionable effort to mislead the Court about the emails, which leave no doubt that Ms. McCann was writing to Mr. Ricci ███████████████████████████████████████████████ ████████████████████████████. The first, written in early January 2013, states as follows:



[Ex. 29 at 18482 (emphasis added).]

The testimony Nuance cites (Opp. Br. 14) cannot overcome this evidence. Presented with a 2013 email in which Ms. McCann wrote to Nuance's CEO about ███████████, Nuance does not raise a triable issue of fact by citing to incredible testimony from Ms. McCann that ███████ ████████████████████████████████████. *See BanxCorp v. Costco Wholesale Corp.*, 978 F. Supp. 2d 280, 299 (S.D.N.Y. 2013) ("'[A] self-serving, contradictory affidavit fails to raise a triable issue of fact when it conflicts with documentary evidence.'"); *see also Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 105-06 (2d Cir. 2011) (court may reject a party's testimony in opposition to summary judgment where it cannot be reconciled with the party's earlier statements and is therefore implausible). As to the remaining testimony Nuance cites, assuming for argument's sake that (i) ████████████████████████████████████████████████████ ██████████████████████ and (ii) certain IBM executives (Eric Brown and David Boloker) did not know whether Nuance had been told about it, none of that undermines the documentary evidence that proves that Nuance's CEO and his right-hand woman did know about it.

## III.   THERE IS NO TRIABLE ISSUE ON NUANCE'S CLAIM THAT IBM BREACHED THE IMPLIED COVENANT OF GOOD FAITH

In its opening brief, IBM posited that Nuance's claim for breach of the covenant of good faith was premised on an implied promise to (i) provide Nuance with all Modifications to DeepQA,

regardless where they were developed, or (ii) develop all Modifications in IBM Research.  IBM Br. 20.  Rather than take on IBM's arguments as to why these promises cannot ground a viable claim, Nuance asserts that IBM has misconstrued the claim.  According to Nuance, its claim is based on pre-contractual promises that IBM would incorporate all improvements to DeepQA's question answering technology into a "common core" (Opp. Br. 18) and that Nuance would "reap the benefits" of those improvements (*id.* 20).

Clarified this way, the claim still fails on the law.  This is, first, because the distinction Nuance tries to draw is one without a difference.  In asserting that IBM promised to put all improvements to DeepQA into a common code base and give Nuance access to it, Nuance is doing nothing other than alleging that IBM promised to provide Nuance with all Modifications to DeepQA.  As explained in IBM's opening brief (at 20), this supposed promise cannot be the basis for a breach of good faith claim because it is contrary to the express provisions of the SLA, which limit Nuance to Modifications created by IBM Research.  *See Murphy v. Am. Home Prods. Corp.*, 448 N.E.2d 86, 91 (N.Y. 1983) ("No obligation can be implied ... which would be inconsistent with other terms of the contractual relationship.").  Further, a breach of good faith claim based on a claim that IBM failed to deliver all Modifications would be impermissibly duplicative of Nuance's breach of contract claim, which alleges the same thing.  IBM Br. 19-20.  Independently, because Nuance alleges that IBM made these supposed promises before executing the SLA, they cannot ground a breach of good faith claim.  This is mandated by the parties' contract, *see* Ex. 5 (SLA) § 7.10 ("Neither party relies on any promises, inducements or representations made by the other ... except as expressly provided in the Agreement."), and the law.  *See Sonoran Scanners, Inc. v. PerkinElmer, Inc.* 585 F.3d 535, 542 (1st Cir. 2009) ("[S]tatements that are made *before* a contract is executed are 'inadequate' for a claim of breach of the implied covenant of good faith

and fair dealing."); Restatement (Second) of Contracts § 205 cmt. c (1981) (duty of good faith and fair dealing "does not deal with good faith in the formation of a contract").

Elsewhere in its opposition, Nuance appears to suggest that IBM breached the covenant of good faith by stripping IBM Research of the resources necessary to make improvements to DeepQA.  Opp. Br. 19.  IBM strongly disputes that allegation,[4] but even assuming it to be true for summary judgment purposes, it does not save Nuance's claim.  As noted above, Nuance has conceded that IBM did not promise to develop all DeepQA Modifications within IBM Research, so this version of Nuance's implied covenant claim can only be that IBM breached an implied promise to develop some unspecified percentage of DeepQA Modifications within IBM Research.  But aside from the fact that it would be impossible to know when or if this implied promise was breached (how few is too few?), Nuance fails to raise a triable issue as to whether this promise was one that could reasonably be considered part of the SLA.  This is true for at least two reasons:

*First*, nothing in the SLA supports the conclusion that Nuance could reasonably have understood IBM to have impliedly promised that some minimum amount of Modifications would be developed within IBM Research or that such a promise was "essential to effectuate the contract's purposes."  *Bank of China v. Chan*, 937 F.2d 780, 789 (2d Cir. 1991).  While the SLA provides that any Modifications to DeepQA that are created within IBM Research must be given to Nuance, nothing in the SLA obligates IBM to create Modifications within IBM Research, or

---

[4] Nuance misleadingly quotes an email in which an IBM employee ███████████████████████████████████████████████. Further, while Nuance asserts that IBM transferred personnel out of IBM Research to prevent their work on DeepQA from going to Nuance, the only occasion on which a team of researchers that worked on DeepQA was transferred into SWG occurred four years after the SLA was executed.  Moreover, after that team moved into SWG, IBM continued to provide Nuance with its domain-independent work on DeepQA (despite not being obligated to do so).   (ECF No. 135, IBM's Response to Nuance's Rule 56.1 Statement, ¶ 18).

anywhere else in the company.  Section 7.12 of the SLA, moreover, provides that "[e]xcept as expressly set forth in this Agreement, each party may ... conduct its business in whatever way it chooses," which means that IBM is and always has been free to create Modifications whenever and wherever it decides.  Ex. 5 (SLA) § 7.12.  The "essential purpose" of the SLA was to license Nuance the DeepQA code, and any Modifications that IBM Research made to it, so that Nuance could try to develop the code into a profitable product.  Nuance received that; the fact that it failed to capitalize does not create a good faith claim against IBM.

*Second*, any subjective expectation on Nuance's part that IBM Research would create Modifications necessary to commercialize DeepQA would have been objectively unreasonable. When Nuance executed the SLA, it was well aware that IBM's practice was for IBM Research to hand over its work product to IBM's commercial units for commercial development.  IBM Br. 22. Absent an explicit commitment in the SLA to deviate from this development model, Nuance had no reasonable basis to believe that IBM had promised to do so.

## IV.    IV.    NUANCE'S CLAIMS ARE TIME BARRED UNDER THE CONTRACT

Nuance kicks up a dust storm of irrelevant evidence in an effort to disguise the fact that that it knew by 2012 – not 2015 – that IBM had forked the DeepQA code and was not giving Nuance anything from the SWG branch.  Opp. Br. 22-24.  Again, however, Nuance cannot run from Jeanne McCann's clear emails to Paul Ricci.  In January 2012, ███████████████████ ████████████████████████████████████████████████████████████████████ Ex. 39 at 9270.  In January 2013, Ms. McCann wrote to Mr. Ricci that ██████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████████████████████ Ex. 29 at 18482.

Nuance's argument that IBM waived this defense (Opp. Br. 24) is unavailing.  Nuance cites no authority establishing that IBM was required to plead Nuance's failure to comply with a

contractually mandated deadline for filing claims as an affirmative defense, but assuming that proposition for argument's sake, "the law is clear that, in the absence of prejudice, 'a defendant may raise an affirmative defense in a motion for summary judgment for the first time.'" *McGuiggan v. CPC Intern., Inc*., 84 F. Supp. 2d 470, 480 (S.D.N.Y. 2000); *see also Cowan v. Ernest Codelia, P.C*., 149 F. Supp. 2d 67, 73–74 (S.D.N.Y. 2001). Nuance makes no argument that it was prejudiced nor could it, as the timeliness of Nuance's claims was a central piece of discovery, and Nuance was on notice that IBM might be pursuing this defense. *See*, *e.g*., Reed Decl., Ex. 52 (IBM's First Set for Requests for Admission) at 5-6.

Nuance's estoppel claim (Opp. Br. 25) fails because, at a minimum, Nuance cannot establish detrimental reliance, since it knew in 2012 that it was not receiving SWG's work.

Finally, the authorities Nuance cites in invoking the continuing wrong doctrine (Opp. Br. 25) are distinguishable. Neither of them is a case in which the defendant had repudiated any intent to perform the continuing obligation prior to litigation being filed. Here, again, IBM had made clear to Nuance not later than 2012 that it had not and would not provide SWG's work. Nuance was thus on notice of the entirety of the claims it asserts here by that time.

## V.     IN THE ALTERNATIVE, IBM IS ENTITLED TO PARTIAL SUMMARY JUDGMENT

In the event the Court does not grant summary judgment against Nuance's claims in their entirety, the Court should grant summary judgment to the extent Nuance claims an entitlement to any code solely on the basis that it performs a similar function to any part of the DeepQA processing pipeline, because the SLA requires a more direct connection between DeepQA and other code for the latter to be considered a Modification. Nuance's counter arguments all fail.

*First*, Nuance was not hindered in taking discovery about products that purportedly share functionality with DeepQA by any "refusal" by IBM to produce source code. IBM objected to

producing that source code because shared functionality "outside the DeepQA pipeline" (Opp. Br. 21) is not relevant.  IBM Br. 24-25.  Magistrate Judge McCarthy sustained IBM's objection, Reed Decl., Ex. 53 (8/1/17 Hr'g Tr.) at 12:16-24,17:12-22, and Nuance did not appeal her ruling.

*Second*, Nuance's argument that it is not limited to Modifications to the code listed on Exhibit A to the SLA (Opp. Br. 22), if meant to say that Nuance is entitled to Modifications to something beyond DeepQA, is bizarre.  Modifications, by their nature, modify another thing; here that thing is obviously DeepQA, and Nuance does not offer any alternative.

*Third*, if Nuance is arguing that it is owed Modifications to parts of DeepQA that may not be listed on Exhibit A, IBM disagrees but it does not matter.  Adopting Nuance's position for argument's sake, the Modifications to which Nuance is entitled consist of "modifications, updates [and] upgrades" to DeepQA, Ex. 5 (SLA) at 10986, and, according to *Nuance's* expert, those terms do not describe code that merely shares functionality with DeepQA but was not developed as part of or in connection with DeepQA.  IBM Br. 24.

*Fourth,* Nuance's claim that there are questions of fact as to whether particular products contain code that "evolved" from DeepQA is irrelevant, as IBM is only seeking summary judgment to the extent Nuance claims entitlement to code based solely on purportedly shared functionality with some part of DeepQA.

## <u>CONCLUSION</u>

For the foregoing reasons, IBM's motion for summary judgment should be granted.

Dated: New York, New York
        September 28, 2018

                              QUINN EMANUEL URQUHART &
                              SULLIVAN, LLP


                    By:    */s/ Kevin S. Reed*
                           Richard I. Werder, Jr.
                           Kevin S. Reed
                           Elinor Sutton
                           Hope Skibitsky
                           Florentina Dragulescu, *pro hac vice*
                           51 Madison Avenue, 22nd Floor
                           New York, New York 10010
                           Tel. (212) 849-7000
                           Fax (212) 849-7100
                           rickwerder@quinnemanuel.com
                           kevinreed@quinnemanuel.com
                           elinorsutton@quinnemanuel.com
                           hopeskibitsky@quinnemanuel.com
                           florentinafield@quinnemanuel.com

                           *Attorneys for Defendant*