UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NUANCE COMMUNICATIONS, INC.,

               Plaintiff,

        v.

INTERNATIONAL BUSINESS
MACHINES CORPORATION,

               Defendant.

No. 16-CV-5173 (KMK)

AMENDED OPINION & ORDER[1]

Appearances:

Jessica L. Falk, Esq.
Kevin F. Meade, Esq.
David Lender, Esq.
Weil, Gotshal & Manges LLP
New York, NY
*Counsel for Plaintiff*

Elinor C. Sutton, Esq.
Hope D. Skibitsky, Esq.
Justin L. Bernstein, Esq.
Kevin S. Reed, Esq.
Florentina Dragulescu, Esq.
Quinn Emanuel Urquhart & Sullivan, LLP
New York, NY
Washington, DC
*Counsel for Defendant*

KENNETH M. KARAS, United States District Judge:

      Nuance Communications, Inc. ("Nuance") brings this Action against International

Business Machines Corporation ("IBM") alleging breach of contract and breach of the implied

---

[1] The Amended Opinion & Order differs from the initial Opinion & Order only in that it omits non-material information that the Parties proposed for redaction.

covenant of good faith and fair dealing.  Before the Court is Nuance's Motion for Summary

Judgment, (Not. of Mot. (Dkt. No. 116)), and IBM's Motion for Summary Judgment, (Not. of

Mot. (Dkt. No. 120)).  For the reasons discussed below, Nuance's Motion is denied, and IBM's

Motion is granted in part and denied in part.

I.  Background

A.  Factual Background

The following facts are drawn from the Parties' statements submitted pursuant to Local

Civil Rule 56.1, both as to Nuance's Motion, (*see* Pl.'s Local Rule 56.1 Statement ("Nuance

56.1") (Dkt. No. 118); Def.'s Resp. to Pl.'s Rule 56.1 Statement ("IBM Resp. 56.1") (Dkt. No.

135)), and as to IBM's Motion, (*see* Def.'s Local Rule 56.1 Statement ("IBM 56.1") (Dkt. No.

123); Pl.'s Resp. to Def.'s Rule 56.1 Statement ("Nuance Resp. 56.1") (Dkt. No. 132)), as well

as from the admissible evidence submitted by the Parties.[2]  The facts are not in dispute except to

the extent indicated.[3]

---

[2] Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  The nonmoving party, in turn, must submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  Local Civ. R. 56.1(b).

[3] Where the Parties identify disputed facts but with semantic objections only or by asserting irrelevant facts, the Court will not consider these purported disputes, which do not actually challenge the factual substance described in the relevant paragraphs, as creating disputes of fact.  *See, e.g.*, *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014); *Pape v. Bd. of Educ. of Wappingers Cent. Sch. Dist.*, No. 07-CV-8828, 2013 WL 3929630, at *1 n.2 (S.D.N.Y. July 30, 2013); *Goldstick v. The Hartford, Inc.*, No. 00-CV-8577, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002).  Where possible, the Court has relied on the undisputed facts in the Parties' 56.1 submissions.  However, direct citations to the record have also been used where relevant facts were not included in any of the Parties' Rule 56.1 submissions, or where the Parties did not accurately characterize the record.

1.  DeepQA and Contract Formation

The IBM Research Group ("IBMRG") is a subdivision within IBM that develops

technologies it then licenses; it does not itself develop commercial products.  (IBM 56.1 ¶¶ 1–2.)

By September 2010, IBMRG had developed DeepQA, a natural-language question-answering

technology.  (IBM 56.1 ¶¶ 3–4; Nuance 56.1 ¶ 2.)[4]  IBM, seeking to monetize DeepQA,

approached Nuance, a software technology company, in June 2010 to license its code and

thereby allow Nuance to apply DeepQA to various fields, including banking, health care, and

customer service.  (Nuance 56.1 ¶¶ 4–6.)

On September 30, 2010, Nuance and IBM entered into a contract to license DeepQA (the

"Software License Agreement" or "SLA").  (Nuance 56.1 ¶ 1; Decl. of David J. Lender, Esq. in

Supp. of Pl.'s Mot. ("First Lender Decl.") Ex. B ("SLA") (Dkt. No. 119).)  The SLA provides

that it is an agreement "between Nuance Communications, Inc." and "International Business

Machines Corporation, through its IBM Research Group."  (SLA 1.)  It also provides that, "[a]s

used in this Agreement, all references to 'IBM' mean IBM Corporation, unless otherwise

expressly limited to a division or group of IBM Corporation herein."  (*Id.* § 7.11.)

The SLA grants Nuance a license to DeepQA — identified as the "Licensed IBM

Background Software" — "which Nuance may use to develop and commercialize its own

products."  (*Id.* at 1; *see also id.* § 2.1 (describing terms of license).)  The SLA defines "Licensed

IBM Background Software" as:

> all Software that exists as of the Effective Date in all available formats . . . that is
> owned by, or that has been developed or licensed by the IBM Research Group,
> including Tools, and that is listed on Exhibit A, including any modifications,
> updates, error corrections, bug fixes, diagnostic and/or testing tools, that are JDBC
> complaint, and other changes, if available ("Modifications"), and if such

---

[4] DeepQA eventually formed the basis for IBM's Watson supercomputer, which
successfully competed on *Jeopardy!* in February 2011.  (Nuance 56.1 ¶ 3; IBM 56.1 ¶¶ 22–24.)

> Modifications are not contractually prohibited under a Third Party Agreement, and such Modifications are available, will be timely provided to Nuance; and where the Modifications continue to meet the scope contemplated in Article 2.1 regarding the licensing of DeepQA under this Agreement, as of the Effective Date and thereafter for a [defined] period . . . , and additional Software as agreed by the parties, provided to Nuance by IBM under the Agreement (collectively "Updates") . . . .

(*Id.*, at Schedule A.)  The SLA further provides that, "if IBM provides . . . any modifications, updates, upgrades, error corrections, bug fixes, diagnostic and/or testing tools and other changes to [DeepQA], IBM will update Exhibit B [to the SLA] to include any additions or subtractions to the Open Source Software or the Third Party Code."  (*Id.* § 2.4.)  Finally, the SLA provides that, "[e]xcept as expressly set forth in [the SLA], each party may . . . conduct its business in whatever way it chooses."  (*Id.* § 7.12.)

At the core of this case is a dispute as to *which* DeepQA updates Nuance is entitled. According to Nuance, the Parties agreed that Nuance would receive updates to DeepQA no matter where within IBM they were developed.  (Nuance 56.1 ¶ 9; Nuance Resp. 56.1 ¶ 16.) According to IBM, however, the Parties agreed that Nuance would receive only those updates to DeepQA developed by IBMRG, and that any DeepQA updates developed outside IBMRG would not be provided to Nuance.  (IBM 56.1 ¶ 16; IBM Resp. 56.1 ¶ 9.)

### 2.  Post-Formation Events

At the time the SLA was executed, IBMRG exclusively managed DeepQA and continued to develop its source code.  (Nuance 56.1 ¶ 14; IBM Resp. 56.1 ¶ 14.)  On August 1, 2011, however, IBMRG "forked" (i.e., copied) the DeepQA code and delivered a copy to the IBM Software Group ("IBM Software"), a separate subdivision within IBM that develops commercial products, in order to further develop and commercialize DeepQA.  (Nuance 56.1 ¶¶ 15–17; IBM Resp. 56.1 ¶¶ 15–17; IBM 56.1 ¶¶ 25–27, 31.)  IBM Software then "bluewashed" DeepQA — that is, rewrote and cleaned up the code — and renamed it "Watson Core" for eventual product

4

development.  (IBM 56.1 ¶¶ 32–33.)  IBM also transferred certain personnel in IBMRG who had

worked on DeepQA to IBM Software to further develop DeepQA code.  (Nuance 56.1 ¶ 18; IBM

Resp. 56.1 ¶ 18.)  Thereafter, IBM Software had access to IBMRG's work on DeepQA, but that

access was not reciprocal.  (Nuance 56.1 ¶ 19; IBM Resp. 56.1 ¶ 19.)  IBM implemented a

"firewall" to ensure that IBMRG did not receive any information about IBM Software's work on

DeepQA.  (Nuance 56.1 ¶ 20; IBM Resp. 56.1 ¶ 20; IBM 56.1 ¶¶ 34–35.)  Nuance maintains that

IBM took these various actions to prevent the work performed on, and the updates applied to,

DeepQA by non-IBMRG employees from being transferred to Nuance under the SLA.  (Nuance

56.1 ¶ 21.)  IBM's position is that it "erected the firewall because of a concern that, if IBM

Software consulted with [IBMRG] on work relating to the Watson Core, Nuance might claim

that [IBM Software] work in question had been developed by [IBMRG] and was thus within the

scope of Nuance's license."  (IBM Resp. 56.1 ¶ 21; IBM 56.1 ¶ 36.)

     Although IBM has provided updates to DeepQA developed by IBMRG to Nuance, IBM

has *not* provided updates developed by IBM Software to Nuance.  (Nuance 56.1 ¶ 24; IBM Resp.

56.1 ¶ 24.)

     In August 2011, IBM proposed amending the SLA.  (IBM 56.1 ¶ 38; Nuance 56.1 ¶ 25.)

The proposed amendment provided, in relevant part, that:

> For avoidance of doubt, Software, (including modifications, updates, upgrades,
> error corrections, bug fixes, diagnostic and/or testing tools) written by IBM
> employees that are not [IBMRG] employees shall not be considered "Licensed IBM
> Background Software" even if such non-[IBMRG] employees consult with
> [IBMRG] employees in the course of their work on such Software.

(IBM 56.1 ¶ 38.)  The purpose of the amendment, according to IBM, was "to clarify the

distinction between [IBMRG] and the rest of IBM relative to the Licensed Background Software

and future obligations."  (*Id.* ¶ 39.)  Nuance rejected the proposed amendment.  (*Id.* ¶ 40.)

B.  Procedural History

Plaintiff filed a sealed Complaint on June 30, 2016, (Dkt. No. 1), and a public, redacted Complaint on July 18, 2016, (Dkt. No. 6).  IBM filed its answer on August 19, 2016.  (Dkt. No. 9.)  The Court held an initial conference on January 24, 2017, after which it adopted a case management plan and referred the case to a Magistrate Judge for general pretrial management.  (Dkt. Nos. 13, 17.)  The Parties completed discovery on June 22, 2018.  (Dkt. No. 110.)  On July 18, 2018, IBM filed a pre-motion letter requesting permission to file a Motion for Summary Judgment.  (Dkt. No. 112.)  Nuance filed a similar letter on July 19, 2018.  (Dkt. No. 114.)

On July 27, 2018, Nuance filed its Motion for Summary Judgment and accompanying papers.  (Not. of Mot. (Dkt. No. 116); Mem. of Law in Supp. of Mot. ("Nuance Mem.") (Dkt. No. 117); Nuance 56.1; First Lender Decl.)

On July 27, 2018, IBM filed its Motion for Summary Judgment and accompanying papers.  (Not. of Mot. (Dkt. No. 120); Mem. of Law in Supp. of Mot. ("IBM Mem.") (Dkt. No. 121); Decl. of Kevin S. Reed, Esq. in Supp. of Def.'s Mot. ("First Reed Decl.") (Dkt. No. 122); IBM 56.1.)

On September 14, 2018, IBM filed its response in opposition to Nuance's Motion.  (Mem. of Law. in Opp'n to Mot. ("IBM Opp'n") (Dkt. No.133); Decl. of Kevin S. Reed, Esq. in Opp'n to Pl.'s Mot. ("Second Reed Decl.") (Dkt. No. 134); IBM Resp. 56.1.)

On September 14, 2018, Nuance filed its response in opposition to IBM's Motion.  (Mem. of Law. in Opp'n to Mot. ("Nuance Opp'n") (Dkt. No. 130); Decl. of David J. Lender, Esq. in Opp'n to Def.'s Mot. ("Second Lender Decl.") (Dkt. No. 131); Nuance Resp. 56.1.)

On September 28, 2018, IBM filed a reply in support of its Motion.  (Reply Mem. of Law in Supp. of Mot. ("IBM Reply") (Dkt. No. 143); Decl. of Kevin S. Reed, Esq. in Supp. of Def.'s

Mot. ("Third Reed Decl.") (Dkt. No. 144).)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (citation, alteration, and quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in

the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted).  At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (quotation marks omitted).  Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quotation marks omitted).  However, a district court should consider "only evidence that would be admissible at trial." *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998).  "[W]here a party relies on affidavits or deposition testimony to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

B.  Analysis

Nuance brings claims of breach of contract and breach of the implied covenant of good faith.  (Compl. ¶¶ 41–50.)  In its Motion for Summary Judgment, Nuance argues that the SLA's unambiguous language entitles Nuance to updates to DeepQA regardless where within IBM they are developed.  (Nuance Mem. 6.)  In response, and in its own Motion for Summary Judgment,

IBM argues that the SLA's unambiguous language entitles Nuance only to DeepQA updates developed by IBMRG, and that even assuming the SLA is ambiguous, consideration of extrinsic evidence shows that the Parties did not intend Nuance to receive DeepQA updates from non-IBMRG groups such as IBM Software.  (IBM Mem. 10; IBM Opp'n 1.)  In the alternative, IBM seeks partial summary judgment declaring that Nuance is not entitled to code that is not derived from DeepQA.  (IBM Mem. 24.)  IBM also argues that Nuance's claim for breach of the implied covenant of good faith is impermissibly duplicative of its breach-of-contract claim.  (IBM Mem. 19; IBM Opp'n 2–3.)  Finally, IBM argues that all of Nuance's claims are untimely.  (IBM Mem. 22.)

The Court addresses each argument separately, taking the timeliness argument first and then proceeding to the merits arguments.

### 1. Contractual Limitation to Suit

IBM argues that the Complaint must be dismissed as untimely because the SLA provides for a contractual limitations period that limits an otherwise longer statute of limitations.  (IBM Mem. 22.)[5]

New York law permits parties to a contract to agree to shorten the applicable statutory

---

[5] Nuance argues that IBM waived its limitations defense for failure to assert it in its Answer.  (Nuance Opp'n 24 (citing *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 967 F.2d 742, 751–52 (2d Cir. 1992)).)  However, "the law in the Second Circuit is clear that when a defendant raises an affirmative defense, like the statute of limitations, in its summary judgment motion papers that was not asserted in the pleadings, courts may nonetheless consider the argument so long as the plaintiff had an opportunity to respond." *Scott v. City of Mount Vernon*, No. 14-CV-4441, 2017 WL 1194490, at *24 (S.D.N.Y. Mar. 30, 2017) (collecting cases).)  Here, Nuance has had an opportunity to respond (and in fact has responded).  (*See* Nuance Opp'n 22–24.)  Moreover, Nuance has not shown, or even argued, that it has suffered prejudice from IBM's belated raising of the limitations defense.  (*See id.*; *see also* IBM Reply 8–9 (noting that "Nuance makes no argument that it was prejudiced").)  Accordingly, the Court declines to hold IBM's limitations defense waived.

limitations period.  *See* N.Y. C.P.L.R. § 201 ("An action . . . must be commenced within the time specified . . . unless . . . a shorter time is prescribed by written agreement.").  Courts will enforce a contractual limitations period "as long as it is reasonable."  *Ajdler v. Province of Mendoza*, 890 F.3d 95, 99 (2d Cir. 2018); *see also Sidik v. Royal Sovereign Int'l Inc.*, 348 F. Supp. 3d 206, 213 (E.D.N.Y. 2018) (collecting cases).

Here, Section 7.9 of the SLA provides that "[n]either party may bring an action arising out of this Agreement, regardless of form, more than two years after the cause of action has accrued and the party *obtained knowledge* thereof."  (SLA § 7.9 (emphasis added).)  This period is reasonable.  *See Maniello v. State Farm Fire & Cas. Co.*, No. 16-CV-1598, 2017 WL 496069, at *2 (E.D.N.Y. Feb. 6, 2017) (holding that a "two-year contractual statute of limitations is enforceable — as such limitations typically are" (citation omitted)); *see also Wechsler v. HSBC Bank USA, N.A.*, 674 F. App'x 73, 74 (2d Cir. 2017) ("New York courts have found [even] one-year limitations clauses to be reasonable."); *Sidik*, 2018 WL 6727351, at *5 (noting that "[c]ourts applying New York law have consistently upheld one-year contractual limitations period[s]" (citation omitted)).  Further, the SLA "is a negotiated agreement between sophisticated business entities," and there is no evidence suggesting the SLA is "a contract of adhesion or the product of overreaching."  *MPI Tech A/S v. Int'l Bus. Machs. Corp.*, No. 15-CV-4891, 2017 WL 481444, at *5 (S.D.N.Y. Feb. 6, 2017) (citation and alteration omitted).  Accordingly, the two-year contractual limitations period is enforceable.

Nuance initiated suit on June 30, 2016.  (*See* Dkt. No. 1.)  Because a two-year limitations period applies, the question is whether, viewing the evidence in the light most favorable to Nuance, *see Brod*, 653 F.3d at 164, there is a dispute of material fact as to whether Nuance

"obtained knowledge" of IBM's alleged breach prior to June 30, 2014.  (SLA § 7.9.)[6]

In its Complaint, Nuance alleges that it learned only in January 2015 — within the limitations period — that IBM was not providing Nuance with DeepQA updates from non-IBMRG sources, and thus that IBM was in breach of the SLA.  (Compl. ¶ 26.)  In particular, the Complaint alleges:

> In or around early January 2015, Bill LaFontaine ["LaFontaine"], an [IBMRG] employee, informed Nuance's Jeanne McCann ["McCann"] that IBM's Watson team was not using [IBMRG] code, but "basically wrote all new code" and that IBM was not prepared to provide Watson code in total to Nuance.  In other words, IBM was confessing to Nuance that it had forked its ongoing development of Updates of [DeepQA] and that it was not and will not provide the Updates developed outside of [IBMRG].

> LaFontaine, however, offered Nuance a subset of the Updates being withheld by IBM called 'WatsonPlus,' which, upon information and belief, is a small subset of the withheld Updates relating to medical training.  He proposed that Nuance accept this subset of the withheld Updates in full satisfaction of IBM's obligation to deliver all Updates available.  Knowing that the [SLA] entitled it to all Updates, Nuance rejected this offer.

> LaFontaine's disclosures admitted that IBM was not delivering all Updates as required by the [SLA].  Prior to LaFontaine's disclosure, IBM had concealed from Nuance that it was not delivering all Updates to [DeepQA], including by delivering low-value updates, such as bug fixes and speed upgrades, to create the false impression that IBM was complying with its obligation to deliver all Updates to [DeepQA].

(Compl. ¶¶ 26–28.)

---

[6] The Court notes that, in general, "where there is generic language in a contractual limitations period provision, the statute of limitations begins running on the date that the legal claim *accrues*."  *Nikchemny v. Allstate Ins. Co.*, No. 16-CV-407, 2016 WL 6082034, at *3 (E.D.N.Y. Oct. 17, 2016) (emphasis added) (citation omitted); *see also IBM Corp. v. BGC Partners, Inc.*, No. 10-CV-128, 2013 WL 1775437, at *1 (S.D.N.Y. Apr. 25, 2013) ("In New York, a breach of contract cause of action accrues at the time of the breach, even if no damage occurs until later." (citation and quotation marks omitted)).  Here, however, the contractual provision does not use generic language; rather, it explicitly refers to the injured party's awareness of alleged breach.  Accordingly, the relevant moment is not when IBM allegedly breached, but when Nuance "obtained knowledge" of breach.  (SLA § 7.9.)

In its summary judgment papers, Nuance reiterates that it did not obtain knowledge of alleged breach until "the earliest January 2015." (Nuance Opp'n 22 (citing Nuance Resp. 56.1 ¶ 64).)  Nuance points to three principal pieces of evidence.  First, in April 2015, LaFontaine emailed McCann stating that "Watson Paths only works with the [IBM Software] version of Watson[,] and since neither it nor the base Watson code were built from [IBMRG] code[,] there is no way to use it as a stand alone capability."  (Second Lender Decl. Ex. 33 ("Apr. 2015 LaFontaine Email").)  Second, in July 2015, LaFontaine emailed John Kelly, another IBM employee, stating: "It was a surprise to [McCann] when I told her that the Watson business is built on code that has no [IBMRG] content at all."  (*Id.* Ex. 20 ("July 2015 LaFontaine Email"), at 5464.)  LaFontaine further stated that Paul Ricci ("Ricci"), Nuance's CEO, "probably knows this and that I think is why they were silent for so long."  (*Id.*)  And third, Ricci testified that he "first [became] aware of the concern within Nuance that Nuance was not receiving all it was entitled to" between six and nine months prior to the June 2016 filing of the lawsuit.  (*Id.* Ex. 15 (Deposition Testimony of Paul Ricci) ("Ricci Dep.") 19–20.)

It bears noting that Nuance's own evidence seems to point to April 2015, rather than January 2015, as the date Nuance obtained knowledge of IBM's alleged breach. Notwithstanding this discrepancy, however, the Court cannot say that Nuance conclusively "obtained knowledge" of IBM's alleged breach prior to June 30, 2014.  To be sure, IBM does marshal evidence to the contrary.  (IBM Mem. 22–24; IBM 56.1 ¶¶ 41, 64–70.)  First, in September 2011, following a meeting with IBM, McCann expressed concern to Ricci that IBM had "over the last few months" been "pulling back" on "what we feel are items they have made commitments to in the agreements we have signed with them."  (First Reed Decl. Ex. 42 ("Sept. 2011 McCann Email").)  In particular, McCann stated that Nuance is "left with the assumption

that [it] will . . . accept being blocked from [IBM Software] investments in 'industrialization' of

the Watson domain-independent core." (*Id.*)  Second, in January 2012, following a call with

IBM Software, McCann informed Ricci that "'vanilla' productization of Watson" was being

done "solely in [IBM Software]," and that IBM Software "took an image of the [DeepQA] code

and have gone on their own." (*Id.* Ex. 39 ("Jan. 2012 McCann Email").)  Third, Mark Fanty,

Nuance's lead DeepQA engineer, testified that he knew by January 2012 that IBM Software was

making enhancements to DeepQA, that Nuance "for sure [was] not receiving [IBM Software]

enhancements," that IBM Software had forked the DeepQA code, and that he was "lectur[ed] . . .

seemingly dozens of times" by IBM about how Nuance does not "get anything from [IBM

Software]." (*Id.* Ex. 41 (Deposition Testimony of Mark Fanty) ("Fanty Dep.") 108–09, 171–72.)

And fourth, in January 2013, McCann reported to Ricci and another Nuance employee that:

> It is the wording in the SLA under which Nuance is entitled to Updates which is
> creating the distance between IBM Software Group and [IBMRG], and the negative
> feelings toward Nuance surrounding Watson.  Due to their interpretation (or
> concern that there may be a different interpretation), the IBM Software Group is
> not allowing any joint work with [IBMRG] to occur, as [IBM Software] the IBM
> Software Group wants to be absolutely sure that none of their software or work is
> to be made available to Nuance.  There may well have been a transfer of the entire
> Watson code tree to the Software Group in order to allow IBM to execute work in
> [IBM Software] completely independently of [IBMRG] in order to keep any such
> work exclusive to IBM.

(*Id.* Ex. 29 ("January 2013 McCann Email").)  As McCann later testified, the SLA's "wording

relative to updates" was, in her view, "creating distance between" IBMRG and IBM Software.

(*Id.* Ex. 7 (Deposition Testimony of Jeanne McCann) ("McCann Dep.") 203.)[7]

In IBM's view, this evidence conclusively shows that Nuance "obtained knowledge" by

---

[7] The Parties submitted different portions of McCann's deposition transcript.  (*See* First
Reed Decl. Ex. 7; First Lender Decl. Ex. I; Second Lender Decl. Ex. 9.)  The Court will cite
directly to the transcript rather than to the separate exhibits.

January 2013, at the latest, that IBM was not providing Nuance with DeepQA updates from IBM Software.  (IBM Mem. 22.)[8]  The Court agrees that this evidence suggests, even strongly so, that, by January 2013, Nuance knew that DeepQA had been forked, that IBM Software was doing independent work on a forked copy of DeepQA with an eye toward productization, and that Nuance was increasingly unhappy with the updates it was receiving from IBMRG.

Yet, as Nuance argues, (Nuance Opp'n 22–23), a reasonable jury could, first, credit Nuance's argument that, at the time it signed the SLA in September 2010, it expected that DeepQA updates "would come from all of IBM and would be kept in a common code base managed by [IBMRG] as 'custodian' of the code," (*id.* at 22 (citing McCann Dep. 95, 110–12, 171–73)), and that Nuance's later awareness that IBM Software was separately developing DeepQA, including doing "vanilla productization," was not inconsistent with that understanding, (*id.* at 23 (citing McCann Dep. 187–90, 193–96)).  Further, a reasonable jury could conclude that, although Nuance had suspicions, even strong ones, prior to June 2014, it was not receiving DeepQA updates to which it felt it was entitled, it had not "obtained knowledge" of such, as IBM had assuaged Nuance's concerns by providing reassurances.  (Nuance Resp. 56.1 ¶¶ 64, 68 (collecting record evidence).)  For example, McCann testified that, while she wrote in September 2011 that IBM was "pulling back" on its commitments, she was there referring to a separate joint development agreement between the Parties, rather than the SLA at issue in this case, that as of

---

[8] IBM also points to a November 2011 email exchange between IBM executives, in which one executive, describing a phone conversation with McCann, states that McCann told him that DeepQA "[u]pdates [c]ome under the SLA," that the updates are "[n]ot happening [q]uarterly," and that there is a "[m]aterial gap on expectations."  (First Reed Decl. Ex. 43 (Nov. 2011 Email Exchange between Ken King and Mark Overman), at 7536.)  However, this email is hearsay.  It is a statement made by IBM employees, not McCann, which IBM now offers to prove the truth of the matter asserted, namely, that McCann believed that IBM was in breach of its obligations.  *See* Fed. R. Evid. 801(c).  No exception to hearsay applies.  *See* Fed. R. Evid. 803.  Accordingly, the Court will not consider this statement for present purposes.

January 2013 Nuance "had no evidence of [IBM's] withholding" of DeepQA updates, and that

Nuance had sought assurances from IBM, which it received.  (McCann Dep. 160, 184, 234–35.)

Helgi Bloom ("Bloom"), a Nuance employee, testified that there were "concerns" within Nuance

in 2011 and 2012 "about whether [it was] receiving everything that [it was] supposed to receive,"

that Nuance "had questions . . . as opposed to convictions," that Nuance "did not 'kn[ow] one

way or another what the facts were at that point in time,'" and that McCann had received

assurances from IBM in "late 2011" that Nuance was receiving all updates.  (Second Lender

Decl. Ex. 1 (Deposition Testimony of Helgi Bloom ("Bloom Dep.") 106–07, 115–18.)

Similarly, a February 2013 email from IBM to Fanty states that IBM "will deliver Modifications

to the Watson code as per the SLA."  (Id. Ex. 34 ("Feb. 2013 Email Exchange between Murthy

Devarakonda and Mark Fanty").)  Further, in March 2013, McCann emailed Ricci that IBMRG

"may be adhering to the letter of any agreements but failed the spirit."  (First Reed Decl. Ex. 30

("Mar. 2013 McCann Email").)  Vladimir Sejnoha ("Sejnoha"), a Nuance employee, testified

that, by October 2014, Nuance "had questions and concerns," but McCann "was reassured [by

IBM] that [Nuance was] getting everything."  (Second Lender Decl. Ex. 16 (Deposition

Testimony of Vladimir Sejnoha ("Sejnoha Dep.") 142–43.)  Indeed, as Nuance points out,

throughout the life of the SLA, it had "no way of verifying what IBM was doing on DeepQA"

separate from its receipt of updates from IBMRG.  (Nuance Opp'n 23 (collecting record

evidence).)

     In sum, there is substantial record evidence suggesting that, although Nuance did have

serious questions as to whether IBM was providing Nuance with DeepQA updates from IBM

Software prior to January 2015, its suspicions were not confirmed until sometime in 2015, in part

because it received assurances from IBM that it was receiving all updates.  Therefore, although

IBM's evidence suggests that Nuance knew by early 2013 that IBM had forked the DeepQA code, that IBMRG and IBM Software were independently developing DeepQA, and that a firewall had been implemented between IBMRG and IBM Software, a reasonable jury could conclude — given Nuance's relative inability to be sure what updates IBM was providing, and given IBM's assurances to Nuance — that Nuance did not "obtain knowledge" until sometime in 2015 that it was not receiving, and would not receive, DeepQA updates developed outside IBMRG.  The Court thus concludes that, viewing the evidence in the light most favorable to Nuance, *Brod*, 653 F.3d at 164, there is a significant dispute of material fact as to whether Nuance "obtained knowledge" of IBM's alleged breach within the contractual limitations period. Accordingly, the Court denies summary judgment on this point.  *See Mindspirit, LLC v. Evaluserve Ltd.*, 346 F. Supp. 3d 552, 592 (S.D.N.Y. 2018) ("Reading these emails in the light most favorable to [the plaintiff], a reasonable juror could find that [the plaintiff] 'demanded its stock' in February 2012.  Accordingly, [the defendant] is not entitled to summary judgment on its statute of limitations defense." (citation and alterations omitted)); *Meidl v. Aetna, Inc.*, 346 F. Supp. 3d 223, 247 (D. Conn. 2018) (denying summary judgment where "there is an issue of fact as to when class member 1's contractual limitations period expired" and where "the record does not provide a basis for concluding that there is no issue of material fact as to whether class members 2 and 3 are time barred"); *cf. Discuillo v. Allstate Ins. Co.*, No. 17-CV-234, 2019 WL 499255, at *2 (D. Conn. Feb. 8, 2019) ("Where it is undisputed that the [limitations] provision has not been complied with, summary judgment is appropriate." (citation and quotation marks omitted).  This ruling is without prejudice to IBM raising a contractual limitations defense at trial.[9]

---

[9] Because the Court concludes that IBM is not entitled to summary judgment on its

### 2.  Contract Interpretation

#### a.  Applicable Law

The Parties agree that this case is governed by New York's substantive law of contracts.

Under New York law, the interpretation of a contract "is a matter of law for the court to decide."

*Int'l Multifoods Corp. v. Com. Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002) (citation omitted);

*see also Lepore v. Hartford Fire Ins. Co.*, No. 18-CV-689, 2019 WL 1129614, at *5 (S.D.N.Y.

Mar. 12, 2019) (same) (collecting cases).

Courts are to interpret a "contract . . . so as to give effect to the intention of the parties as

expressed in the unequivocal language they have employed."  *Terwilliger v. Terwilliger*, 206

F.3d 240, 245 (2d Cir. 2000) (citation omitted)).  This analysis begins with "the four corners of

the document itself."  *Luitpold Pharm., Inc. v. Ed Geistlich Sohne A.G. Fur Chemische Industrie*,

784 F.3d 78, 87 (2d Cir. 2015) (citation and quotation marks omitted); *see also Terwilliger*, 206

F.3d at 245 ("[M]atters extrinsic to the agreement may not be considered when the intent of the

parties can fairly be gleaned from the face of the instrument." (citation omitted)).  "Only when a

court finds ambiguity in the parties' written agreement may it look to extrinsic evidence to

discern the parties' intent."  *Luitpold Pharm.*, 784 F.3d at 87 (citation omitted).

Ambiguity is not to be found solely because the parties urge different interpretations of

the contract.  *See Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990); *see*

*also O.D.F. Optronics Ltd. v. Remington Arms Co.*, No. 08-CV-4746, 2008 WL 4410130, at *11

(S.D.N.Y. Sept. 26, 2008) (same).  Courts "analyze the ambiguity of a provision under the

normal rules of contract interpretation: words and phrases should be given their plain meaning

---

limitations defense, the Court need not consider Nuance's arguments that IBM should be
equitably estopped from asserting a limitations defense and that its claims are timely under the
continuing wrong doctrine.  (Nuance Opp'n 25.)

and a contract should be construed so as to give full meaning and effect to all of its provisions."

*Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 157 (2d Cir. 2016)

(citation and quotation marks omitted); *see also Utica Mut. Ins. Co. v. Munich Reinsurance Am.,*

*Inc.*, 594 F. App'x 700, 702 (2d Cir. 2014) ("[I]f the court finds that the contract is not

ambiguous it should assign the plain and ordinary meaning to each term and interpret the

contract without the aid of extrinsic evidence." (citation and quotation marks omitted)); *Belt*

*Painting Corp. v. TIG Ins. Co.*, 795 N.E.2d 15, 17 (N.Y. 2003) (noting that contracts are

interpreted "in light of common speech and the reasonable expectations of a businessperson"

(citations and quotation marks omitted)).

"Contract language is not ambiguous if it has a definite and precise meaning, unattended

by danger of misconception in the purport of the contract itself, and concerning which there is no

reasonable basis for a difference of opinion." *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d

1274, 1277 (2d Cir. 1989) (citation, alterations, and quotation marks omitted).  Where the court

determines that the contractual language is unambiguous, it may "construe it as a matter of law

and grant summary judgment accordingly." *Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 187 (2d

Cir. 2006) (citation omitted).

"A contract is ambiguous when its terms could suggest 'more than one meaning when

viewed objectively by a reasonably intelligent person who has examined the context of the entire

integrated agreement and who is cognizant of the customs, practices, usages and terminology as

generally understood in the particular trade or business.'" *Utica*, 594 F. App'x at 703 (quoting

*Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir. 1997)).  If a contractual term is

ambiguous, the court then "consider[s] extrinsic evidence submitted by the parties to assist in

determining their actual intent." *McCostis v. Home Ins. Co. of Ind.*, 31 F.3d 110, 113 (2d Cir.

1994).  "Extrinsic evidence may include the acts and circumstances surrounding execution of the ambiguous term, conversations, negotiations[,] and agreements made prior to or contemporaneous with the execution of a written agreement, and the parties' course of conduct throughout the life of the contract."  *GE Funding Cap. Market Servs., Inc. v. Neb. Inv. Fin. Auth.*, No. 15-CV-1069, 2017 WL 2880555, at *4 (S.D.N.Y. July 6, 2017) (citations, alterations, and quotation marks omitted).

Because "facial ambiguity" in a contract requires the factfinder to examine extrinsic evidence to determine the contract's effect, "and because such extrinsic evidence is most often mixed," a court "generally will not grant summary judgment on a contract claim when the operative language is ambiguous."  *Luitpold Pharm.*, 784 F.3d at 87–88 (citation omitted). However, a court may grant summary judgment where "the evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide the contrary," or "if the non-moving party fails to point to any relevant extrinsic evidence supporting that party's interpretation of the language."  *Id*. at 88 (citation and quotation marks omitted).

### b.  Analysis

#### i.  Contract Ambiguity

Each Party argues that the unambiguous language of the SLA supports its interpretation of the contract: IBM argues that the SLA clearly limits Nuance's license to DeepQA updates developed by IBMRG, (IBM Mem. 10; IBM Opp'n 2–3), while Nuance argues that the SLA clearly entitles it to DeepQA updates developed outside IBMRG, including by IBM Software, (Nuance Mem. 6–9; Nuance Opp'n 8–12).

The key contractual language — the SLA's provision defining the "Licensed IBM Background Software" — provides that DeepQA is:

all Software that exists as of the Effective Date in all available formats (including Source Code and Object Code) that is owned by, or that has been developed or licensed by the IBM Research Group, including Tools, and that is listed on Exhibit A, including any modifications, updates, error corrections, bug fixes, diagnostic and/or testing tools, . . . and other changes, if available ("Modifications"), and if such Modifications are not contractually prohibited under a Third Party Agreement, and such Modifications are available, will be timely provided to Nuance; and where the Modifications continue to meet the scope contemplated in Article 2.1 regarding the licensing of DeepQA under this Agreement, as of the Effective Date and thereafter for a [defined] period . . . |  and additional Software as agreed by the parties, provided to Nuance by IBM under the Agreement (collectively "Updates") . . . .

(SLA, at Schedule A (border added).)

According to IBM, this provision can be broken down into two basic components: (1) the portion of the definition prior to the comma highlighted above, which refers to *IBMRG*-produced DeepQA code, and (2) the portion of the definition following the comma highlighted above, which refers to *IBM*-provided "additional" code "as agreed by the parties."  (IBM Mem. 11.)  In IBM's view, the dispute in this case has nothing to do with the second component, as IBM and Nuance did not make any further agreements on "additional" code.  (*See* IBM Opp'n 2.)

Having conceived of the definitional provision in this way, IBM argues that, within the first component, the SLA's language unambiguously entitles Nuance to three discrete sets of *IBMRG*-produced code: (a) software "listed on Exhibit A" of the SLA, that is, the DeepQA code; (b) updates to the DeepQA code existing as of the SLA's effective date; and (c) updates to the DeepQA code created for a certain period following the SLA's effective date.  (IBM Mem. 11–12.)  IBM focuses on two factors.  The first component explicitly refers to IBMRG, rather than IBM as a whole.  (*Id.* at 13.)  And the definition uses the term "including," which demonstrates that the Parties intended that the DeepQA updates to be provided to Nuance "are a subset of the [IBMRG] code being licensed, not an expansion of the license to [DeepQA] code developed outside of [IBMRG]."  (*Id.* at 12.)  In support, IBM cites to *Caring Habits, Inc. v. Fun for the*

20

*Public Interest, Inc.*, No. 11-CV-5768, 2014 WL 7146041 (S.D.N.Y. Dec. 13, 2014), for the proposition that "[c]ourts interpreting contract language have noted that the word 'including' is definitional, and is designed to broaden the concept being defined." *Id.* at *5 (citations and some quotation marks omitted).

In response, Nuance argues that IBM's construction of the SLA's definitional provision suffers from a structural flaw. Nuance rejects IBM's two-part conception of the definitional provision: whereas IBM sees the highlighted comma as separating the provision into discrete components, Nuance argues that the more natural breaking point is the preceding semicolon. (Nuance Opp'n 11–12.) Under Nuance's conception of the definitional provision's structure, the phrase "provided to Nuance *by IBM*" shows that IBM as a whole, rather than IBMRG in particular, is required to provide Nuance both "additional" code "as agreed by the parties" and, critically, DeepQA updates created for a certain period following the SLA's effective date. (*Id.* at 8–9 (quoting SLA, at Schedule A).) Nuance argues that its reading is supported by other language in the SLA. Section 7.11 provides that "all references to 'IBM' mean IBM Corporation, unless otherwise expressly limited to a division or group of IBM Corporation herein." (SLA § 7.11.) And Section 2.4 provides that, "if *IBM* provides . . . any . . . updates . . . to [DeepQA], *IBM* will update Exhibit B" to the SLA. (SLA § 2.4 (emphasis added).) In other words, according to Nuance, the Parties knew how to refer to IBMRG in particular when they wanted to — indeed, they did precisely that at the beginning of the definitional provision and in other provisions of the SLA — and intentionally used the term "IBM" rather than "IBMRG" in the second portion of the definitional provision. (Nuance Mem. 6–7.) If Nuance were entitled only to those updates provided by IBMRG, as IBM maintains, "there would be no need to refer to all of IBM" either at the end of the definitional provision or in Section 2.4, because "IBM

21

would never be [the entity] providing" updates.  (*Id.* at 8.)

In addition, Nuance argues that IBM's construction of the term "including" — as describing a subset — produces a nonsensical result.  (Nuance Opp'n 10.)  That is because the SLA's definitional provision begins by referring to DeepQA software that "exists as of the Effective Date."  (SLA, at Schedule A.)  According to Nuance, under IBM's construction, that portion of the definitional provision following "including" — namely, future updates to DeepQA — would "have to be a subset of Software that exists as of Effective Date."  (Nuance Opp'n 10.)  Yet, this "makes no sense because future Updates obviously did not, and by definition, could not, exist as of the Effective Date."  (*Id.*)  To Nuance, then, the term "including" must be read differently, to mean "as well as," in order to avoid an absurd result.  (*Id.*)  In support, Nuance cites to *Ariz. State Bd. for Charter Schs. v. U.S. Dep't of Educ.*, 464 F.3d 1003 (9th Cir. 2006), for the proposition that "including" can mean "in addition to" where "the exclusivity of two or more items requires a broader interpretation to avoid an irrational result."  *Id.* at 1008.  In short, Nuance would read the SLA's definitional provision to mean that it is entitled to:

> all Software that exists as of the Effective Date . . . that is owned by, or that has been developed or licensed by [IBMRG], . . . ~~including~~ [as well as] any . . . modifications, updates, . . . and other changes, . . . ("Modifications") . . . ; and where the Modifications continue to meet the scope contemplated in Article 2.1 regarding the licensing of DeepQA under this Agreement . . . for a period . . . , and additional Software as agreed by the parties, provided to Nuance by IBM under the Agreement (collectively "Updates") . . . .

(Nuance Mem. 3.)

In reply, IBM argues that Nuance misinterprets the "provided to Nuance by IBM" phrase in the definitional provision.  (IBM Mem. 13.)  According to IBM, that phrase "do[es] not purport to define *what* code is licensed to Nuance"; rather, it "merely specif[ies] *who* will deliver a specified set of code to Nuance."  (*Id.* (some emphasis omitted); *see also* IBM Reply 1 ("[T]he

phrase . . . is facially a passive descriptor, by which the parties referenced who would deliver the code that phrase describes.").)  Put differently, in IBM's view, that phrase "do[es] not broaden or otherwise modify" which updates Nuance is entitled to, and indeed reading the phrase otherwise "would be nonsensical," as it would render "superfluous" the previous portion of the definition. (IBM Mem. 13.)  Properly read, the phrase "merely provides that IBM [as a whole] may . . . at some later point elect to license additional code to Nuance under the terms of the SLA (an eventuality both [P]arties agree never occurred)."  (IBM Opp'n 2.)

        As the Parties' conflicting interpretations of both the structure and terms of the SLA's definitional provision demonstrate, and as IBM itself admits, the provision is "a bit garbled." (IBM Mem. 11.)  The Parties' interpretations are not unreasonable.  IBM's reading of the provision's structure and of the word "including" is "intuitively appealing"; yet, Nuance's grammatical critique is fair, and its own reading of the provision is at least somewhat "consistent with the [SLA's] text."  *Bayerische Landesbank v. Neb. Inv. Fin. Auth.*, No. 15-CV-7287, 2017 WL 752192, at *6 (S.D.N.Y. Feb. 27, 2017).  Neither Party convincingly demonstrates that the SLA's definitional provision, read in light of the other contractual language, unambiguously shows what DeepQA updates Nuance is entitled to.[10]  The Court therefore concludes that the definitional provision is "reasonably susceptible of more than one interpretation," and thus ambiguous.  *Burger King Corp. v. Horn & Hardart Co.*, 893 F.2d 525, 528 (2d Cir. 1990); *see also Luitpold Pharm.*, 734 F.3d at 87 ("A contract is ambiguous when reasonable minds could differ as to its meaning." (citation, alterations, and quotation marks omitted)).  Because the

---

        [10] The Court notes that, although the SLA provides that "[a]s used in this Agreement, the words 'include' and various thereof will not be deemed to be terms of limitation, but rather will be deemed to be followed by the words 'without limitation,'" (SLA § 7.11), neither Party cites to this contractual language or argues that it supports their position.

Parties' "intended meaning simply is not apparent from the face of the agreement," the Court

proceeds to examine "extrinsic evidence of intent." *Burger King*, 893 F.2d at 528.

ii.  Extrinsic Evidence

IBM argues that the extrinsic evidence "conclusively shows" that the Parties did not

intend Nuance to receive DeepQA updates from non-IBMRG groups such as IBM Software.

(IBM Mem. 14.)  Nuance argues that material questions of disputed fact preclude summary

judgment.  (Nuance Opp'n 12.)

In support, IBM first argues that it maintained a firewall between IBMRG and IBM

Software designed to prevent DeepQA-related collaboration between the groups — and thus to

prevent Nuance from receiving IBM Software updates to DeepQA — and that it maintained the

firewall with Nuance's knowledge.  (IBM Mem. 14–15 (citing, inter alia, January 2013 McCann

Email).)  Further, because the firewall impeded IBM's work on developing DeepQA, IBM

proposed amending the SLA to "make the firewall unnecessary by clarifying that" collaboration

between IBMRG and IBM Software would not entitle Nuance to DeepQA updates from IBM

Software.  (*See* IBM 56.1 ¶¶ 37–38.)  Yet, Nuance rejected that amendment without complaining

about the firewall or describing it as unnecessary, as it logically would have done had Nuance

believed that it was entitled to DeepQA updates from IBM Software.  (IBM Mem. 14–15.)  "The

critical point," according to IBM, "is that there would have been no reason" for the firewall's

existence or the proposed amendment "unless the [P]arties were operating on the understanding

that the SLA did not entitle Nuance to [IBM Software's] work product."  (*Id.* at 16.)

In response, Nuance argues that evidence shows that, in fact, it did not have knowledge

of a firewall, at least prior to 2013, and that, given its status as an outside party to IBM, could not

have known about the full effect of any such firewall on its receipt of DeepQA updates.  (Nuance

24

Opp'n 14 & n.6 (citing McCann Dep. 200–01; Second Lender Decl. Ex. 2 (Deposition

Testimony of David Boloker) ("Boloker Dep.") 185; Second Lender Decl. Ex. 4 (Deposition

Testimony of Eric Brown) ("Brown Dep.") 178; Bloom Dep. 166–67; Sejnoha Dep. 96).)

Nuance further argues that IBM's proposed amendment, which would have "clarif[ied]" that

Nuance was entitled only to IBMRG updates, actually cuts *against* IBM's argument, as it

reasonably could be interpreted to show that IBM knew Nuance was entitled to non-IBMRG

updates and thus sought to remedy the problem.  (*Id.* at 13–14.)  Finally, Nuance argues,

correctly, that *IBM's* erection of a firewall after the SLA went into effect does not shed light on

the *Parties'* intent at the time the SLA was signed, (*id.* at 15), since "unilateral expressions of

one party's postcontractual subjective understanding of the terms of the agreement . . . are not

probative as an aid to the interpretation of the contract," *Faulkner v. Nat'l Geographic Soc'y*,

452 F. Supp. 2d 369, 379 (S.D.N.Y. 2006) (citations, alterations, and quotation marks omitted),

*aff'd*, 284 F. App'x 822 (2d Cir. 2008).

      Moving beyond the firewall, IBM next argues that Nuance's internal documents show

that it understood the SLA as only entitling it to DeepQA updates produced by IBMRG.  (IBM

Mem. 16.)  On September 30, 2010, the day the SLA was signed, Ricci described the SLA to

McCann, Sejnoha, and other Nuance employees as an agreement "with IBM Research Group"

through which "Nuance acquires a source code license to IBM Research's DeepQA Watson

Program."  (First Reed Decl. Ex. 31 ("Sept. 2010 Ricci Email"), at 18238.)  In February 2011,

McCann stated that "Nuance acquired [DeepQA] from IBM Research."  (*Id.* Ex. 32 ("Feb. 2011

McCann Email to Ricci"), at 36259.)  In January 2013, Sejnoha emailed McCann and stated that

Nuance would receive "updates . . . from IBM Research."  (*Id.* Ex. 33 ("Jan. 2013 Sejnoha Email

to McCann"), at 18214.)  And in March 2013, McCann emailed Ricci to state that "the SLA

provision affording Nuance Updates to the IBM Research work . . . (and wording which his

preventing IBM Research from working with IBM [Software]) is something of value."  (*Id.* Ex.

30 ("Mar. 2013 McCann Email to Ricci").)

In response, Nuance argues that this evidence merely reflects Nuance's understanding

that IBMRG "would serve as a 'conduit' for the Updates developed throughout IBM."  (Nuance

Opp'n 15 (citing McCann Dep. 95–103, 107, 110–12, 171–73, 225–26; Sejnoha Dep. 40–41,

110–11).)  After all, as Nuance points out, at the time the agreement was signed, "DeepQA was

managed exclusively within [IBMRG]," and thus there would have been no reason for Nuance to

characterize the relationship otherwise.  (*Id.*)

Third and finally, IBM argues that Nuance knew that the SLA was an agreement with

IBMRG, not IBM as a whole, and that IBMRG lacked authority to license code from non-

IBMRG groups.  (IBM Mem. 17.)  Not only does the SLA itself state that the agreement is with

IBM "through its IBM Research Group," (SLA 1), but an internal Nuance email reflects that

understanding: when Fanty asked McCann about Nuance's rights to three specific pieces of

software related to (but distinct from) DeepQA, McCann responded that the software in question

is "owned by IBM Software Group and not IBM Research," and that to acquire their rights

"Nuance would need to get a license . . . [from] IBM Software Group."  (IBM Mem. 18 (quoting

First Reed Decl. Ex. 36 ("Sept. 2010 McCann Email to Fanty"), at 30610.)

In response, Nuance argues, first, that IBM's argument ignores McCann's deposition

testimony, in which she indicated that Nuance in fact "did *not* think that [IBMRG] lacked

authority."  (Nuance Opp'n 17 (citing McCann Dep. 116–20).)  Second, and more

fundamentally, Nuance characterizes IBM's argument as "a red herring" and "irrelevant," given

the Parties' pre-SLA course of conduct.  (*Id.* at 16.)  In negotiating the SLA, Nuance sought, and

received, an "updates" provision that was "very much like, if not identical" to the language used in a prior contract between Nuance and IBM, in which IBMRG provided the code base and updates came from other portions of IBM.  (*Id.* at 13 (citing McCann Decl. 78–79, 236–37); *see also* IBM 56.1 ¶¶ 5, 9 (noting other licensing agreements between the Parties).)  Given this previous dealing, Nuance argues, it "could not possibly have understood that [IBMRG] did not have authority to license the [IBM Software] code."  (*Id.* at 17.)

As this brief review of the voluminous evidence demonstrates, it may fairly be said that the extrinsic evidence conflicts.  *See Burger King*, 893 F.2d at 528.  There is little extrinsic evidence directly bearing on how the Parties interpreted the SLA's definitional provision, and the evidence indirectly bearing on the question is subject to varying interpretation.  The Court thus concludes that the extrinsic evidence "about the [P]arties' intended meaning" as to whether the Parties intended Nuance to receive DeepQA updates from non-IBMRG groups, such as IBM Software, "is not so one-sided that no reasonable person could decide the contrary."  *Luitpold Pharm.*, 784 F.3d at 88 (citation and quotation marks omitted); *see also Com. Lubricants, LLC v. Safety-Kleen Systems, Inc.*, No. 14-CV-7483, 2017 WL 3432073, at *10 (E.D.N.Y. Aug. 8, 2017) ("Neither interpretation is unreasonable, and it is not the Court's role on summary judgment to weigh the extrinsic evidence to determine which interpretation better captures the parties' intent [at the time the contract was agreed-to].").

Accordingly, the Court cannot enter summary judgment for either Party on Nuance's breach-of-contract claim.  *See Crede CG III, Ltd. v. 22nd Century Grp., Inc.*, No. 16-CV-3103, 2019 WL 652592, at *5 (S.D.N.Y. Feb. 15, 2019) (denying summary judgment where "the plain language of the [contract] is ambiguous" and "a genuine dispute of material fact exists as" to the parties' intent); *GE Funding Cap. Market Servs.*, 2017 WL 2880555, at *6 ("Because the

extrinsic evidence in the record is sufficient for a reasonable juror to find in favor of [the non-

movant's] interpretation of the termination provision, [the movant's] motion for summary

judgment is denied as to the declaratory judgment and breach of contract claims."); *Bayerische*

*Landesbank*, 2017 WL 752192, at *7 (denying summary judgment where contractual language

was ambiguous and extrinsic evidence did not answer question of parties' intent); *St. Barnabas*

*Hosp. v. Amisys, LLC*, No. 04-CV-2778, 2007 WL 747805, at *5 (S.D.N.Y. Mar. 9, 2007) ("This

extrinsic evidence is in conflict.  Accordingly, there is a genuine issue of material fact regarding

the meaning of the [contractual] phrase . . . .").

### iii.  Partial Summary Judgment

In the alternative, IBM seeks partial summary judgment against Nuance as to "all claims

to code not derived from DeepQA."  (IBM Mem. 24; *see also* IBM Reply 9–10.)  In support,

IBM argues, without citation, that Nuance

> has asserted that its right to receive Modifications to DeepQA entitles it to code that
> performs a similar function to any part of the DeepQA pipeline, regardless of
> whether it was developed from or as part of DeepQA.  Under this theory, Nuance
> has asserted an entitlement to code that was developed entirely separately from
> DeepQA and even code that IBM purchased from third-parties.

(IBM Mem. 24.)  The Court does not read Nuance's Complaint to make that allegation.  (*See*

Compl. ¶¶ 40, 46, 50 ("IBM is required to deliver all Updates to [DeepQA] regardless of where

they are developed within IBM.").)  Indeed, IBM appears to request relief on a question ("*What*

code is DeepQA-derived code?") distinct from the question at issue in this case ("From *where*

within IBM is Nuance entitled to receive DeepQA code?").  Although Nuance briefly argues that

"questions of fact preclude IBM's request for partial summary judgment," (Nuance Opp'n 21),

the Parties have not meaningfully addressed this distinct question.  Accordingly, the Court denies

IBM's alternative request for partial summary judgment.

3.  Breach of the Implied Covenant of Good Faith and Fair Dealing

"Under New York law, parties to an express contract are bound by an implied duty of good faith." *Arcadia Biosciences, Inc. v. Vilmorin & Cie*, 356 F. Supp. 3d 379, 399 (S.D.N.Y. 2019) (quoting *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002)); *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 159 (S.D.N.Y. 2018) ("The promise of good faith and fair dealing is treated as an implied provision in every contract." (citations and quotation marks omitted)).  The implied covenant is "breached when a party acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement." *Skillgames, LLC v. Brody*, 767 N.Y.S.2d 418, 423 (App. Div. 2003) (quotation marks omitted); *see also Moran v. Erk*, 901 N.E.2d 187, 190 (N.Y. 2008) ("The implied covenant . . . embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." (citation and quotation marks omitted)).  "In order to find a breach of the implied covenant, a party's action must 'directly violate an obligation that may be presumed to have been intended by the parties.'" *Gaia House Mezz LLC v. State Street Bank & Trust Co.*, 720 F.3d 84, 93 (2d Cir. 2013) (citation and quotation marks omitted).

However, "[a] claim for breach of the implied covenant will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract." *Arcadia*, 356 F.Supp.3d at 400; *see also Harris*, 310 F.3d at 81 ("New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled."); *JGB (Cayman) Newton, Ltd. v. Sellas Life Sciences Grp. Inc.*, No. 18-CV-3095, 2018 WL 5266877, at *13 (S.D.N.Y. Oct. 23, 2018)

("When a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant." (quotation marks and alterations omitted) (quoting *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013))).

Here, it is clear that Nuance's claim for breach of the implied covenant of good faith and fair dealing is based on the same facts as, and indeed is premised on, its breach-of-contract claim. The breach-of-contract claim alleges "IBM breached Section 1.1 and 2.1 of the [SLA] by failing to deliver all Updates of [DeepQA], including those developed outside of [IBMRG]," and seeks the remedy of specific performance "to deliver all Updates of [DeepQA] regardless of where they were developed within IBM." (Compl. ¶¶ 44, 46.) The implied-covenant claim alleges that IBM's "splitting the ongoing development of the DeepQA software into code bases, with valuable code improving the functionality developed outside of [IBMRG], in an attempt to deprive Nuance of the benefit of its bargain (i.e., the right under Section 1.1 and 2.1 of the [SLA] to any available Updates of [DeepQA])," and seeks the remedy of specific performance "compelling IBM to deliver all Updates of [DeepQA], regardless of where they were developed within IBM." (*Id.* ¶¶ 49–50.) Both claims are premised on the same set of facts. Both claims refer to IBM's alleged violations of its obligations under the contract. And both claims seek the same remedy. Therefore, the implied-covenant claim is duplicative. *See EFG Bank AG, Cayman Branch v. AXA Equitable Life Ins. Co.*, 309 F. Supp. 3d 89, 93–94 (S.D.N.Y. 2018) (dismissing as duplicative implied-covenant claim where "[t]he gravamen" of the two claims "is the exact same" and where the damages sought were identical); *The Najjar Group, LLC v. West 56th Hotel LLC*, No. 14-CV-7120, 2017 WL 819487, at *5 (S.D.N.Y. Mar. 1, 2017) (denying leave to amend complaint to add claim of breach of fiduciary duty because such a claim would

be "based upon the same facts and theories" of the existing breach-of-contract claim and thus duplicative (citation omitted)); *see also Bakal v. U.S. Bank Nat'l Ass'n*, 747 F. App'x 32, 37 (2d Cir. 2019) (affirming dismissal of implied-covenant claim where it was duplicative of breach-of-contract claim). Accordingly, summary judgment is granted for IBM on Nuance's claim alleging violations of the implied covenant of good faith and fair dealing.

### III. Conclusion

For the foregoing reasons, the Court denies Nuance's Motion for Summary Judgment, and grants in part and denies in part IBM's Motion for Summary Judgment. Nuance's claim for breach of the implied covenant of good faith and fair dealing is dismissed with prejudice.

The Clerk of the Court is respectfully directed to terminate the pending Motions. (*See* Dkt. Nos. 116, 120.)

The Court will hold a Status Conference on Tuesday, June 18, 2019, at 11:30 a.m.

SO ORDERED.

Dated:   May 6 , 2019
         White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE