**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**NUANCE COMMUNICATIONS, INC.,**

              **Plaintiff,**

     **v.**

**INTERNATIONAL BUSINESS**
**MACHINES CORPORATION**,

              **Defendant.**

**Case No: 16-cv-5173 (ECR)**
**ECF Case**

---

**DEFENDANT INTERNATIONAL BUSINESS MACHINES CORPORATION'S**
**SUPPLEMENTAL POST-TRIAL BRIEF**

QUINN EMANUEL URQUHART
& SULLIVAN, LLP
Richard I. Werder, Jr.
Kevin S. Reed
Elinor Sutton
Hope Skibitsky
Florentina Dragulescu, *pro hac vice*
51 Madison Avenue, 22nd Floor
New York, New York 10010
Tel. (212) 849-7000
Fax (212) 849-7100

*Attorneys for Defendant*
*International Business Machines*
*Corporation*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ........................................................................................................1

ARGUMENT ............................................................................................................1

I.     NUANCE OBTAINED KNOWLEDGE OF ITS CLAIMS IN 2011 ...............................1

      A.     Nuance Knew SWG Was Creating Alleged Modifications In 2011........................3

      B.     Nuance Knew That IBM Was Withholding SWG's Alleged Modifications
           in 2011 ...........................................................................................................5

II.    NEITHER THE CONTINUING BREACH DOCTRINE NOR EQUITABLE
      ESTOPPEL SAVES NUANCE'S CLAIMS .....................................................12

CONCLUSION.........................................................................................................17

# **TABLE OF AUTHORITIES**

**Page**

**Cases**

*Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc.*,
    404 F.3d 566 (2d Cir. 2005) ............................................................. 14

*BlackRock Allocation Target Shares: Series S Portfolio v. Wells Fargo Bank*,
    No. 149371, 2017 WL 3610511 (S.D.N.Y. Aug. 21, 2017) ............................................. 2

*Bulova Watch Co. v. Celotex Corp.*,
    46 N.Y.2d 606 (1979) ............................................................. 14

*Ely-Cruikshank Co., Inc. v. Bank of Montreal*,
    81 N.Y.2d 399 (1993) ............................................................. 12

*Goldman Copeland Assoc. v. Goodstein Bros. & Co.*,
    268 A.D.2d 370 (1st Dep't 2000) ............................................................. 13

*Guilbert v. Gardner*,
    480 F.3d 140 (2d Cir. 2007) ............................................................. 12, 14

*Henry v. Bank of Am.*,
    147 A.D.3d 599 (1st Dep't 2017) ............................................................. 15

*Hosokawa v. Screen Actors Guild-Am. Fed'n of Television and Radio Artists*,
    234 F. Supp. 3d 437 (S.D.N.Y. 2017) ............................................................. 14

*K-Bay Plaza, LLC v. Kmart Corp.*,
    132 A.D.3d 584 (1st Dep't 2015) ............................................................. 15, 16

*Kirschner v. KPMG LLP*,
    15 N.Y.3d 446 (2010) ............................................................. 2

*Kobayashi Ventures LLC v. Papertech Inc.*,
    No. 08 Civ. 4450(LAP), 2009 WL 10738379 (S.D.N.Y. Feb. 23, 2009) ............................ 13

*Konstantinidis v. Pappas*,
    No. 507612/15, 2018 WL 4407536 (N.Y. Sup. Ct. Kings Cty., Sep. 17, 2018) ........ 15, 16

*Le Veen v. Kurtz*,
    50 A.D.2d 899 (2d Dep't 1975) ............................................................. 13

*Loral Corp. v. Goodyear Tire and Rubber Co.*,
    No. 93 Civ. 7013(CSH), 1996 WL 38830 (S.D.N.Y Feb. 1, 1996) ................................ 13

*Marshall v. Hyundai Motor Am.*,
    51 F. Supp. 3d 451 (S.D.N.Y. 2014) ............................................................. 16

*Roslyn Sav. Bank v. Nat'l Westminster Bank USA*,
    266 A.D.2d 272 (2d Dep't 1999) ............................................................. 15, 16

*Schaefer v. Chautauqua Escapes Assoc., Inc.*,
    158 A.D.3d 1186 (4th Dep't 2018)........................................................................ 13, 15

*State v. United Parcel Serv., Inc.*,
    253 F. Supp. 3d 583 (S.D.N.Y. 2017)............................................................................ 2

*Viacom Int'l, Inc. v. YouTube, Inc.*,
    676 F.3d 19 (2d Cir. 2012)............................................................................................ 2

## <u>Other Authorities</u>

Restatement (Second) of Contracts
    § 243(2) (1979) ............................................................................................................ 13

## INTRODUCTION

By Order dated October 14, 2020 (ECF No. 263; the "Order"), the Court directed the parties to brief the following questions:

> Does the statute of limitations bar this suit?  Specifically, what level of knowledge triggers the statute of limitations, and does either the continuing breach doctrine or equitable estoppel nullify the statute of limitations defense?

IBM understands the statute of limitations referenced in the Order to be Section 7.9 of the SLA, which provides, "Neither party may bring an action arising out of this Agreement, regardless of form, more than two years after the cause of action has accrued and the party obtained knowledge thereof." JX 1.018.  That provision *does* bar Nuance's causes of action for declaratory judgment and breach of contract insofar as they assert that IBM had or breached an obligation under the SLA to provide Nuance with DeepQA Modifications created outside of IBM Research.[1] The evidence at trial proved that those claims accrued, and Nuance obtained knowledge of them, well more than two years before Nuance filed its complaint on June 30, 2016.  IBM addresses the Court's specific questions below.

## ARGUMENT

### I.   NUANCE OBTAINED KNOWLEDGE OF ITS CLAIMS IN 2011

As relevant here, Nuance's claims for declaratory judgment and breach of contract are that IBM had and breached an obligation under the SLA to deliver DeepQA Modifications created outside of IBM Research.  To have knowledge of those claims, Nuance had to know two things: (1) IBM was creating what Nuance alleges to be DeepQA Modifications outside of IBM Research,

---

[1]   IBM does not assert Section 7.9 as a bar to Nuance's claim that IBM breached its obligation to deliver Modifications created by IBM Research.  As detailed in IBM's Post-Trial Memorandum, that claim fails for other reasons.  ECF No. 255, at 18-20.

and (2) IBM was not delivering such alleged Modifications to Nuance.  Nuance alleges in its Complaint that it had knowledge of IBM's alleged breach once it came to know those two things in 2015.  ECF No. 6, at ¶¶ 26-28.  Contrary to Nuance's Complaint, however, Nuance knew them in 2011.

IBM interprets Section 7.9 to require actual knowledge.  It does not suffice that a party could have known of the claim.  A party is not barred from bringing a claim for breach of the SLA unless it had actual knowledge of the breach more than two years before filing the claim.  As a matter of law, actual knowledge encompasses conscious avoidance, which "occurs when it can *almost* be said that the defendant actually knew because he or she suspected a fact and realized its probability, but refrained from confirming it in order later to be able to deny knowledge." *BlackRock Allocation Target Shares: Series S Portfolio v. Wells Fargo Bank*, No. 149371, 2017 WL 3610511, at *10 (S.D.N.Y. Aug. 21, 2017) (internal quotations omitted) (emphasis in original); *Viacom Int'l, Inc. v. YouTube, Inc*., 676 F.3d 19, 35 (2d Cir. 2012) (same).  Resort to conscious avoidance is unnecessary here, though, because as shown below, the evidence proves that Nuance had clear and direct knowledge of its claims well more than two years before it filed this case.  Finally, since the parties at issue in this case are corporations, it bears noting that the knowledge of corporate employees acting within the scope of their duties is imputed to the corporation, such that the corporation is deemed to know what its employees know.  *See Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 466 (2010) ("[W]here conduct falls within the scope of the agents' authority, everything they know or do is imputed to their principals."); *State v. United Parcel Serv., Inc.*, 253 F. Supp. 3d 583, 669 (S.D.N.Y. 2017) ("[T]he presumption of corporate knowledge is conclusive, even if the corporate employee never communicated the information to her superiors.").

### A.     Nuance Knew SWG Was Creating Alleged Modifications In 2011

The evidence introduced at trial proved that Nuance – through Jeanne McCann and others – knew in 2011 that IBM was creating what Nuance alleges to be Modifications outside of IBM Research, specifically in the IBM Software Group ("SWG").

In early 2011, after DeepQA's success on *Jeopardy!*, IBM tasked SWG with commercializing the DeepQA technology.  DX 182 ¶¶ 13, 21.  SWG began by "blue-washing" a copy of the IBM Research DeepQA code base and then used what resulted to create a commercial version of the DeepQA code base known as the Watson Core.  DX 183 ¶¶ 6-7; Boloker Tr. 73:25-74:17.  Nuance claims that both the blue washed code base and the Watson Core are Modifications, which Nuance defines to include any improvements to the licensed DeepQA technology that are domain independent, *i.e.*, suitable for general use, as opposed to designed for use in a single area, such as finance.  PX 235 ¶ 24.  Nuance was told by IBM personnel in both 2011 and early 2012 that SWG had created these alleged Modifications.

In its Post-Trial Memorandum, IBM detailed for the Court the 2011 exchange in which IBM executives David McQueeney and Kenneth King told Nuance's Jeanne McCann about (i) the firewall SWG had erected between itself and IBM Research in regards to DeepQA, and (ii) IBM's desire to clarify the SLA so as to remove the necessity for the firewall.  ECF No. 255, at 3-6.  As recounted by Messrs. McQueeney and King, they explained to Ms. McCann that SWG was working on commercializing the DeepQA technology but was being hindered in such efforts by the firewall because it prevented collaboration between SWG and IBM Research.  DX 178 ¶¶ 14-17; DX 174 ¶¶ 12-14; DX 3.003.  Ms. McCann, in her testimony, acknowledged the 2011 conversation she had with Messrs. McQueeney and King, and she admitted they told her SWG was refusing to collaborate on DeepQA with IBM Research to avoid having SWG's Watson-related work fall within the DeepQA license granted to Nuance by the SLA.  McCann Tr. 207:17-

208:23; 210:22-211:4.  She also admitted understanding that SWG was working on its own version of the IBM Research DeepQA domain-independent core, in parallel to IBM Research.  *Id.* at 195:20-196:11.  Nuance, through Ms. McCann, therefore, knew in 2011 that SWG was creating what it alleges to be Modifications.

Nuance's documents also demonstrate its early understanding that SWG was creating what Nuance alleges to be Modifications.  Starting in 2011, Nuance engaged in discussions with SWG about creating a partnership based around Nuance's development of healthcare applications that would sit on top of the Watson Core being developed by SWG.  McCann Tr. 185:14-186:8.  In the course of such discussions, SWG executives briefed Jeanne McCann and Joe Petro on their progress in creating the Watson Core.  During a call on January 17, 2012, IBM's Angus McIntyre presented a slide that, among other things, described SWG's work in the area of "Watson Core Engine Commercialization," which included things such as "Remove 2000+ dead files, and create generic pipeline for multiple medical domains."  DX 71.002.  Shortly after that call, on January 23, 2012, Ms. McCann emailed her CEO, Paul Ricci, to report on it.  DX 87.  She advised Mr. Ricci, "We had a call with the IBM SWG last week, to keep the momentum up," and she told him, "they have done work on 'vanilla' productization of Watson, solely in the IBM SWG.  They took an image of the code and have gone on their own."  DX 87.001.  At her deposition, Ms. McCann acknowledged that, when she wrote "they took an image of the code," she was referring to SWG taking a copy of the IBM Research DeepQA code, McCann Tr. 189:9-13, and when she said they have "gone on their own," she was telling Mr. Ricci that SWG was "work[ing] in parallel with the IBM Research [G]roup" in cleaning up that code.  Ms. McCann also testified that, when she told Mr. Ricci that SWG had "done work on 'vanilla' productization' of Watson," she was referring to,

among other things, domain-independent work on the code for purposes of "software hygiene or productization."  *Id.* at 187:17-190:5.

Several months later, on April 3, 2012, Mr. Petro reported to Ms. McCann, Vlad Sejnoha, and other Nuance executives, about another conversation with Angus McIntyre about the potential Nuance partnership with SWG.  Mr. Petro was equally if not more explicit in stating Nuance's understanding that SWG was creating what Nuance alleges to be Modifications, *i.e.*, domain-independent improvements to the IBM Research DeepQA code.  He thus wrote:

> I asked [McIntyre] specifically what the IBM SWG is working on versus the core research team.  He avoided the specifics about the core research team completely. And roughly he said:  The IBM SWG is working specifically on the Jeopardy engine [*i.e.*, DeepQA] and generalizing to a core base set of capabilities that are domain agnostic and in line with the requirements of 'smart applications' that support physician workflow . . . .

DX 88.001.  Mr. Petro acknowledged that this report to Ms. McCann, Mr. Sejnoha, and others conveyed his awareness that "the IBM software group was working specifically on DeepQA and in fact the domain independent code associated with DeepQA."  Trial Tr. 93:3-13.

Accordingly, the written evidence and testimony from Nuance's witnesses demonstrates that Nuance knew in 2011 that SWG was creating what Nuance considers to be Modifications.

**B.    Nuance Knew That IBM Was Withholding SWG's Alleged Modifications in 2011**

IBM told Nuance in 2011 that IBM was not giving Nuance any of SWG's DeepQA-related work.  Addressing this point in its Post-Trial Memorandum, Nuance argues, "IBM's alleged evidence of prior disclosure comes solely from witnesses who lack credibility – their undocumented assertions that they relayed to Nuance that IBM was withholding DeepQA Updates should carry no weight."  ECF 253, at 18.  This is meant primarily to undermine Messrs. McQueeney and King, who, as noted above, testified consistently with one another that they told Ms. McCann in 2011 that IBM had erected a firewall between IBM Research and SWG

to ensure that Nuance did not and would not obtain rights to SWG's DeepQA-related work under the SLA.  DX 178 ¶¶ 14-17; DX 174 ¶¶ 12-14.  Nuance's challenges to these witnesses' credibility are weak; to wit, they fault Mr. King for not being able to recall the exact words of his conversations with Ms. McCann nine years after the fact.  ECF No.253, at 19.  The best answer to Nuance's credibility challenges, however, is that IBM's witnesses are corroborated in full by *Nuance's* witnesses and documents, which make clear that, in 2011, multiple IBM employees told multiple Nuance employees that IBM would not give Nuance SWG's DeepQA-related work.

Mr. McQueeney, for example, testified to a September 16, 2011 meeting he attended at which Manoj Saxena, who was the General Manager of the Watson Solution's unit within SWG, "explicitly reiterated IBM's [view] that Nuance was not entitled to any Modifications developed by [SWG]."  DX 174 ¶ 17.  Nuance attacks this testimony on the grounds that Mr. McQueeney made no mention of Mr. Saxena's statement in a three-sentence summary of the meeting he wrote the following day.  ECF 253, at 19.  But though Mr. McQueeney did not memorialize Mr. Saxena's statement, Ms. McCann did.  On September 20, 2011, Ms. McCann wrote to Paul Ricci in response to an email Mr. Saxena had sent Mr. Ricci in the wake of the September 16 meeting, at which the parties had continued discussions about a potential Nuance/SWG partnership.  DX 138.001.  At the beginning of the email, Ms. McCann lists several items on which she asserts Nuance has seen "a notable pulling back by IBM."  *Id.*  The second item is "[a]ccess to the 'full' set of modifications by IBM to Watson Core," which Ms. McCann wrote was "a notable assertion by IBM during the meeting."  *Id.*  Asked about this language at her deposition, Ms. McCann testified it referred to a statement by Mr. Saxena that IBM would not deliver Modifications created outside of IBM Research.  McCann Tr. 158:8-160:2; *id.* at 166:13-167:5.  Ms. McCann's email and subsequent

testimony thus make clear that Mr. McQueeney's recollection of Mr. Saxena's statement was correct.

Additionally, an October 12, 2011 email from Nuance executive Mark Fanty to Ms. McCann and others evidences that Nuance was separately told by another IBM employee, Murthy Devarakonda, that IBM would not provide Nuance with Modifications or any other DeepQA-related work done by SWG.  Mr. Fanty was a Director, Natural Language Processing Research, at Nuance, and was involved in Nuance's efforts to determine whether DeepQA could be incorporated into commercial products.  In that role, he was "part of the decision process" relating to Nuance's agreement to the SLA.  Fanty Tr. 25:21-26:2.  After the SLA was executed, Fanty was involved in "much discussion" with IBM and internally with, at least, Ms. McCann, about what updates Nuance was getting under the SLA.  *Id.* at 39:7-40:9.  Mr. Devarakonda was a manager in IBM Research responsible for delivering Modifications to Nuance.  Devarakonda Tr. 10:21-11:11, 76:9-23.

Reporting on a conversation with Mr. Devarakonda about IBM's view of the SLA, Mr. Fanty wrote in his October 12, 2011 email, "Murthy had an eye opening view of the 10 years of updates [under the SLA] that is much worse tha[n] research group v. software group."  DX 84.001.  At his deposition, Mr. Fanty testified that when he wrote "much worse tha[n] research group v. software group" he was referencing a prior statement by Mr. Devarakonda that Nuance would not receive anything from SWG under the SLA.  Fanty Tr. 83:5-23.  Indeed, Mr. Fanty repeatedly testified that Mr. Devarakonda told him more than once that "our agreement's with research and that's what we get, only what's from research and not from what's outside research. In general, not just software division.  He made that point repeatedly."  *Id.* at 43:14-18; *see also* *id*. at 41:20-42:5, 107:21-108:7.  Mr. Fanty also testified with certainty that he reported Mr.

Devarakonda's statements to Ms. McCann and others at Nuance and that, given Mr. Devarakonda's statements, he and others at Nuance understood that Nuance was not receiving SWG's DeepQA-related work:

> Q:     Did you have an understanding as to whether or not Nuance was receiving the updates or enhancements that the software group was making to the DeepQA –
>
> A:     No, we've – oops.  Sorry.  We for sure were not receiving software group enhancements.
>
>               *         *         *
>
> Q:     [I]s it correct that it was your understanding that Nuance was not being provided with the work that the software group was doing with regard to DeepQA?
>
> A:     I knew we weren't getting that work for sure, yes.
>
> Q:     And you expressed that understanding to others at Nuance?
>
> A:     I'm sure we all knew that we weren't getting updates from the software group.
>
>               *         *         *
>
> Q:     Did you tell anybody else within Nuance that Mr. Devarakonda had told you that Nuance would not receive updates from the software group?
>
> A:     I'm a hundred percent sure I would have.  Things like that is what, you know, the management cared about, Jeanne [McCann] and others.
>
> Q:     Was it part – sorry.
>
> A:     I would have told them.  I don't remember saying the words on any specific day, but I'm sure they – I passed that on.

Fanty Tr. 109:5-13, 164:21-165:6, 168:23-169:9.

       Finally, there is Ms. McCann's express written corroboration of Messrs. McQueeney's and King's account of the 2011 conversation in which they told Ms. McCann that IBM had erected a firewall between SWG and IBM Research in order to prevent Nuance from gaining access to or

rights in SWG's DeepQA-related work.  In a January 2013 memorandum Ms. McCann drafted to prepare Paul Ricci for a meeting with IBM's Dr. Kelly, Ms. McCann wrote the following under the heading "Watson JDA and SLA":

> Under the SLA license agreement, Nuance continues to be entitled to Updates to the Licensed Software until Sep[tember] 30, 2020 (10 years from the effective date of the license).  It is the wording in the SLA under which Nuance is entitled to Updates which is creating the distance between IBM Software Group and IBM Research, and the negative feelings toward Nuance surrounding Watson.  Due to their interpretation (or concern that there may be a different interpretation), the IBM Software Group is not allowing any joint work with IBM Research to occur, as **the IBM Software Group wants to be absolutely sure that none of their software or work is to be made available to Nuance**.  There may well have been a transfer of the entire Watson code tree to the Software Group in order to allow IBM to execute work in the SWG completely independently of IBM Research in order to keep any such work exclusive to IBM.

DX 103.004 (emphasis added).  During her deposition, Ms. McCann admitted that this paragraph set forth what she had been told by Mr. McQueeney.  McCann Tr. 209:5-210:16.  It thus confirms, yet again, that IBM told Nuance that it would not receive SWG's work on DeepQA.[2]  Additionally, Ms. McCann's observation that SWG was working independently of IBM Research "in order to keep such work exclusive to IBM" also puts the lie to her testimony that she assumed that SWG's domain-independent work on DeepQA would be merged into the IBM Research DeepQA code base that Nuance had licensed.[3]  *See, e.g.,* McCann Tr. 196:3-19.

---

[2] Nuance tries to skirt the impact of DX 103 by citing deposition testimony by Ms. McCann that it was "in the context of a potential second JDA."  ECF No. 262, at 7, n.5.  It is unclear why Nuance maintains that is a significant distinction.  Regardless, Ms. McCann cannot explain away her clear and explicit statement that SWG wanted to be "absolutely sure" that none of its DeepQA-related work was made available to Nuance under the SLA.  As noted above, she admitted at her deposition that she understood that SWG's aim was to make sure that its DeepQA-related work did not fall under the license granted to Nuance by the SLA.  *See* McCann Tr. 207:17-208:23; 210:22-211:4.

[3] Though Ms. McCann wrote in this January 2013 email that "[t]here *may well have been* a transfer of the entire Watson code tree to the Software Group in order to allow IBM to execute work in the SWG completely independently of IBM Research in order to keep any such work

Nuance's primary basis for claiming that it did not know IBM was withholding SWG's DeepQA-related work is its assertion that "IBM repeatedly assured Nuance . . . that it was receiving all Updates, and Nuance had no ability to confirm otherwise." ECF No. 253, at 18. That claim is destroyed by the above-discussed evidence, which makes clear IBM repeatedly told Nuance it was *not* receiving alleged Modifications created by SWG. Moreover, Nuance's assertion is not even borne out by the evidence Nuance relies on to support it. Nuance cites the same several exhibits and snippets of testimony over and over again in 12 paragraphs of its proposed findings of fact. ECF No. 252 ¶¶ 200-12. With but one exception, though, all of the evidence Nuance cites merely shows that:

- the representations Nuance relies on were made only to Ms. McCann (*see* PX 221 ¶ 34, Sejnoha Tr. 135:9-20, PX 220 ¶ 19, Trial Tr. at 239:21-240:2, Sejnoha Tr. 140:18-141:15, Trial Tr. 123:2-10);[4]

- the representations made to Ms. McCann were merely that (i) Nuance had the same DeepQA codebase as IBM Research (*see* McCann Tr. 184:7-19, PX 54.001), or (ii) Nuance was receiving all Modifications to which it was entitled *under the SLA* (*see* McCann Tr. 235:3-11, *id.* 238:19-239:8, Trial Tr. 299:17-300:2, *id.* 300:3-12, *id.* 313:5-10). Ms. McCann, in fact, testified that she never asked whether Nuance was receiving Modifications from SWG and was never told that. *See* McCann Tr. 196:20-197-3, 239:20-240:5.

---

exclusive to IBM," her above-discussed January 2012 email to Mr. Ricci makes clear that she *knew* this had happened. *See* DX 87.001 ("[T]hey [*i.e.*, SWG] have done work on 'vanilla' productization of Watson, solely in the IBM SWG. They took an image of the code and have gone on their own.").

[4] Part of Mr. Sejnoha's testimony Nuance cites on this point was excluded by the Court in response to IBM's hearsay objection. *See* ECF No. 197, ¶¶ 49, 50.

Those representations to Ms. McCann were true and, more importantly for present purposes, did not mislead Nuance into believing it was receiving Modifications created by SWG. As detailed above, the evidence clearly shows Ms. McCann had heard directly or indirectly from numerous IBM employees – Messrs. McQueeney, King, Saxena, and Devarakonda – that SWG was *not* sharing its DeepQA-related work with IBM Research and that IBM did not believe Nuance had an entitlement to SWG's DeepQA-related work under the SLA.   Having received that message, Nuance knew that any representations by IBM that Nuance was receiving the updates it was entitled to under the SLA meant only that Nuance was receiving IBM Research's work, and nothing more.   Likewise, Nuance knew that any representations that Nuance had the same DeepQA code base that IBM Research had meant only that both of those parties had the same code base, which did not include code created by SWG.[5]

Finally, Nuance suggests that a 2015 email from William LaFontaine supports Nuance's claim that it learned it was not receiving alleged Modifications created by SWG only in 2015. This, too, fails.  Mr. LaFontaine's email merely says that he believed Ms. McCann was surprised "that the Watson business is built on code that has no Research content at all."  DX 144.002.  It does not, as Nuance would have the Court believe, say that Ms. McCann was surprised that Nuance had not received SWG's DeepQA-related work, nor are those two things the same.  It may well be that Ms. McCann was surprised that SWG had completely jettisoned the IBM Research DeepQA code base.  If so, that would neither mean nor suggest that she did not know that none of SWG's

---

[5]   The only purported representation Nuance cites that was not made to Ms. McCann was an alleged representation by John Kelly to Paul Ricci that Nuance was getting "everything" related to DeepQA.  Trial Tr. 521:21-522:19.  Mr. Ricci, however, provides no details or context about this vague representation, nor could he have accepted it in good faith given that Ms. McCann was reporting to him that IBM personnel were telling her that IBM was *not* sharing SWG's work with Nuance. *See, e.g.*, DX 103.004.

DeepQA-related work had been given to Nuance.  And, again, Ms. McCann's own writings and testimony confirm that she *did* know that Nuance had not received SWG's work.

*      *      *

The burden of proof in a civil case is a preponderance of the evidence.  In this case, the evidence proves by well more than a mere preponderance that Nuance knew in 2011 that SWG was creating alleged Modifications to DeepQA and that IBM would not give those alleged Modifications to Nuance.  Nuance, therefore, had knowledge of its claims that IBM had and was in breach of a supposed obligation to deliver SWG's Modifications more than four years before it filed this lawsuit and asserted those claims.  Consequently, Nuance exceeded the contractually-specified two-year time limit to bring the claims by more than two years, and the claims are barred. *See* JX 1 at § 7.9.

## II.     NEITHER THE CONTINUING BREACH DOCTRINE NOR EQUITABLE ESTOPPEL SAVES NUANCE'S CLAIMS

Nuance contends that, irrespective of when it first learned of its claims, the doctrines of continuing breach and equitable estoppel save them from the bar imposed by Section 7.9 of the SLA.  This is incorrect.

The general rule under New York law is that a breach of contract claim accrues, and the statute of limitations begins to run, at the time of the breach.  *See Ely-Cruikshank Co., Inc. v. Bank of Montreal*, 81 N.Y.2d 399, 401 (1993).  The continuing breach doctrine is an exception to this rule.  Where applicable, it provides that, in the case of a contract that requires continuing performance, each successive breach triggers its own separate statute of limitations, such that the expiration of the limitations period on earlier breaches does not bar the assertion of claims based on later breaches.  *See Guilbert v. Gardner,* 480 F.3d 140, 150 (2d Cir. 2007) ("If, however, a contract requires continuing performance over a period of time, each successive breach may begin

12

the statute of limitations running anew."); *Kobayashi Ventures LLC v. Papertech Inc*., No. 08 Civ.
4450 (LAP), 2009 WL 10738379, at *4 (S.D.N.Y. Feb. 23, 2009) ("[W]here a contract requires
continuing performance, the limitations period may be renewed with each successive breach.").
The continuing breach doctrine is not applicable in this case, however, for at least two reasons.

    *First*, where the initial breach of a continuing obligation (other than for periodic payments
of money) is accompanied by a repudiation of the obligation, a claim for total breach accrues, and
the limitations period on that claim starts to run and does *not* reset with each subsequent failure to
perform the obligation.  As Judge Preska of this Court put it in *Kobayashi,* "[w]here the continuous
performance required by a contract contemplates something more than cash payments, the statute
of limitations begins to run when nonperformance is coupled with repudiation."  *Kobayashi*, 2009
WL 10738379, at *4.  *See also Loral Corp. v. Goodyear Tire and Rubber Co.,* No. 93 Civ. 7013
(CSH), 1996 WL 38830, at *8, (S.D.N.Y Feb. 1, 1996) ("'[A] breach by non-performance
accompanied or followed by a repudiation gives rise to a claim for damages for total breach.'")
(quoting Restatement (Second) of Contracts § 243(2) (1979)); *Schaefer v. Chautauqua Escapes
Assoc., Inc.*, 158 A.D.3d 1186, 1187 (4th Dep't 2018) (breach of contract claim against property
owners association for failure to collect periodic assessments from certain owners accrued for
limitations purposes when association voted to waive future assessments); *Le Veen v. Kurtz*, 50
A.D.2d 899, 899 (2d Dep't 1975) (finding that limitations period started when defendant
repudiated partnership, not when defendant subsequently failed to pay partnership profits).

    The rule applied in these cases, and set forth in the Restatement, accords with the common
sense notion that when a party has breached a continuing obligation and made clear it will not
perform that obligation in the future, the non-breaching party is fully on notice of its claim and
must bring it within a reasonable time or face a limitations bar.  *Cf. Goldman Copeland Assoc. v.*

*Goodstein Bros. & Co.*, 268 A.D.2d 370, 371 (1st Dep't 2000) ("Since [the allegedly erroneous rent] statements consistently used the same formula in determining the escalation, the tenant's overcharge claim accrued upon its receipt of the first statement almost 12 years before it commenced this action.  At that time it had all of the information it needed to contest the manner in which the landlord computed the escalation.").  The cases cited by Nuance that applied the continuing breach doctrine are not to the contrary.  In *Guilbert*, 480 F.3d 140, the continuing obligation that had been breached involved only periodic payments of money (pension benefits). In *Bulova Watch Co. v. Celotex Corp.*, 46 N.Y.2d 606 (1979), the continuing obligation (roof repair) was non-monetary, but there was never a repudiation.

In this case, the continuing obligation IBM allegedly breached – delivery of Modifications created outside of IBM Research – was non-monetary, and there was a repudiation of that obligation by IBM.  The evidence discussed above (*supra* at 3-12) shows that IBM told Nuance early and often that it had not and would not give Nuance any of SWG's DeepQA-related work product.  *See Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 587 (2d Cir. 2005) ("[r]epudiation occurs when a party manifests an intent not to perform, either by words or by deeds"); *Hosokawa v. Screen Actors Guild-Am. Fed'n of Television and Radio Artists*, 234 F. Supp. 3d 437, 444 (S.D.N.Y. 2017)  ("Anticipatory repudiation occurs when, before the time to performance has arisen, a party to a contract declares his intention not to fulfill a contractual duty.") (internal quotations marks omitted).  Accordingly, the two-year limitations period on Nuance's claim for total breach of IBM's supposed obligation to deliver Modifications created by SWG began to run in 2011, when IBM gave Nuance clear notice that it would not fulfill that supposed obligation, and it did not reset when IBM abided by that notice during subsequent years.

**Second**, the continuing breach doctrine does not aid Nuance because it does not apply in cases where there was single breach with continuing consequences, rather than multiple breaches. As stated in a case cited by Nuance, "[t]he distinction is between a single wrong that has continuing effects and a series of independent, distinct wrongs." *Henry v. Bank of Am.*, 147 A.D.3d 599, 601 (1st Dep't 2017) (internal quotation marks omitted); *see also Schaefer*, 158 A.D.3d at 1187 (breach occurred when defendant waived assessments; subsequent failures to collect assessments were not separate breaches); *K-Bay Plaza, LLC v. Kmart Corp.*, 132 A.D.3d 584, 587 (1st Dep't 2015) ("a claim for breach of contract based on an allegedly erroneous computation of rent accrues upon the first use of that computational methodology, and the statute of limitations does not begin to run anew each time the same formula is used."); *Roslyn Sav. Bank v. Nat'l Westminster Bank USA*, 266 A.D.2d 272, 273 (2d Dep't 1999) (claim for bank's breach of contract for check reconciliation services was untimely because "[t]he $1.3 million discrepancy . . . occurred as early as September 1987 . . . and [bank's] repetition of this discrepancy was not a separate breach that started the claim to accrue anew."); *Konstantinidis v. Pappas*, No. 507612/15, 2018 WL 4407536, at *5 (N.Y. Sup. Ct. Kings Cty., Sep. 17, 2018) (breach of contract occurred when defendant wrongfully reduced plaintiff's LLC share; subsequent payment of reduced distributions based on reduced share were not separate breaches).

Here, according to Nuance's claim, the SLA obligated IBM to funnel any Modifications created by SWG into the IBM Research DeepQA code base and then deliver such modifications to Nuance. *See* McCann Tr. at 111:5-112:12, 128:6-22. If there was such an obligation (and there was not), IBM fully breached it when it determined not to give Nuance SWG's alleged Modifications and to enforce that decision by erecting a firewall that prevented those alleged Modifications from getting into IBM Research's DeepQA code base. The fact that Nuance did

15

not receive alleged Modifications created by SWG after that decision by IBM is merely a consequence of that decision, not a separate series of breaches. The situation is analogous to that faced by the courts in the *K-Bay Plaza*, *Roslyn Sav. Bank* and *Konstantinidis* cases*, supra*. In *K-Bay Plaza*, the defendant breached the contract by calculating rent with an incorrect formula, but its subsequent use of that formula to compute rent was a consequence of that breach, not a series of separate breaches. *See K-Bay Plaza*, 132 A.D.3d at 587. In *Roslyn Sav. Bank,* the defendant breached a contract to reconcile checks by creating a $1.3 million discrepancy, but its repetitions of that discrepancy on subsequent bank statements were consequences of that initial breach, not separate breaches. *See Roslyn Sav. Bank,* 266 A.D.2d at 273. In *Konstantinidis*, the defendants breached the parties' partnership agreement by improperly reducing the plaintiffs' partnership share, but their subsequent payment of smaller partnership distributions were consequences of that breach, not separate breaches. *See Konstantinidis*, 2018 WL 4407536, at *5. Here, IBM made a single decision not to give Nuance SWG's DeepQA-related work product; that Nuance thereafter did not receive SWG's alleged Modifications is the consequence of that decision, not a series of separate breaches.

**Finally**, Nuance's invocation of the doctrine of equitable estoppel is illogical in this context. Equitable estoppel requires, at a minimum, a showing that the defendant took some action that prevented the plaintiff from learning of its claim in time to assert it prior to the expiration of the applicable statute of limitations. *See Marshall v. Hyundai Motor Am.*, 51 F. Supp. 3d 451, 462 (S.D.N.Y. 2014) ("Equitable tolling applies where a defendant's fraudulent conduct results in a plaintiff's lack of knowledge of a cause of action."). Here, however, the applicable statute of limitations – Section 7.9 of the SLA – specifies that the limitations clock does not start running until a party knows of its claim. *See* JX 1.018. Accordingly, equitable estoppel has no role here,

16

because Nuance cannot be barred from asserting its claims unless it is shown to have known about the claims more than two years before filing them.  And even if equitable estoppel somehow could apply here, the evidence discussed above makes clear that, far from hiding the fact that it was not giving Nuance alleged modifications created by SWG, numerous IBM employees disclosed that fact to numerous Nuance employees on numerous occasions, and no IBM employee made any representation to the contrary.  *See supra* at 3-12.  The factual predicate for Nuance's invocation of equitable estoppel thus does not exist.

## CONCLUSION

For the foregoing reasons, Nuance's claims that IBM had or breached an obligation to give Nuance Modifications created outside of IBM Research are barred by Section 7.9 of the SLA.

Dated: New York, New York
       October 29, 2020

                                        QUINN EMANUEL URQUHART &
                                        SULLIVAN, LLP

                            By:    *Kevin S. Reed*
                                   Richard I. Werder, Jr.
                                   Kevin S. Reed
                                   Elinor Sutton
                                   Hope Skibitsky
                                   Florentina Dragulescu, *pro hac vice*
                                   51 Madison Avenue, 22nd Floor
                                   New York, New York 10010
                                   Tel. (212) 849-7000
                                   Fax (212) 849-7100
                                   rickwerder@quinnemanuel.com
                                   kevinreed@quinnemanuel.com
                                   elinorsutton@quinnemanuel.com
                                   hopeskibitsky@quinnemanuel.com
                                   florentinafield@quinnemanuel.com

                                   *Attorneys for Defendant*
                                   *International Business Machines*
                                   *Corporation*