**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | x | |
| NUANCE COMMUNICATIONS, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | NO. 16-CV-5173 (ECR) |
| | : | |
| INTERNATIONAL BUSINESS MACHINES CORPORATION | : | |
| | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | x | |

**PLAINTIFF NUANCE COMMUNICATIONS, INC.'S**
**RESPONSE TO DEFENDANT'S SUPPLEMENTAL POST-TRIAL BRIEF**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................1

THE FACTUAL RECORD ...............................................................................................2

ARGUMENT ...................................................................................................................3

I.      Nuance Did Not Obtain Actual Knowledge of IBM's Breach Until 2015 ........................3

        A.      Awareness of DeepQA Work Being Performed Outside of IBM Research
                Does Not Impute Actual Knowledge that IBM was Withholding Updates............4

        B.      IBM's Alleged Examples of Nuance's Actual Knowledge of IBM's
                Breach are Belied by the Record ...........................................................6

        C.      The Record Evidence Proves that Nuance Did Not Obtain Actual
                Knowledge of IBM's Breach Until 2015 ..............................................11

II.     Even if Nuance Had Obtained Actual Knowledge of IBM's Breach Before 2015,
        Nuance's Claims Would Still Not Be Barred ...................................................12

        A.      The Continuing Breach Doctrine .......................................................12

        B.      Equitable Estoppel ........................................................................15

CONCLUSION..............................................................................................................17

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*,
    404 F.3d 566 (2d Cir. 2005)......................................................................................13, 14

*Affordable Hous. Assocs., Inc. v. Town of Brookhaven*,
    13 N.Y.S.3d 876 (Sup. Ct. Suffolk Cnty. 2015) ....................................................14

*Axiom Inv. Advisors, LLC v. Deutsche Bank AG*,
    234 F. Supp. 3d 526 (S.D.N.Y. 2017)......................................................................16

*Beller v. William Penn Life Ins. Co. of New York*,
    778 N.Y.S.2d 82 (N.Y. App. Div. 2d Dep't 2004) ..................................................15

*Bulova Watch Co. v. Celotex Corp.*,
    389 N.E. 2d 130 (N.Y. 1979) ...................................................................................12

*Buttry v. Gen. Signal Corp.*,
    68 F.3d 1488 (2d Cir. 1995)......................................................................................16

*Guilbert v. Gardner*,
    480 F.3d 140 (2d Cir. 2007)......................................................................................12

*Henry v. Bank of Am.*,
    147 A.D.3d 599 (N.Y. App. Div. 1st Dep't 2017)............................................12, 13

*Hosokawa v. Screen Actors Guild-Am., Fed'n of Television & Radio, Artists*,
    234 F. Supp. 3d 437 (S.D.N.Y. 2017)......................................................................13

*Meridien Int'l Bank Ltd. v. Gov't of the Republic of Liber.*,
    23 F. Supp. 2d 439 (S.D.N.Y. 1998)........................................................................16

*Nuance Commc'ns, Inc. v. Int'l Bus. Machs. Corp.*,
    No. 16-CV-5173 (KMK), 2019 WL 2006180 (S.D.N.Y. May 7, 2019) ..............1, 4

*O'Shanter Res., Inc. v. Niagara Mohawk Power Corp.*,
    915 F. Supp. 560 (W.D.N.Y. 1996) .........................................................................13

*Stalis v. Sugar Creek Stores, Inc.*,
    744 N.Y.S.2d 586 (N.Y. App. Div. 4th Dep't 2002) ..............................................15

*Stanford Square, L.L.C. v. Nomura Asset Cap. Corp.*,
    228 F. Supp. 2d 293 (S.D.N.Y. 2002)......................................................................13

## PRELIMINARY STATEMENT

IBM concedes that Section 7.9 of the Software License Agreement ("SLA") "**require[s] actual knowledge**" and that "a party is not barred from bringing a claim for breach of the SLA unless it had actual knowledge of the breach more than two years before filing the claim."  IBM Supp'l Brief (ECF No. 265) (the "IBM Brief") at 2 (emphasis added).  This is consistent with what the Court ruled in denying IBM's motion for summary judgment on its statute of limitation defense. *Nuance Commc'ns, Inc. v. Int'l Bus. Machs. Corp.*, No. 16-CV-5173 (KMK), 2019 WL 2006180, at *8 (S.D.N.Y. May 7, 2019) ("[A]lthough Nuance did have serious questions as to whether IBM was providing Nuance with DeepQA updates from IBM Software prior to January 2015, its suspicions were not confirmed until sometime in 2015, in part because it received assurances from IBM that it was receiving all updates," and therefore "a reasonable jury could conclude . . . that Nuance did not 'obtain knowledge' until sometime in 2015 that it was not receiving, and would not receive, DeepQA updates developed outside [IBM Research]").

Under this agreed standard, IBM's statute of limitations defense fails.  There is simply no evidence that Nuance knew IBM was withholding Updates until 2015, putting Nuance's complaint squarely within the two-year filing period.  IBM cannot identify a single document whereby IBM relayed that it was withholding Updates outside of IBM Research, because no such documents exist.  Instead, what IBM presents is, at best, Nuance employees raising suspicions about what IBM was providing to Nuance and Nuance repeatedly seeking—and receiving—assurances from IBM that Nuance was receiving all DeepQA Updates.  In fact, each of the alleged instances of "knowledge" that IBM asserts in its Brief are followed by a subsequent assurance from IBM to Nuance that Nuance was receiving all DeepQA Updates.  IBM simply cannot meet its burden of establishing that Nuance had actual knowledge of IBM's breach.

Moreover, even if IBM's allegations of actual knowledge were accurate—which they are not—the continuing breach doctrine and equitable estoppel would both preserve Nuance's claims. IBM's Updates obligation was continuing in nature, and each failure to provide Updates began the clock anew. All of the products and APIs at issue in this case were released by IBM less than two years before Nuance filed suit. Further, IBM's repeated assurances to Nuance that it would receive all DeepQA Updates should estop IBM from seeking to use the contractual limitations period as IBM lulled Nuance into delay. Therefore, even if Nuance is deemed to have had actual knowledge prior to June 30, 2014, it should still be afforded relief from IBM's breach.

## **THE FACTUAL RECORD**

As detailed fully in Nuance's Supplemental Proposed Findings of Fact and Conclusions of Law (ECF No. 252) ("FOF") and Post-Trial Memorandum (ECF No. 253), once DeepQA gained acclaim by winning *Jeopardy!* in 2011, IBM chose to unilaterally rewrite its SLA with Nuance to withhold all Updates to DeepQA and its functionality created outside of IBM Research from Nuance. Despite IBM's extraordinary efforts to keep meaningful Updates from Nuance, when questioned about the status of DeepQA, IBM repeatedly assured Nuance that it was working on the code, but things take time, and IBM had and would deliver all Updates. FOF ¶¶ 200-11. There is not a single document in the record indicating that IBM relayed to Nuance, prior to 2015, that it was not providing all DeepQA Updates from all of IBM.

Nuance had no way of uncovering on its own whether IBM was withholding DeepQA Updates as Nuance only had access to the source code that IBM provided. *Id.* at ¶¶ 212-13. Further, Nuance obtained industry feedback that IBM was having difficulty advancing DeepQA outside of *Jeopardy!*, which also made Nuance believe it had and was receiving all DeepQA Updates. *Id.* at ¶¶ 214-15. Additionally, starting in January 2013, IBM began using Watson as a broad descriptor in the marketplace, therefore, Nuance was unable to ascertain what, if any,

Watson products had a DeepQA correlation.  *Id.* at ¶ 216.  Moreover, there was no reason to suspect that IBM would not ultimately deliver the work given that the Updates Provision did not require delivery within a set period of time.  *Id.* at ¶ 218.  IBM also told Nuance to expect some delays with delivery as IBM had to first test the Updates to ensure they were compatible with Nuance's environment.  *Id.* at ¶ 217.

It was only in 2015 that IBM's William LaFontaine first informed Nuance's Jeanne McCann that IBM's Watson team was not using the IBM Research code and instead had new DeepQA code that it was not providing to Nuance.  *Id.* at ¶¶ 219-21.  As he noted at the time, Ms. McCann "was surprised to see [that the code bases] were completely separate."  *Id.* at ¶ 220.  Accordingly, Nuance filed suit on June 30, 2016.  *Id.* at ¶ 223.  Section 7.9 of the SLA provides that "[n]either party may bring an action arising out of this Agreement, regardless of form, more than two years after the cause of action has accrued and the party obtained knowledge thereof."  JX001 at JX001.18.  Therefore, Nuance's suit was timely filed within two years of obtaining actual knowledge of IBM's breach.

## **ARGUMENT**

## I.    **Nuance Did Not Obtain Actual Knowledge of IBM's Breach Until 2015**

As IBM concedes, IBM must prove that Nuance had ***actual knowledge*** (1) that IBM was developing DeepQA Updates outside of IBM Research, and (2) that IBM was withholding those Updates from Nuance.  IBM Brief at 1-2.[1]  IBM has not come close to meeting its burden.  Instead,

---

[1] IBM briefly alludes to "conscious avoidance," but does not and cannot suggest that the conscious avoidance standard applies here, because there is not a single shred of evidence that Nuance avoided learning the truth of IBM's breach.  To the contrary, Nuance repeatedly sought and received assurances from IBM that IBM was providing all required Updates to Nuance.  *See* FOF ¶¶ 200-13, 398.  Furthermore, such an argument is illogical, as it would presume that although Nuance paid $25 million to license DeepQA and all Updates and invested millions more in its own work attempting to commercialize DeepQA, Nuance ultimately decided to nullify those investments by consciously avoiding learning of IBM's breach.  *Id.* at ¶¶ 92, 340-41.

as shown below, IBM presents a one-sided, cherry-picked version of the facts that crumbles once the full scope of the evidence presented at the trial is examined.  Actual knowledge does not exist where IBM cites to a selected snippet of evidence, but ignores what happened soon thereafter. What becomes self-evident is that, although Nuance may have had *concerns* or *suspicions* that IBM was withholding certain Updates from Nuance, any such suspicions or concerns were allayed by IBM's assurances and do not bar Nuance's claims, as the Court, and now IBM, have both acknowledged.  IBM Brief at 2 ("It does not suffice that a party *could* have known of the claim.") (emphasis added); *Nuance Commc'ns, Inc.*, 2019 WL 2006180, at *7 (holding that "suspicions, even strong ones," are not the same as obtaining knowledge).

### A.   Awareness of DeepQA Work Being Performed Outside of IBM Research Does Not Impute Actual Knowledge that IBM was Withholding Updates

IBM's reliance on evidence that Nuance knew about IBM's productization work on DeepQA, *see* IBM Brief at 3-5, does not show that Nuance had actual knowledge that IBM was withholding Updates from Nuance.  First, simply creating Updates outside of IBM Research would not have breached the SLA; indeed, as the record established, Nuance expressly negotiated for all DeepQA Updates from all of IBM, and not only IBM Research.  FOF ¶ 62; Deposition of Ellen Cox at 58:7-59:10 (IBM's lawyer who negotiated the SLA admitting that during the SLA negotiations, Nuance's Jeanne McCann wanted DeepQA updates to be "as broad and as long as she could get"); Trial Tr. at 178:4-14 (Helgi Bloom testimony) (testifying that getting updates from all of IBM and not only IBM Research "was among the most important points to us in this negotiation. . . . I mean, that was critical, and I think Jeanne and I both made that point."); *id.* at 178:22-179:6 ("Q.  Do you, as you sit here now, have a specific recollection, like a videotape, of either you or Jeanne saying, our expectation is that updates will come from all of IBM, not only IBM Research Group?  A.  Yes, I said that.  Yes, Jeanne said that.").  Nuance "fully expected the

DeepQA technology to move within IBM, and it was important to [Nuance] that any obligations under the SLA be attached to IBM and not to a division." Trial Tr. at 166:2-11 (Helgi Bloom testimony); *see also* FOF ¶ 63. As such, Nuance not only anticipated that groups outside of IBM Research would work on DeepQA, it was an essential part of Nuance's bargain. Therefore, awareness that IBM was working on DeepQA outside of IBM Research is not awareness of a breach, as, by itself, that conduct is not a breach.

Second, the record evidence also shows that Nuance actually received certain, limited Updates from outside of IBM Research. FOF ¶ 139. For example, while IBM cites an email from Nuance's Jeanne McCann indicating that the IBM Software Group had "done work on 'vanilla' productization of Watson," *see* IBM Brief at 4 (citing DX-87), IBM fails to inform the Court that Ms. McCann and others at Nuance testified that Nuance received those productization updates. Deposition of Jeanne McCann ("McCann Tr.") at 196:12-19 (testifying that IBM "included some items that we would characterize as productization" in its DeepQA Updates), 217:12-21 (testifying that Nuance received productization updates from IBM through when Ms. McCann left Nuance in 2016); Trial Tr. at 131:5-12 (Joseph Petro testimony) (testifying that IBM provided "minimal" productization updates to Nuance). IBM's own expert similarly identified the ESG Parser, which IBM alleged was developed by IBM Software Group, as an example of an Update that Nuance received from IBM. Hicks Rebuttal Decl. ¶ 94; DX-34 ("Enhancements: Improved the ESG Parser"); FOF ¶ 108.

Finally, Nuance could not have known whether the Updates it received from IBM included source code from just IBM Research or other IBM groups. Nuance had no way to "verify what IBM was doing with DeepQA." Petro Decl. ¶ 21; *see also* FOF ¶ 212. It did not have access to IBM's source code (other than what IBM provided with its periodic code drops) and therefore

could not check to see if IBM had developed Updates that it had not provided to Nuance.  FOF ¶ 213.  Further, based on industry feedback, IBM did not appear to have success utilizing DeepQA outside of *Jeopardy!*, so there was no reason to suspect that IBM was developing more than what was being delivered to Nuance.  *Id.* at ¶¶ 214-15.  The extent of IBM's work on DeepQA was also obscured by IBM's practice, beginning in January 2013, of using "Watson" as a broad descriptor in the marketplace, including for things unrelated to DeepQA.  *Id.* at ¶ 216.

Given the above, though Nuance was aware of limited DeepQA work being performed outside of IBM Research, there was no reason for Nuance to suspect that IBM breached the SLA as Nuance believed and was told by IBM it was ultimately receiving all DeepQA Updates.

### B.    IBM's Alleged Examples of Nuance's Actual Knowledge of IBM's Breach are Belied by the Record

IBM makes much hay of assertions from IBM's David McQueeney and Ken King that IBM allegedly informed Nuance in 2011 that IBM was withholding DeepQA Updates from outside of IBM Research.  *See* IBM Brief at 3-4, 6-7.  IBM also points to an email from a lower-level Nuance employee, Mark Fanty, to allege that Nuance had actual knowledge of IBM's breach as early as October 2011.  None of these assertions holds water.

First, IBM relies on Mr. McQueeney's testimony that, during a September 2011 "5 x 5 meeting" between senior executives of IBM and Nuance, IBM's Manoj Saxena allegedly "explicitly reiterated IBM's [view] that Nuance was not entitled to any Modifications developed by SWG."  *See* IBM Brief at 5-7 (citing DX-174 ¶ 17).  IBM glosses over the fact that Mr. McQueeney wrote a contemporaneous summary of that very meeting but failed to mention such an explicit alleged statement by Mr. Saxena in that summary.  JX018; Trial Tr. at 289:7-14 (David McQueeney testimony) (admitting that his contemporaneous summary does not mention the alleged statement); FOF ¶ 348.

Realizing that Mr. McQueeney's claim lacks credibility, IBM attempts to bolster his testimony by incorrectly arguing that Jeanne McCann corroborated it.  *See* IBM Brief at 6-7.  IBM points to a September 20, 2011 email, DX-138, from Jeanne McCann that IBM alleges "makes clear that Mr. McQueeney's recollection of Mr. Saxena's statement was correct," *id.*, but in fact makes no reference to any such alleged statement by Mr. Saxena (nor, for the record, does Mr. Saxena's own email in the same chain make any such reference).  IBM also neglects to mention that Ms. McCann's deposition testimony regarding DX-138 addressed that the "notable pulling back by IBM" in that exhibit was a reference to IBM's work on a completely separate agreement, the Joint Development Agreement ("JDA"), which has no relevance to whether IBM breached the SLA.  McCann Tr. at 160:3-17.

Moreover, as Ms. McCann's deposition testimony also established, though Mr. Saxena had, at some point, "threatened" to cease delivering the "full set of modifications by IBM to the Watson core," at some point in the future, to her knowledge IBM had not breached the contract.  McCann Tr. 159:18-160:2.  She further testified that she and Mr. Ricci "addressed [Mr. Saxena's threat] with Dave McQueeney and Ken King and very clearly said -- and I believe Paul Ricci said this to Manoj Saxena as well, that we believe we are entitled to those [Updates outside of IBM Research] and that that's what the agreement says.  We wanted to remind them of what had been signed."  *Id.* at 166:13-167:14.  IBM also ignores that Nuance's former CEO, Paul Ricci was present at the September 2011 five-by-five meeting, and Mr. Ricci testified that no one at IBM ever told him that IBM was withholding DeepQA Updates from Nuance.  Trial Tr. at 558:5-10, 559:11-20 (Paul Ricci testimony).  Two months later, in November 2011, Nuance believed it now had "all the parts" it needed to "begin to make [the DeepQA system] runnable."  PX60; FOF ¶

201.   Therefore, IBM's assertion that an alleged statement by Mr. Saxena in September 2011 provided Nuance with actual knowledge that IBM was withholding DeepQA Updates falls flat.

Next, IBM pivots to an October 12, 2011 email from Nuance's Mark Fanty to Jeanne McCann indicating that IBM's Murthy Devarakonda "had an eye opening view of the 10 years of updates [under the SLA] that is much worse tha[n] research group v. software group."  IBM Brief at 7-8 (citing DX-84).  IBM fails to address Nuance's follow-up to this October 2011 email, as Ms. McCann testified that she considered Mr. Devarakonda to be a "junior" individual at IBM Research and that, after this email, she went directly to Dave McQueeney who assured her that Nuance was receiving all DeepQA Updates.  McCann Tr. at 155:9-156:8, 160:19-23, 161:12-18 (noting that Mr. Devarakonda "had taken upon himself to determine what kind of enhancements [Nuance] might or might not get in our deliveries" and that Nuance "had to ask Dave McQueeney to intercede").

IBM also relies on testimony from IBM's Mr. McQueeney and Mr. King that they allegedly "told Ms. McCann in 2011 that IBM had erected a firewall between IBM Research and SWG to ensure that Nuance did not and would not obtain rights to SWG's DeepQA-related work under the SLA."  IBM Brief at 5-6, 8.  Noticeably, IBM has left off the month in which this alleged conversation took place.  *Id.*  That is because IBM alleges that this conversation took place in ***August*** 2011, ECF No. 255 at 4, around the time that IBM sought to amend the SLA to replace the definition of "Licensed IBM Background Software" with one that would drastically limit IBM's obligations to deliver Updates to only those from IBM Research.  JX017.  However, both Mr. McQueeney and Mr. King admitted on cross-examination that, several months later, in ***November*** 2011, Ms. McCann reiterated on a call to IBM (which IBM documented contemporaneously) that Nuance expected all DeepQA Updates from all of IBM, even those created by IBM Software

Group.  Trial Tr. at 298:2-24 (David McQueeney); *id.* at 620:21-622:23 (Kenneth King); DX-12; DX-39; FOF ¶¶ 348, 350.  Ms. McCann testified that during this November 2011 call with IBM, she was reinforcing Nuance's belief that it was entitled to Updates created anywhere in IBM, not merely from IBM Research.  McCann Tr. at 174:15-175:1 ("Q.  Okay.  So what point, if you recall, were you trying to reinforce with respect to the contract language during this November 2011 weekly update?  A.  I was trying to reinforce what the contract said about the delivery of updates to the domain-independent core and our expectation that we would receive them.  Q.  That you receive them from the entirety of the company?  Is that the point?  A.  Yes.").

Despite the clear assertions from Ms. McCann to IBM in November 2011 that Nuance was entitled to ***all*** DeepQA Updates, neither Mr. McQueeney nor Mr. King had any recollection of anyone at IBM reaching out to Ms. McCann or to Nuance to clarify IBM's view of the scope of IBM's Updates obligation.  Trial Tr. at 299:14-16 (David McQueeney); *id.* at 624:10-22, 625:14-23 (Kenneth King testimony).  Seeming to understand that the contemporaneously documented November 2011 exchange destroys their litigation narrative about an alleged and undocumented August 2011 conversation, IBM does not even attempt to address the November 2011 exchange in its Brief.  *See generally* IBM Brief.

Similarly, IBM mischaracterizes a note that Ms. McCann drafted in January 2013 as "express written corroboration of Messrs. McQueeney's and King's account of the [August] 2011 conversation."  IBM Brief at 8-9.  There is no evidence that this 2013 note is referring to an alleged conversation from August 2011, nearly two years prior.  Moreover, IBM relegates to a footnote, *id.* at 9 n.2, Ms. McCann's testimony that DX-103 was discussing the Nuance/IBM relationship in the context of a potential second JDA, not in the context of discussing IBM's obligations under the existing SLA.  McCann Tr. at 204:10-205:5.  Further, Ms. McCann's testimony flatly

contradicts any assertion that "IBM told Nuance that it would not receive SWG's work on DeepQA," IBM Brief at 9, because she testified emphatically that Mr. McQueeney had told her no such thing. *See* McCann Tr. at 214:24-215:7 ("Q.  But McQueeney had told you that they were not giving their code to you, hadn't he?  A.  No.  No, he had not.  He had not.  What he said was the IBM Software group was not collaborating -- allowing itself to collaborate with IBM Research.").  Indeed, Ms. McCann explicitly testified that, at the time she wrote DX-103, Nuance was not aware of IBM withholding Updates. *Id.* at 234:12-22.  IBM omits those portions of Ms. McCann's testimony while also failing to mention that just one month later, on February 21, 2013, IBM again assured Nuance that it was providing all Updates under the SLA.  PX084 (IBM indicating in writing to Nuance that "we will deliver Modifications to the Watson code as per the SLA" and quoting the SLA).

Simply put, IBM has no documentary evidence of ever relaying to Nuance that it was withholding DeepQA Updates, despite documented assertions from Nuance to IBM that Nuance believed it was entitled to Updates from all of IBM, not just IBM Research, *see* DX-39, and documentary evidence from IBM that it had or would deliver all Updates, *see* PX54; PX84.  IBM thus resorts to statements by witnesses with hampered credibility to contend that it made statements verbally, despite vociferous denials from Nuance.  *See, e.g.*, McCann Tr. at 214:24-215:7, 234:12-22; Trial Tr. at 558:5-10, 559:11-20 (Paul Ricci testimony); *id.* at 240:4-17 (Helgi Bloom Testimony).  The record is replete with instances of Nuance seeking assurances that it was receiving all DeepQA Updates and IBM providing comfort.  *See, e.g.*, FOF ¶¶ 200-11; Trial Tr. at 521:21-522:19 (Paul Ricci testimony) ("I would bring this up with John [Kelly], with whom I've done $200 million of business over the years, and John would assure me that, no, we were getting everything."); McCann Tr. at 238:19-239:8 (Ms. McCann testifying that she received assurances

from Mr. McQueeney on at least three separate occasions that Nuance was receiving all Updates); *see also id.* at 184:7-19 (Mr. McQueeney told McCann that Nuance's codebase was the same as IBM's core DeepQA codebase and that Nuance was getting the full set of Updates).

This testimony did not just come from the Nuance side – even IBM's witnesses admitted they assured Nuance that it was receiving all Updates.  *See* FOF ¶ 206 (IBM's Mr. McQueeney admitting that it is "certainly possible that in conversations with Ms. McCann[, he] reassured her that IBM was complying with its obligations under the SLA to deliver modifications," and that he "can remember Jeanne on many occasions asking very pointed questions to make sure she was getting all of the updates that she was entitled to, which was a reasonable thing for a person in her position to be doing."); *id.* at ¶ 207 (IBM's Kevin Reardon admitting that, after the parties signed the SLA, he heard some complaints from Nuance that Nuance believed it was not receiving sufficient updates under the SLA, but his recollection is that whenever Nuance raised those complaints, he and Nuance got them sorted out); *id.* at ¶¶ 208-09 (assurances provided by IBM's Mr. Devarakonda); *id.* at ¶ 210 (IBM's Eric Brown admitting he never told Nuance it was not receiving all Updates).  Accordingly, IBM's attempts to paint Nuance with actual knowledge of IBM's breach fail.

### C. The Record Evidence Proves that Nuance Did Not Obtain Actual Knowledge of IBM's Breach Until 2015

Nuance did not obtain actual knowledge that IBM was withholding DeepQA Updates until April 13, 2015, when IBM's William LaFontaine informed Ms. McCann for the first time that a project called Watson Paths "only works with the software group version of Watson and . . . neither it nor the base Watson code were built from the Research code . . . ."  *See* PX 105 at PX105.001; Ricci Decl. ¶ 40.  Three months after Mr. LaFontaine sent that email to Ms. McCann, he wrote in an internal IBM email to John Kelly, ***"It was a surprise to Jeanne when I told her that the Watson***

11

***business is built on code that has no Research content at all.***"  PX108 at PX108.002 (emphasis

added).  Since IBM cannot square Mr. LaFontaine's July 14, 2015 email with its theory of Nuance

having actual knowledge prior to 2015, IBM speculates about possible alternative meanings of Mr.

LaFontaine's email.  *See* IBM Brief at 11.  But the meaning is clear: Nuance did not have actual

knowledge that IBM was withholding DeepQA Updates until April 13, 2015.  *See* FOF ¶¶ 219-22.

Nuance sued less than two years later.

## II. Even if Nuance Had Obtained Actual Knowledge of IBM's Breach Before 2015, Nuance's Claims Would Still Not Be Barred

Even if Nuance had obtained actual knowledge of IBM's breach more than two years

before filing this action, which as discussed above, it did not, Nuance's claims would be preserved

under the continuing breach doctrine and the doctrine of equitable estoppel.

### A. The Continuing Breach Doctrine

Where a contract requires "continuing performance over a period of time, each successive

breach may begin the . . . limitations [period] running anew."  *Guilbert v. Gardner*, 480 F.3d 140,

150 (2d Cir. 2007) (because defendant employer's obligation to contribute $10,000 per year to a

pension under an employment contract was a continuing one, plaintiff's claim for breach of

contract for the failure to make those payments within six years of the filing of the complaint were

timely); *see also Bulova Watch Co. v. Celotex Corp.*, 389 N.E. 2d 130, 132 (N.Y. 1979) (holding

that separate breaches occurred each time defendant failed to meet its obligation to repair a bonded

roof and that plaintiff's "claims arising within six years of the commencement of this suit [were]

timely").  The continuing breach doctrine applies "where there is a series of continuing wrongs

and serves to toll the running of a period of limitations to the date of the commission of the last

wrongful act."  *Henry v. Bank of Am.*, 147 A.D.3d 599, 601 (N.Y. App. Div. 1st Dep't 2017).  "In

contract actions, the doctrine is applied to extend the statute of limitations when the contract

imposes a continuing duty on the breaching party." *Id.*  IBM offers two rationales for why the continuing breach doctrine should not apply, neither of which have any merit.

First, IBM argues that the continuing breach doctrine should not apply because IBM "repudiated" the obligation. *See* IBM Brief at 13-14.  A repudiation under New York law requires "a *clear manifestation of intent* communicated in advance of the time for performance that when the time for performance arrives the required performance will not be rendered." *O'Shanter Res., Inc. v. Niagara Mohawk Power Corp.*, 915 F. Supp. 560, 567 (W.D.N.Y. 1996) (emphasis added). In other words, repudiation occurs "when there is an *overt communication of intention* not to perform." *Id.* (internal quotations omitted) (emphasis added).  For a repudiation to occur, there must be "a definite and final communication of the intention to forego performance." *Stanford Square, L.L.C. v. Nomura Asset Cap. Corp.*, 228 F. Supp. 2d 293, 299-300 (S.D.N.Y. 2002) (quoting *Rachmani Corp. v. 9 East 96th Street Apartment Corp.*, 629 N.Y.S.2d 382, 385 (N.Y. App. Div. 1st Dep't 1995)).  As IBM's cited cases recognize, there can be no finding of repudiation where the defendant did not clearly manifest an intent to completely breach the agreement.  *See, e.g.*, *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 587-88 (2d Cir. 2005) (finding no repudiation based on a failure to make a contractual payment because the defendant made a statement "evinc[ing] a belief that the contract was to remain in place"); *Hosokawa v. Screen Actors Guild-Am., Fed'n of Television & Radio, Artists*, 234 F. Supp. 3d 437, 444 (S.D.N.Y. 2017), *aff'd sub nom. Hosokawa v. New York Local of Screen Actors Guild-Am. Fed'n of Television & Radio Artists*, 745 F. App'x 433 (2d Cir. 2018) (finding no repudiation where "the statements made by [defendant's] representative were neither a final nor unequivocal statement that [plaintiff's] membership would be revoked").  "For a party's action to constitute repudiation, it must 'make it

actually or apparently impossible for [that party] to perform.'" *Aetna Cas.*, 404 F.3d at 588 (citing Restatement (Second) of Contracts § 250 cmt. c (1981)) (alteration in original).

IBM's repudiation defense is unavailing.  Contrary to IBM's assertion that it "told Nuance early and often that it had not and would not give Nuance any of SWG's DeepQA-related work product," IBM Brief at 14, the record shows that IBM did, in fact, provide limited Software Group DeepQA-related work product to Nuance.  *See supra* 4-5.  Further, IBM *never* indicated that it would not perform under the SLA, let alone provide a "definite and final" communication that it would breach.  To the contrary, IBM repeatedly assured Nuance that it *would* perform, including in its February 21, 2013 correspondence where IBM directly quoted the SLA and promised performance in accordance with the SLA's terms.  FOF ¶¶ 202-11; PX84.  As a result, IBM's repudiation argument cannot help it avoid the continuing breach doctrine.

Second, IBM attempts to argue that the continuing breach doctrine does not apply by mischaracterizing IBM's misconduct as a "single breach with continuing consequences, rather than multiple breaches."  IBM Brief at 15.  IBM posits that it made a "single decision not to give Nuance SWG's DeepQA-related work product" and that, therefore, it is one breach and "not a series of separate breaches."  *Id.* at 16.  This argument is equally unavailing.  Here, the SLA calls for continuing performance—delivery of Updates—for a period of ten years.  JX001 at JX001.253. Each failure by IBM to deliver Updates to Nuance as required under the SLA is thus an independent, distinct wrong that starts the limitations period running anew.  *See Affordable Hous. Assocs., Inc. v. Town of Brookhaven*, 13 N.Y.S.3d 876, 878-80 (Sup. Ct. Suffolk Cnty. 2015) (holding that a "new breach occurred for statute-of-limitations purposes each time the Town defendants allegedly failed to make a required monthly payment to the plaintiff").

Unlike the cases IBM cites where a single breach had numerous continuing effects, here, each failure by IBM to provide a new and separate Update constituted a separate breach.  In addition, IBM provided multiple deliveries of DeepQA source code to Nuance.  *See, e.g.*, Petro Decl. ¶ 20; Deposition of Peter Stubley at 167:2-10 (testifying that Nuance received "periodic code drops from IBM").  IBM could have, at any time, provided its DeepQA Updates to Nuance; instead, each successive delivery of source code without Updates constituted a separate breach.  *See Stalis v. Sugar Creek Stores, Inc.*, 744 N.Y.S.2d 586, 587 (N.Y. App. Div. 4th Dep't 2002) (holding that because defendant's obligation was "a continuing one" . . . "the claims for breach of that obligation are not referable exclusively to the day the original wrong was committed") (internal quotations omitted).  Furthermore, IBM released each of the products and APIs that Nuance seeks no earlier than two years before Nuance filed its complaint, *see* FOF ¶ 407, therefore Nuance's claims regarding those items cannot be untimely.  The failure to provide each of them constituted a separate breach.  *See Beller v. William Penn Life Ins. Co. of New York*, 778 N.Y.S.2d 82, 85-86 (N.Y. App. Div. 2d Dep't 2004) (holding that where defendant had a "continuing duty" to "review the cost of insurance rates at least once every five years," plaintiff's damages claim accrued "each time the defendant allegedly breached these obligations" and only claims for damages accruing more than six years prior were time-barred).  Finally, New York courts have recognized that the continuing breach doctrine may be used, even where damages are barred, to provide for equitable or prospective relief.  *See Stalis*, 744 N.Y.S.2d at 587-88.  For the reasons noted above, IBM's argument that only a single breach occurred, rather than multiple breaches, fails.

## B.    Equitable Estoppel

Even if the SLA's two-year limitations period applied in this case, which it does not, Nuance's claims would also be preserved by the doctrine of equitable estoppel.  This doctrine tolls

the statute of limitations "when a party claiming to benefit from the statute carries on in such a way as to lull the other party into delay or misrepresent the situation in such a manner that equity requires tolling of the statute." *Meridien Int'l Bank Ltd. v. Gov't of the Republic of Liber.*, 23 F. Supp. 2d 439, 447 (S.D.N.Y. 1998). Under New York law, equitable estoppel may apply where the plaintiff was "induced by fraud, misrepresentation or deception to refrain from filing a timely action." *Id.* (quoting *Schupak v. Florescue*, No. 92 CIV. 1189 (JFK), 1993 WL 256572, at *5 (S.D.N.Y. July 8, 1993)). Equitable estoppel is appropriate where: "(1) the defendant made a definite misrepresentation of fact, and had reason to believe that the plaintiff would rely on it; and (2) the plaintiff reasonably relied on that misrepresentation to his detriment." *Buttry v. Gen. Signal Corp.*, 68 F.3d 1488, 1493-94 (2d Cir. 1995); *see also Axiom Inv. Advisors, LLC v. Deutsche Bank AG*, 234 F. Supp. 3d 526, 539-40 (S.D.N.Y. 2017) (denying motion to dismiss based on statute of limitations where: (1) defendant failed to disclose practice complained of by plaintiff; (2) defendant's explanations for practice when plaintiff inquired were pretextual and misleading; (3) plaintiff had no way of knowing it was being harmed by defendant's practice; and (4) plaintiff acted with reasonable diligence commencing the lawsuit following news reports illuminating effects of the practice).

Here, IBM knew Nuance expected all Updates to DeepQA and its functionality, not just those developed by IBM Research. *See, e.g.* FOF ¶¶ 32, 52, 62-63, 110-15; JX019; DX-12; DX-39; McCann Tr. at 174:15-175:1. IBM also knew that, since Nuance lacked access to IBM's source code other than what IBM agreed to provide, Nuance had no way of knowing that IBM was withholding Updates. *See, e.g.* FOF ¶¶ 212-13. Nevertheless, when Nuance sought assurances that IBM was delivering all Updates, IBM repeatedly assured Nuance that it was. *See id.* at ¶¶ 200-13. Since Nuance could not verify what Updates IBM made to DeepQA, Nuance relied on

IBM's false assurances.  *See id.* at ¶¶ 214, 216-17.  Nuance's reliance was to its detriment, as the lack of Updates made Nuance unable to commercialize the DeepQA code.  *See id.* at ¶¶ 338-43.

Accordingly, *even if* Nuance is considered to have obtained actual knowledge based on IBM's alleged 2011 assertions that it was withholding DeepQA Updates created outside IBM Research, IBM's subsequent repeated assurances that Nuance would receive all DeepQA Updates, *id.* at ¶¶ 202-11, warrant that equitable estoppel should toll the contractual limitations period. Therefore, contrary to IBM's assertion that equitable estoppel is "illogical in this context," IBM Brief at 16, the doctrine clearly applies as, if Nuance is found to have actual knowledge prior to June 30, 2014, then IBM's repeated assurances that it would ultimately deliver all DeepQA Updates lulled Nuance into delay.

## **CONCLUSION**

For the foregoing reasons, the record proves that Nuance did not obtain the requisite "actual knowledge" of IBM's breach until 2015, and, therefore, SLA Section 7.9 does not bar Nuance's claims.  Moreover, even if Nuance is found to have had actual knowledge prior to June 30, 2014, the continuing breach doctrine and equitable estoppel warrant tolling the contractual limitations period.

Dated:  November 13, 2020
        New York, New York

/s/ David J. Lender
David J. Lender
Jessica L. Falk
Robert W. Taylor
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Tel: 212-310-8000
Fax: 212-310-8007
david.lender@weil.com
jessica.falk@weil.com
robert.taylor@weil.com

/s/ David Greenbaum
David Greenbaum
NUANCE COMMUNICATIONS, INC.

*Attorneys for Plaintiff Nuance
Communications, Inc.*